**MARTORELL LAW APC**
Eduardo Martorell, State Bar No. 240027
EMartorell@Martorell-Law.com
Christopher Rosario, State Bar No. 326436
CRosario@Martorell-Law.com
Evan Miller, State Bar No. 336473
EMiller@Martorell-Law.com
Playa District
6100 Center Drive, Suite 1130
Los Angeles, CA 90045
Telephone: (323) 840-1200
Facsimile: (323) 840-1300

Attorneys for Defendants Ye f/k/a KANYE
OMARI WEST; GETTING OUT OUR
DREAMS, INC.; GETTING OUT OUR
DREAMS II, LLC; YEEZY LLC; YEEZY
SUPPLY LLC; and OX PAHA INC.
f/k/a MASCOTTE HOLDINGS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTIST REVENUE ADVOCATES, LLC,<br><br>        Plaintiff,<br><br>vs.<br><br>KANYE OMARI WEST a/k/a "YE;" *et al.*,<br><br>        Defendants. | Case No.: 2:24-cv-06018 MWC (BFMx)<br><br>Hon. Michelle Williams Court<br><br>**DEFENDANTS YE f/k/a KANYE OMARI WEST; GETTING OUT OUR DREAMS, INC.; GETTING OUT OUR DREAMS II, LLC; YEEZY LLC; YEEZY SUPPLY LLC; and OX PAHA INC.'s NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Date:        February 27, 2026<br>Time:        1:30 p.m.<br>Courtroom: 6A<br><br>Action Filed:        July 17, 2024<br>Fact Disc. Cutoff:  December 15, 2025<br>Trial:        April 20, 2026 |

**MARTORELL LAW APC**
Litigation & Trial Counsel

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MARTORELL LAW APC
Litigation & Trial Counsel

## TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES** ......................................6

**I.    INTRODUCTION**.....................................................................6

**II.   STATEMENT OF FACTS** .....................................................9

**A.   Plaintiff ARA is Comprised of the Artists and Actio Capital LP**...9

**B.   The Artists Created *MSD PT2* in 2018**.........................................9

**C.   DJ Khalil Shared the Sound Recording of MSD PT2 With Nascent 10**

**D.   Since 2018, the Artists Celebrated Ye's Use of MSD PT2** ............10

**E.   Consistent With a Licensing Deal, the Artists were Credited as Contributors to *Hurricane* and *Moon*, and Collected Royalties Related to *Hurricane* and *Moon***...............................................................11

**F.   The Artists Intentionally Delayed Splits Negotiations Until Hurricane and Moon's Release** .............12

**G.   In 2024, The Artists Purportedly Transferred Their Interests in MSD PT2 to ARA** .................................13

**H.   The Artists Were All Parties to Copyright Administration Agreements Providing Exclusive Rights to their Publishers**.........................................13

**III.  LEGAL STANDARD** ..............................................................15

**IV.   ARGUMENT** ...........................................................................15

**A.   ARA Lacks Standing to Bring its Infringement Claim as to the Musical Composition** ...................15

**B.   Until at Least the Filing of This Action, Defendants Held an Implied License to Use the Work in *Hurricane* and *Moon*.** ...............................17

C.    Copyright Infringement ..................................................................19

D.    No Sound Recording Copyright Infringement.............................19

E.    No Musical Composition Infringement Under the Extrinsic Test (Substantial Similarity).....................................................................20

    1.    Plaintiff Cannot Rely on a Lineage Methodology as They Still Must Prove Similarity in Protectable Expression Between *MSD PT2* and *Moon* ............................21

    2.    Plaintiffs Rely on Unprotectable Elements to Claim that *Hurricane* Infringes on *MSD PT2* .....................24

    3.    Moon is Not Substantially Similar to MSD PT2.................27

F.    Plaintiff Cannot Recover Statutory Damages or Attorneys' Fees 28

MARTORELL LAW APC
Litigation & Trial Counsel

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1

## __Table of Authorities__

2
Page(s)

Cases

3

4
*Ambrosetti v. Oregon Cath. Press*,
   151 F.4th 1211 (9th Cir. 2025) ............................................................... 19

5
*Ashton-Tate Corp. v. Ross*,
   916 F.2d 516 (9th Cir. 1990) .................................................................. 22

6

*Asset Marketing Systems, Inc. v. Gagnon*,
7
   542 F.3d 748 (9th Cir. 2008) ....................................................... 16, 17, 18

8
*Bernal v. Paradigm Talent & Literary Agency*,
   788 F. Supp. 2d 1043 (C.D. Cal. 2010) ................................................... 20

9
*Cavalier v. Random House, Inc.*,
10
   297 F.3d 815 (9th Cir. 2002) ........................................... 19, 22, 23, 24

*Celotex Corp v. Catrett*,
11
   477 U.S. 317 (1986) ......................................................................... 13, 14

12
*Corbello v. Valli*,
   974 F.3d 965 (9th Cir. 2020) ........................................................... 19, 20

13
*Effects Associates, Inc. v. Cohen*,
14
   908 F.2d 555 (9th Cir. 1990) .................................................................. 16

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
15
   499 U.S. 340 (1991) ........................................................................... 19, 22

16
*First nat. Bank of Ariz. V. Cities Service Co.*,
   391 U.S. 253 (1968) ................................................................................ 14

17
*Folkens v. Wyland Worldwide, LLC*,
18
   882 F.3d 768 (9th Cir. 2018) .................................................................. 26

19
*Granite Music Corp. v. United Artists Corp.*,
   532 F.2d 718 (9th Cir. 1976) .................................................................. 24

20
*Gray v. Hudson*,
   28 F.4th 87 (9th Cir. 2022) ...................................................... 20, 25, 27

21
*Jackson v. Bank of Haw.*,
22
   902 F.2 1385 (9th Cir. 1990) .................................................................. 14

23
*Jada Toys, Inc. v. Mattel, Inc.*,
   518 F.3d 628 (9th Cir. 2008) .................................................................. 19

24
*Johannsongs-Publishing, Ltd. v. Lovland*,
   No. CV-18-10009-AB(SSx), 2020 WL 2315805 (C.D. Cal. Apr. 3, 2020) ............ 22

25
*John G. Danielson, Inc. v. Winchester-Conant Props, Inc.*,
26
   332 F.3d 26 (1st Cir. 2003) .............................................................. 16, 17

*Matsuchita Elec. Indus. Co. v. Zenith Radio Corp.*,
27
   475 U.S. 574 (1986) ................................................................................ 14

28
*Oddo v. Ries*,
   743 F.2d 630 (9th Cir. 1984) .................................................................. 22

MARTORELL LAW APC

Litigation & Trial Counsel

4

*Reinsdorf v. Skechers U.S.A.*,
  922 F. Supp. 2d 866 (C.D. Cal. 2013) ........................................................22

*Skidmore v. Led Zeppelin*,
  952 F.3d 1051 (9th Cir. 2020) .......................................................24, 25

*Swirsky v. Carey*,
  376 F.3d 841 (9th Cir. 2004) .......................................................Passim

*Tangle, Inc. v. Aritzia, Inc.*,
  125 F.4th 991 (9th Cir. 2025) ......................................................19

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*,
  692 F.3d 1009 (9th Cir. 2012) ......................................................21

*VMG Salsoul, LLC v. Ciccone*,
  824 F.3d 871 (9th Cir. 2016) .......................................................20

*Weissmann v. Freeman*,
  868 F.2d 1313 (2d Cir.) ............................................................22

*Woodland v. Hill*,
  136 F.4th 1199 (9th Cir. 2025) .....................................................19

Statutes

17 U.S.C. § 101 ......................................................................22
17 U.S.C. § 103 ......................................................................21
17 U.S.C. § 201(a) ...................................................................14
17 U.S.C. § 204(a) ...................................................................15
17 U.S.C. § 412 ......................................................................27
17 U.S.C. § 501(b) ...................................................................14

Rules

Fed. R. Civ. P. 1 ....................................................................14
Fed. R. Civ. P. 56(a) ................................................................14

MARTORELL LAW APC
Litigation & Trial Counsel

MARTORELL LAW APC
Litigation & Trial Counsel

## **MEMORANDUM OF POINTS AND AUTHORITIES**

Defendants KANYE OMARI WEST a/k/a YE, GETTING OUT OUR DREAMS, INC. a/k/a G.O.O.D. MUSIC, GETTING OUT OUR DREAMS II, LLC, YEEZY LLC, YEEZY SUPPLY LLC, and OX PAHA INC. f/k/a MASCOTTE HOLDINGS, INC. ("Defendants") respectfully submit this Motion for Summary Judgment ("MSJ").

## I.    **INTRODUCTION**

This matter concerns Defendants' alleged infringement of the sound recording and musical composition *MSD PT2* (the "Work") by the purported incorporation of the Work into the songs *Hurricane*[1] and *Moon*.  (ECF 1 ¶ 1.)  In particular, Plaintiff alleges infringement in the performance of *Hurricane* and *Moon* on: (1) July 19, 2021; (2) July 22, 2021; and, August 26, 2021; and, (4) the alleged use of the Work on the album-versions of *Hurricane* and *Moon*, released on August 29, 2021. (*Id.* ¶¶ 46-47, 49, 51.)  However, *Hurricane* and *Moon* evolved significantly before release.[2]  The Work was created by Khalil Abdul Rahman, Sam Barsh, Dan Seeff, and Josh Mease ("Artists").  (*Id.* ¶¶ 31, 37.)  The Artists and a "series" of Actio Capital, LP are the members of Plaintiff Artist Revenue Advocates, LLC ("Plaintiff" or "ARA").

When the Work was completed in March 2018, the Artists were joint authors of the musical composition and Mr. Rahman was the sole owner of the sound recording.  According to their usual practice, Mr. Rahman shopped the Work to several music producers, including a producer named Nascent.  Nascent shared the Work with at least two artists, one of them being Defendant Ye.

---

[1] Prior iterations of *Hurricane* were carried the title *80 Degrees*.  The titles are thematically linked in that a hurricane can only form when temperatures reach 80 degrees Fahrenheit.

[2] Plaintiff's musicologist concedes that the sound recording of *MSD PT2* was never present in *Moon* and that the July 19, 2021, version of *Hurricane* was the last version to contain the sound recording of *MSD PT2*.  Thus, the remaining alleged infringements are: (1) substantial similarity between the musical compositions of *MSD PT2* and the album-version of *Moon* and the July 19, July 22, and August 26, 2021, performances; (2) substantial similarity between the musical composition of the album-version of *Hurricane* and in the July 19, July 22, and August 26, 2021, performances; and, (3) the sound recording in *Hurricane* in the July 19, 2021, performance.

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

By the end of 2018, Nascent confirmed that Ye chose to use the Work; and, Nascent forwarded to Mr. Rahman a publicly-posted demo of *Hurricane*. The Artists publicly celebrated Ye's decision to use the Work, even sharing the demo themselves. Unfortunately, however, Defendants scrapped the *Yandhi* album planned for 2018, and *Hurricane* was not immediately released.

In 2020, Jamal Guinn p/k/a BoogzDaBeast ("Boogz"), a producer that works with Ye, contacted Mr. Rahman to "clear" the Work for Defendants' upcoming album, *Donda*. "Clearance" includes the process of negotiating compensation, such as royalty splits and money advances. The Artists were again excited and celebrated the renewed collaboration with Ye.

During this time, the Artists and their representatives watched Defendants pour vast amounts of time and money into the development of *Hurricane* and *Moon*. They applauded the inclusion of superstars like The Weeknd and Lil Baby. They were gleeful when Defendants released a music video for *Hurricane*. And, the Artists happily tuned into Ye's "listening parties," where Ye performed both *Hurricane* and *Moon* on multiple occasions. In fact, rather than considering Defendants' use of the Work to be infringement, the Artists expressed disappointment when the sound recording was removed from *Hurricane*.

At *no* point during this time did the Artists suggest that Defendants did not have the right to use the Work in *Hurricane* and *Moon*. Instead, as is customary in the urban music industry, the Artists and Defendants negotiated royalty splits through release. However, as internal texts show, the Artists and their representatives conspired to avoid finalizing splits before *Donda's* release, so that they could maximize their negotiating power by claiming infringement after the release of *Hurricane* and *Moon*.

*Donda*, including *Hurricane* and *Moon*, was released on August 29, 2021. At least 17 individuals, including the Artists and Ye, are credited with contributing to *Hurricane*. At least 9 individuals, including the Artists and Ye, are credited with contributing to *Moon*.

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

MARTORELL LAW APC
Litigation & Trial Counsel

Following the official release of *Donda*, the Artists have reaped the benefits of contributing to *Hurricane* and *Moon*.  The Artists were interviewed by various outlets, received Grammys, and even collected royalties at the rates that they themselves chose to register.  Pursuant to written agreements, Mr. Rahman collected writer-side royalties through his publishers Universal Music Corp. and Songs of Universal, Inc. (collectively, "UMPG"); and, Mr. Barsh and Mr. Seeff collected writer-side royalties through their publisher HH Music, LLC ("HH Music"), which was itself administered by PEN Music Group Inc. ("PEN Music").  Further, pursuant to an oral and implied agreement, Mr. Mease also collected writer-side royalties through PEN Music.  The Artists' manager, Greg Johnson, owns HH Music.  Michael Eames co-owns and runs PEN Music.

However, once the album released and in furtherance of their plan, the Artists refused to finalize their splits at reasonable industry-standard rates.  As the negotiations dragged on, the Artists increased their demands, but <u>never</u> told Defendants to stop using the Work, *Hurricane*, or *Moon*.

Then, in 2024, the Artists registered the Work with the U.S. Copyright Office and attempted to transfer their rights to ARA.  However, that purported transfer of the musical composition failed because: (1) as Plaintiff's concede, UMPG and not Mr. Rahman, had the exclusive right to enter agreements concerning Mr. Rahman's musical composition rights;[3] (2) as stated in written agreements, PEN Music and not Mr. Barsh, Mr. Seeff, or HH Music, held the exclusive right to transfer Mr. Barsh and Mr. Seef's musical composition rights; and, (3) pursuant to oral and implied agreements, PEN Music and not Mr. Mease held the exclusive right to transfer Mr.

---

[3] Plaintiff produced conflicting and materially different versions of the transfer documents that carry **the same bates numbers**.  Although they attempt to waive off the fabrication as a mere "scrivener's error", the Artists only signed one of these documents and are therefore committed to the position that they attempted to acquire the musical composition rights belonging to Mr. Rahman.  *Compare* Martorell Decl. Ex. 12 at ARA000099 (Exhibit A: Copyright Assignment Agreement) (listing Mr. Rahman as transferring the musical composition, Pau4-220-628) *with id.* Exh. 15 at ARA000099 (Exhibit A: Copyright Assignment Agreement) (omitting Mr. Rahman from the transfer of the musical composition, Pau4-220-628).

MARTORELL LAW APC

Litigation & Trial Counsel

Mease's musical composition rights.  Despite being the only true holders of such rights, neither UMPG nor PEN Music executed a written instrument transferring the musical composition rights to ARA.

Finally, on July 17, 2024, Plaintiff filed this suit against Defendants alleging copyright infringement.  For the first time ever, the implied license to use the Work granted to Defendants by the Artists' conduct since 2018 was apparently revoked.

Therefore, the Court should grant Defendants' Motion for Summary Judgment on the following grounds: (1) ARA lacks standing to bring a suit based upon the musical composition of *MSD PT2*; (2) Defendants held a revocable, non-exclusive, implied license to use the sound recording and musical composition *MSD PT2* from at least 2018 to July 17, 2024; (3) the sound recording does not appear in *Moon*; (4) the sound recording does not appear in *Hurricane* after July 19, 2021; and (5) neither *Hurricane* nor *Moon* are substantially similar to *MSD PT2*.

## II.   STATEMENT OF FACTS

### A. Plaintiff ARA is Comprised of the Artists and Actio Capital LP

Plaintiff ARA is a Delaware limited liability company.  Statement of Undisputed Facts, filed herewith ("Fact" or "Facts")), 1.  The sole Class A member of ARA is a "series" of Actio Capital LP, a Delaware limited partnership.  *See* Fact 2. Khalil Abdul Rahman, Sam Barsh, Dan Seeff, and Josh Mease (collectively, "Artists") are ARA's Class B Members.  *See* Fact 3.  The Artists joined ARA in 2024 to shield their names from the public while conducting this lawsuit.  *See* Fact 4.

### B. The Artists Created *MSD PT2* in 2018

Over the years, the Artists collaborated on hundreds, if not thousands, of recorded jam sessions.  *See* Fact 5.

On March 14, 2018, the Artists collectively created the MSD PT2 musical composition during a jam session at Mr. Rahman's studio.  *See* Fact 6.  By March 20, 2018, Mr. Rahman created the MSD PT2 sound recording following the jam session. *See* Fact 7.

The Work was intended to form the basis or inspiration of a completed record, like *Hurricane* and *Moon*. *See* Fact 8. Plaintiff described the Work "as **a rhythmic and melodic foundation** that supports certain lyrics and flow" with a "melody [that] has a catchy hook with a smooth, urban vibe that's both nostalgic and futuristic, **creating a perfect musical canvas.**" Fact 8.

The Artists likewise acknowledged that the Work was created to be the basis or inspiration for other works. When referring to the Work, the Artists stated:

- they sometimes referred to MSD PT2 as a "sample," "as shorthand to describe what we were doing, because there's a practice in the type of music we make of creating pieces of music that are used the same way that a sample is used, but its not technically a sample," Fact 9;

- the intention was "[t]o create a piece of music . . . as a – you know, an inspirational tool, something that inspired people to maybe do something with it, whether it's me or someone else," Fact 10; and,

- "I wanted what we created to be . . . used on a record. Either the actual recording of what we made or the composition. . . that we made," Fact 11.

## C. DJ Khalil Shared the Sound Recording of MSD PT2 With Nascent

As was customary among the Artists, Mr. Rahman was responsible for shopping the Work. *See* Fact 12. On a 1-to-2-month basis, Mr. Rahman would send folders of works, which he called "ideas," to a group of 3-5 producers including Nascent. *See* Fact 13.

On March 20, 2018, Mr. Rahman sent a Dropbox folder containing about a dozen compositions (including the Work) to Nascent. Fact 14. The Work was also sent to an unknown number of other producers. *See* Fact 15.

## D. Since 2018, the Artists Celebrated Ye's Use of MSD PT2

On September 14, 2018, Nascent texted to Mr. Rahman a link leading to Ye's Instagram post containing an early demo of Hurricane. *See* Fact 16. Mr. Rahman was not upset that Defendants used the Work; instead Mr. Rahman told Nascent that the

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

demo "Sounds dope!"  *See* Fact 17.  In fact, Mr. Rahman was happy that the Work had been "placed," and Mr. Rahman even sent more samples to Nascent to offer Ye.  *See* Fact 18.

Since then, the Artists were aware that Ye used MSD PT2 as a sample in demo-versions of *Hurricane* (and its predecessor *80 Degrees*).  Fact 19.  In fact, the Artists publicly celebrated Ye's use of the Work demonstrating their assent to his use of the Work:

- on September 19, 2018, Mr. Barsh shared on Instagram a video containing a demo of *Hurricane*, *see* Fact 20;

- On September 21, 2018, Mr. Mease shared on Instagram a video containing a demo of *Hurricane*, *see* Fact 21;

- On August 29, 2021, Mr. Seeff shared on Instagram a video containing the album-version of *Hurricane*, *see* Fact 22;

- On August 20 and November 23, 2021, and January 5, 2022, Mr. Seeff made Instagram posts celebrating his involvement with *Donda*, *see* Fact 23; and,

- On September 2, 2021, and April 3, 2022, Mr. Rahman made Instagram posts celebrating his involvement with *Hurricane* and *Donda*, *see* Fact 24.

The Artists were happy that the Work was placed with Ye, because a placement can lead to advances, royalties, better reputations, and more opportunities. *See* Fact 25.

**E. Consistent With a Licensing Deal, the Artists were Credited as Contributors to *Hurricane* and *Moon*, and Collected Royalties Related to *Hurricane* and *Moon***

Plaintiff concedes that "Defendants … credited the Artists as songwriters and producers on both *Hurricane* and *Moon*." Fact 26.

By virtue of *Hurricane* receiving "a Grammy Award for the Best Melodic Rap Performance and Best Rap Song," ECF 1 ¶ 6, the Artists also received Grammy Awards.  *See* Fact 27.

MARTORELL LAW APC

Litigation & Trial Counsel

Finally, each of the Artists have collected royalties related to *Hurricane* and *Moon*. *See* Fact 28.

## F. The Artists Intentionally Delayed Splits Negotiations Until Hurricane and Moon's Release

On July 29, 2020, over one year before the release of *Donda*, Jamal Guinn p/k/a BoogzDaBeast ("Boogz"), a producer who works with Ye, texted Mr. Rahman:

> Khalil…what's good bro. Hope all has been well. I'm reaching on behalf of Kanye in regard to the record "Hurricanes" (tentatively titled). It contains a composition of yours and we're starting the pre-clearances for his upcoming album. Can give me a ring @ . . .

Fact 29. Twelve days later, Boogz asked Mr. Rahman for his lawyer's information "to start clearing the record". *Id.* Mr. Rahman obliged, and sent Boogz the contact information for his attorney Debra Wise. *See* Fact 30.

At **_no_** point did the Artists object to Defendants' use of the Work. *See* Fact 31. Indeed, until the filing of this lawsuit, no person, representative, or entity had **_ever_** told Defendants to stop using the Work. Instead, the Artists intentionally avoided finalizing splits with Defendants. In fact, on August 22, 2021, Mr. Barsh and Mr. Eames exchanged the following messages:

> [Mr. Eames:] Greg's been dealing with splits – Its been challenging for sure. They initially didn't want to give more than 10%
>
> . . .
>
> [Mr. Eames:] We Know that they've already filmed a video for the song and it's the one with The Weeknd on it and everyone loves it.
>
> [Mr. Barsh:] And it has been leaked many times for 3 years, so they don't really have any negotiating power. **But hopefully it won't be settled before it officially releases then they'll have absolutely no power.**
>
> [Mr. Eames:] **Yeah, that's why Greg and I let it sit when no one is calling…we just want the record out**

Fact 32. However, as explained by Mr. Eames (the Artists' copyright administrator), it is the industry standard in urban music that splits are not settled before the release

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

MARTORELL LAW APC
Litigation & Trial Counsel

1  of a record.  *See* Fact 33.

2  **G. In 2024, The Artists Purportedly Transferred Their Interests in MSD**
3  **PT2 to ARA**

4  On or about July 17, 2024, the Artists and ARA executed a Copyright
5  Assignment Agreement.  *See* Fact 34.  The agreement purportedly transferred Mr.
6  Rahman's rights in the sound recording of *MSD PT2* and Mr. Barsh, Mr. Seeff, and
7  Mr. Mease's rights in the musical composition of *MSD PT2*.  *See id.* at ARA000099
8  (table defining "Assigned Copyrights").

9  However, PEN Music did not execute the Copyright Assignment Agreement,
10 *see* Fact 35, or any other written instrument that would have altered its agreements
11 with HH Music or Mr. Mease as it relates to PEN Music's administration of *MSD PT2*
12 on behalf of Mr. Barsh, Mr. Seeff, and Mr. Mease.  *See* Fact 36.

13 **H. The Artists Were All Parties to Copyright Administration Agreements**
14 **Providing Exclusive Rights to their Publishers**

15 **1.  Mr. Rahman's Written Agreement With UMPG**

16 On or about March 1, 2012, Mr. Rahman and Universal Music Publishing Group
17 ("UMPG") entered an Administration Agreement.  *See* Fact 37.  This agreement was
18 extended several times and continues to the present.  *See* Fact 38.

19 The Administration Agreement governs "all musical compositions to the extent
20 written, controlled and/or acquired, prior to and/or during the Term," Fact 39, and
21 grants UMPG the "**sole and exclusive right**" to "[l]icense, and cause others to license,
22 the exploitation of the Compositions," "[a]dminister and grant rights in the
23 Compositions and administer the copyrights therein," "[c]ollect all monies earned
24 during the Term and the Retention Period, with respect to the Compositions," and "to
25 prosecute, defend, settle and compromise all suits and actions respecting the
26 Compositions…." Fact 40.

27 **2.  Mr. Seeff and Mr. Barsh's Written Agreements with HHMusic,**
28 **LLC; and, HH Music, LLC's Written Agreement with PEN Music**

MARTORELL LAW APC
Litigation & Trial Counsel

On or about December 14, 2012, Mr. Seeff and HH Music entered a Publishing Administration Agreement. *See* Fact 41. This agreement governed MSD PT2. *See* Fact 42.

On or about September 10, 2014, Mr. Barsh and HH Music entered a Publishing Administration Agreement. Fact 44. This agreement governed MSD PT2. *See* Fact 45.

During the term of both agreements, HH Music was granted "the exclusive right to administer and exploit the Compositions throughout the world; to print, publish, sell, use and licenses the performance and use the Compositions throughout the world; and to execute in the Publisher's name any licenses and agreements affecting the Compositions." *See* Fact 46.

On or about July 1, 2015, HH Music and PEN Music Group, Inc. ("PEN Music") entered an Administration Agreement. Fact 47. Under the agreement, PEN Music "shall have the **sole and exclusive right**" and "to administer and license the use of the Compositions throughout the world, and **to execute** in its own name or that of Company, **any and all licenses and agreements whatsoever affecting or respecting the Compositions**." Fact 48. "This Agreement sets forth the entire understanding between the parties, and cannot be changed, modified or cancelled except by an instrument signed by all parties hereto." Fact 49. This agreement remains in effect. Fact 50.

### 3. Mr. Mease's Oral and Implied Agreement with PEN Music

Rather than using HH Music as an intermediary, Mr. Mease and PEN Music entered an oral agreement concerning the administration of MSD PT2. *See* Fact 51. Pursuant to their agreement, PEN Music:

- received income on Mr. Mease's behalf related to *Hurricane* and *Moon*, $24,880.01, which is still held by PEN Music;
- had the right to license MSD PT2 on Mr. Mease's behalf; and,
- had the right to administer MSD PT2 on Mr. Mease's behalf.

MARTORELL LAW APC
Litigation & Trial Counsel

1    Fact 52.  Indeed, PEN Music's oral agreement with Mr. Mease was intended to match

2    its written agreements with Mr. Barsh, Mr. Seeff, HH Music.  *See* Fact 53.

3    **III.    LEGAL STANDARD**

4        "Summary judgment procedure is properly regarded … as an integral part of the

5    Federal Rules as a whole, which are designed 'to secure the just, speedy and

6    inexpensive determination of every action.'"  *Celotex Corp v. Catrett*, 477 U.S. 317,

7    327 (1986) (quoting Fed. R. Civ. P. 1).  Summary judgment is appropriate if "there is

8    no genuine dispute as to any material fact and the movant is entitled to judgment as a

9    matter of law." Fed. R. Civ. P. 56(a).  Once the movant shows that summary judgment

10   is appropriate, the burden shifts to the nonmoving party to establish genuine issues of

11   material facts.  *Celotex*, 477 U.S. at 324; *Jackson v. Bank of Haw.*, 902 F.2 1385, 1389

12   (9th Cir. 1990) ("The non-moving party may not oppose summary judgment by

13   allegations but must show specific trial-worthy facts").  Where the record "as a whole

14   could not lead a rational trier of fact to find for the nonmoving party, there is no

15   'genuine issue for trial.'"  *Matsuchita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

16   574, 587 (1986) (quoting *First nat. Bank of Ariz. V. Cities Service Co.*, 391 U.S. 253,

17   289 (1968)).

18   **IV.    ARGUMENT**

19       **A. ARA Lacks Standing to Bring its Infringement Claim as to the Musical**

20           **Composition**

21       The Court should grant summary judgment as to the musical composition

22   infringement claim for *MSD PT2* because Plaintiff does not possess rights to *MSD*

23   *PT2*.  *See* 17 U.S.C. § 501(b) (only "[t]he legal or beneficial owner of an exclusive

24   right under copyright is entitled, . . . to institute an action for any infringement of that

25   particular right committed while he or she is the owner of it.").

26       Upon the completion of *MSD PT2*, the Artists were equal one-fourth co-owners

27   of the musical composition in the Work.  *See* 17 U.S.C. § 201(a) ("The authors of a

28   joint work are coowners of copyright in the work."); Fact 6.  To facilitate the transfer

MARTORELL LAW APC

Litigation & Trial Counsel

of the musical composition, the Artists and ARA executed a Copyright Assignment Agreement. *See* Fact 34. However, for the following reasons, the Copyright Assignment Agreement did not transfer the musical composition rights to ARA.

First, the Copyright Assignment Agreement does not purport to transfer any portion of the musical composition belonging to Mr. Rahman. *See* Fact 34 (Martorell Decl. Exh. 12 at ARA000099 (in the table defining "Assigned Copyrights," omitting Mr. Rahman from the "Listed Claimant[s]" transferring the sound recording under Registration Number Pau4-220-628)); 17 U.S.C. § 204(a) ("A transfer of copyright ownership. . . is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing signed by the owner of the rights conveyed or such owner's duly authorized agent.").

Second, Messrs. Seeff and Barsh's interest in the musical composition was not transferred to ARA by the Copyright Assignment Agreement because their written agreement with PEN Music granted the **exclusive** rights for *MSD PT2* to PEN Music. *See* Facts 41-48; 17 U.S.C. § 204(a). The agreement with PEN Music "cannot be changed, modified or cancelled except by an instrument signed by all parties hereto." Fact 49. And, Mr. Eames testified that no writing existed that would waive PEN Music's exclusive rights to *MSD PT2*. *See* Fact 35. Furthermore, PEN Music did not execute the Copyright Administration Agreement. *See* Fact 36.

Finally, Mr. Mease's interest in the musical composition was not transferred to ARA by the Copyright Assignment Agreement because oral and implied agreements granted his **exclusive** rights for *MSD PT2* to PEN Music. *See* Facts 51-53; 17 U.S.C. § 204(a). Mr. Eames, testifying on behalf of PEN Music stated that, pursuant to its agreement with Mr. Mease, PEN Music had the right to administer and license the Work, and had received on Mr. Mease's behalf a total of $24,880.01 in royalties related to *Hurricane* and *Moon*. *See* Fact 52.

Therefore, the Court should grant summary judgment against Plaintiff and in favor of Defendants as to the musical composition infringement claim because ARA

MARTORELL LAW APC
Litigation & Trial Counsel

1  failed to acquire any rights to the musical composition and lacks standing to bring that
2  claim.  *See* 17 U.S.C. §§ 204(a), 501(b).

3  **B.  Until at Least the Filing of This Action, Defendants Held an Implied**
4  **License to Use the Work in *Hurricane* and *Moon*.**

5  The Court should grant Summary Judgment against Plaintiff and in favor of
6  Defendants because Defendants held a nonexclusive, implied license to use *MSD PT2*
7  in *Hurricane* and *Moon*.   The implied license is irrevocable because the Artists
8  received consideration in the form of royalties.  Alternatively, the Court should grant
9  partial summary judgment in favor of Defendants as to all alleged infringements
10  predating the July 17, 2024 Complaint, because that is the first time Plaintiff or the
11  Artists attempted to rescind Defendants' implied license.

12  In the Ninth Circuit, absent a written or oral license, a nonexclusive implied
13  license to use copyrighted material may arise by conduct.  *See Effects Associates, Inc.*
14  *v. Cohen*, 908 F.2d 555 at 558-559 (9th Cir. 1990); *Asset Marketing Systems, Inc. v.*
15  *Gagnon*, 542 F.3d 748, 754-757 (9th Cir. 2008).   An implied license, supported by
16  consideration, is a contract and irrevocable.  *See Asset Marketing Systems, Inc.*, 542
17  F.3d at 757.  In *Asset Marketing Systems, Inc.*, the Court considered the following three
18  factors:

19  (1) Whether the parties were engaged in a short-term discrete transaction
20  as opposed to an ongoing relationship; (2) whether the creator utilized
    written contracts … providing that copyrighted materials could only be
21  used with the creator's future involvement or express permission; and (3)
22  whether the creator's conduct during the creation or delivery of the
    copyrighted material indicated that use of the material without the
23  creator's involvement or consent was permissible.

24  *Asset Marketing Systems, Inc.*, 542 F.3d at 756 (quoting *John G. Danielson, Inc. v.*
25  *Winchester-Conant Props, Inc.*, 332 F.3d 26, 41 (1st Cir. 2003)).

26  There, the Court found an implied license based upon the following
27  circumstances.  First, the relationship did not indicate an intent to grant or deny an
28  implied license where, during an ongoing relationship, the creator provided technical

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

MARTORELL LAW APC
Litigation & Trial Counsel

support for all computer-related problems and created certain custom software applications at the licensee's request. *See Asset Marketing Systems, Inc.*, 542 F.3d at 756. Second, executed written contracts among the parties did not suggest that future licensing would be necessary. *See id.* at 756-757. The Court noted that the "custom software is far less valuable without the ability to modify" and the programs would "become unusable" after the service agreement expired. *Id.* Finally, the creator "delivered the software without caveats or limitations" on the licensee's use of the programs, and licensing was not discussed until their relationship was ending. *Id.* at 757.

However, "implied licenses arise in a wide variety of circumstances, . . . for which the elements of an implied license defense will be different." *See* Comment, Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit (2025 Ed.) § 17.25.

Here, the *Asset Marketing* factors demonstrate that the Artists granted Defendants an implied license to use *MSD PT2* in *Hurricane* an *Moon*. First, the intended short-term nature of the relationship militates in favor of an implied license. *See John G. Danielson, Inc.*, 322 F.3d at 42 ("If an architect worked on a short-term assignment with no outward signs of expecting to continue involvement with the larger project, and handed over the requested plans to a client without a contract or other limitations, it would not matter if he or she harbored private hopes of working on the next phase of the project."). The Artists delivered the Work to Nascent with the hopes that *MSD PT2* would be used in a record by an artist, but the Artists did not mind who would ultimately used the Work. *See* Facts 14-15.

Second, the Artists did not distribute the Work to various artists and producers under written contracts that provided that copyrighted materials could only be used with the creator's future involvement or express permission. Instead, when Nascent informed the Artists that Ye had chosen to use the Work by forwarding an already-prepared demo of *Hurricane*, the Artists objectively embraced and celebrated the

MARTORELL LAW APC

Litigation & Trial Counsel

development by reposting the demo and lauding their contribution to *Hurricane*, *Moon*, and *Donda*. *See* Facts 19-24. Thus, the second and third factors demonstrate the intent to grant an implied license.

Finally, the Artists have been compensated for the contribution of *MSD PT2* to Defendants through their crediting on *Hurricane* and *Moon*, *see* Fact 26, and their collection of royalties related to *Hurricane* and *Moon*, *see* Fact 28. Thus, the implied license is irrevocable. *See See Asset Marketing Systems, Inc.*, 542 F.3d at 757.

Therefore, based on the objective conduct of the Artists, the Court should find that Defendants hold an irrevocable, implied license to the Work's use in *Hurricane* and *Moon*. Based thereon, Defendants respectfully request that the Court should grant summary judgment in favor of Defendants and against Plaintiff. Alternatively, if the Court finds that the implied license is revocable, then the Court should grant partial summary judgment as to all alleged infringement predating the Complaint, because the first time Plaintiff or the Artists explicitly manifested an intent to rescind the implied license was when they filed this action.

### C.     Copyright Infringement

As discussed above, there is no copyright infringement for the demo versions of Hurricane that sample MSD PT2 because of the implied licenses granted to Defendants. There is also no copyright infringement for the final released versions of Hurricane and Moon.

### D.     No Sound Recording Copyright Infringement

To the extent Plaintiff alleges infringement of their sound recording, that claim fails because they have already conceded that the sound recordings for the released versions of *Hurricane* and *Moon* do <u>not</u> contain *MSD PT2*. Facts 54-56 ("HURRICANE21 does not appear to contain a sample of the Sound Recording (SR) of MSD18."), 57 ("Moon is a composition that interpolates, but does not audio-sample, sections of MSD18.").

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**E.    No Musical Composition Infringement Under the Extrinsic Test (Substantial Similarity)**

Plaintiffs' musical composition copyright claims fail because Plaintiff cannot raise a genuine dispute as to unlawful appropriation, *i.e.*, whether the similarities between the songs are based in protected expression.

"The mere fact that a work is copyrighted does not mean that every element of the work may be protected.  Originality remains the *sine qua non* of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991).

"To show unlawful appropriation, the plaintiff must prove that the defendant copied enough of the protected expression in the work to render the two works substantially similar." *Woodland v. Hill*, 136 F.4th 1199, 1206 (9th Cir. 2025).  The Ninth Circuit applies a two-part test for substantial similarity: the extrinsic test and the intrinsic test.  *Ambrosetti v. Oregon Cath. Press*, 151 F.4th 1211, 1223 (9th Cir. 2025).  The intrinsic test evaluates "similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 637 (9th Cir. 2008).  "The extrinsic test considers whether two works share a similarity of ideas and expression as measured by external, objective criteria." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004).  "The extrinsic test requires analytical dissection of a work and expert testimony." *Id.* "'Analytical dissection' requires breaking the works down into their constituent elements, and comparing those elements for proof of copying as measured by 'substantial similarity.'" *Id.*  "Because the requirement is one of substantial similarity to *protected* elements of the copyrighted work, it is essential to distinguish between the protected and unprotected material in a plaintiff's work." *Id.* (emphasis in original).  "[W]hen applying the extrinsic test, a court must filter out and disregard the non-protectible elements in making its substantial similarity determination."

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

MARTORELL LAW APC
Litigation & Trial Counsel

*Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002).

"Only if the extrinsic analysis succeeds does the so-called 'intrinsic' analysis takes place." *Corbello v. Valli*, 974 F.3d 965, 974 (9th Cir. 2020).  "Courts apply only the extrinsic test at summary judgment." *Ambrosetti*, 151 F.4th at 1224.  "The extrinsic test thus serves to screen out objectively meritless claims, so courts can apply it as a matter of law." *Tangle, Inc. v. Aritzia, Inc.*, 125 F.4th 991, 997 (9th Cir. 2025).

"[T]he extrinsic test is objective and is often resolved as a matter of law." *Gray v. Hudson*, 28 F.4th 87, 97 (9th Cir. 2022).  "[T]he Ninth Circuit has frequently affirmed summary judgment on the issue of substantial similarity." *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1060 (C.D. Cal. 2010). This is true even for cases involving dueling musicologists.  *See, e.g.*, *VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871, 878-79 (9th Cir. 2016) (summary judgment affirmed where musicologist's claimed similarities between musical works—a quarter-note horn hit and a full measure containing a half-note rest, eighth-note rest, eighth-note horn hit, and quarter-note horn hit—were unprotectable).

"The extrinsic test requires a three-step analysis: (1) the plaintiff identifies similarities between the copyrighted work and the accused work; (2) of those similarities, the court disregards any that are based on unprotectable material or authorized use; and (3) the court must determine the scope of protection ('thick' or 'thin') to which the remainder is entitled 'as a whole.'" *Corbello v. Valli*, 974 F.3d 965, 974 (9th Cir. 2020).  The burden is on the plaintiff to identify the similarities for this analysis. *Id.*; *Bernal*, 788 F. Supp. 2d at 1060.

## 1. Plaintiff Cannot Rely on a Lineage Methodology as They Still Must Prove Similarity in Protectable Expression Between *MSD PT2* and *Moon*

Plaintiff's expert Bennett relies on specious legal assumptions throughout his report to claim that he can trace the lineage of Plaintiff's Work, *MSD PT2*, through

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

MARTORELL LAW APC
Litigation & Trial Counsel

one or more of the intermediate versions of *Hurricane* (the ones previewed at the listening parties) to the released version of the song, and then onto *Moon*, which he further claims is derivative of *Hurricane*.  Facts 63-68.  In other words, Bennett's logic is essentially that if *Hurricane* is similar to an earlier version of *Hurricane* that allegedly infringes *MSD PT2*, then the released version of *Hurricane* does as well.  Facts 64, 69-70.  As to *Moon*, Bennet draws the link from the released version of Moon back to the released version of *Hurricane* and, separately, to an early demo of *Hurricane*.  Facts 67, 71-72.  Bennet's lineage methodology is an attempt at bootstrapping his analysis of the songs to create the appearance of greater similarity between the songs.  In reality, Bennet is reappropriating Defendants' contributions as a part of the basis for why there is substantial similarity.  This is improper for numerous reasons.

### a. Bennet's Lineage Methodology Relies on Incorrect Legal Assumptions.

Bennett's lineage methodology is based on multiple legal assumptions in his report.  Facts 73-77.  It is his understanding that in a "joint work" the "copyright vests indivisibly in all co-authors."  Fact 73.  Bennet claims "[t]his means that the law does not assign ownership of specific musical elements (e.g., melody, lyrics, harmony) to individual contributors.  All co-authors share equal ownership in the complete musical work unless a written agreement states otherwise."  Bennet assumes that Plaintiffs are joint co-authors in each of the subsequent versions of *Hurricane* based on his view that they are derivative works.  Bennet further applies this assumption to *Moon* given his opinion that it is derivative of *Hurricane*.  Bennett's legal conclusions are incorrect.

First, Bennett's initial assumption, as applied, is incorrect because "a derivative author may own the copyright in material the author contributed to a preexisting work, but not in infringing material *or material the author did not create.*"  *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1016 (9th

MARTORELL LAW APC

Litigation & Trial Counsel

Cir. 2012) (emphasis added); *see* 17 U.S.C. § 103.  Thus, the fact that early demo versions of *Hurricane* contain Plaintiff's material does not give Plaintiff any rights in the material contributed by Defendants.  *Id.*

Second, Bennett's assumption that joint ownership automatically carries into a derivative work is also wrong.  "Joint authorship in a prior work is insufficient to make one a joint author of a derivative work: '[i]f such were the law, it would eviscerate the independent copyright protection that attaches to a derivative work that is wholly independent of the protection afforded the preexisting work.'"  *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 522 (9th Cir. 1990) (*quoting Weissmann v. Freeman,* 868 F.2d 1313 (2d Cir.)).  Indeed, "where the work has been prepared in different versions, each version constitutes a separate work."  17 U.S.C. § 101.

Third, even assuming arguendo that Bennett's understanding is correct, his lineage methodology still could not result in any copyright infringement.  "Co-authors in a joint work cannot be held liable to one another for infringement of the copyright in the joint work."  *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 871 (C.D. Cal. 2013); see *Oddo v. Ries*, 743 F.2d 630, 632–33 (9th Cir. 1984) (same).

### b. Bennett's Lineage Methodology Fails to Adhere to the Extrinsic Test

At its most basic level, the extrinsic test precludes Bennett's use of his lineage methodology because his process inherently relies on unprotectable elements (*i.e.*, Defendants' contributions) which must be filtered out.  *See Swirsky v. Carey*, 376 F.3d 841, 845; *Cavalier*, 297 F.3d at 822; *Johannsongs-Publishing, Ltd. v. Lovland*, No. CV-18-10009-AB(SSx), 2020 WL 2315805 at *6 (C.D. Cal. Apr. 3, 2020) (granting summary judgment where the plaintiff's expert musicologist failed to filter out prior art elements), *aff'd* No. 20-55552, 2021 WL 5564626 (9th Cir. Nov. 29, 2021).  This is because "copyright protection may extend only to those components of a work that are original to the author."  *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991).

1    Here, in making his indirect comparisons, Bennet does not restrict himself to

2    analysis of those elements originating from *MSD PT2*.  Facts 78-81.  In other words,

3    Bennet purports to rely on original elements or sampling from *MSD PT2* to connect

4    that work to one or more versions of *Hurricane*, but then relies on additional

5    compositional elements to make connections to the released versions of *Hurricane*

6    and *Moon*.  For example, Bennet makes numerous lyrical and vocal comparisons

7    between the early demos of *Hurricane* to the released versions of *Hurricane* and

8    *Moon* to support his substantial similarity analysis—even though *MSD PT2* contains

9    no vocals or words whatsoever.

10    Given the inclusion of unprotectable elements, these indirect comparisons

11    must be disregarded.  *See Cavalier*, 297 F.3d at 822.  As a result, only Bennett's

12    direct comparisons can be properly considered under the extrinsic test.  *Id.*  This is

13    notable as it significantly narrows down the relevant parts of Bennett's report.  As

14    discussed above, although Bennett does make a direct comparison of *MSD PT2* and

15    the released version of *Hurricane*, that analysis separately fails to show substantial

16    similarities in protectable expression.  In contrast, Bennett's report does not include

17    *any* direct comparisons of *MSD PT2* and the released version of *Moon*.  Facts 82-83.

18    As such, *Plaintiff's expert Bennet does not present any expert evidence of direct*

19    *copyright infringement by Moon*.  Indeed, as discussed below, Defendants' expert

20    Nathaniel Sloan concludes there are no musical elements of *MSD PT2* that are

21    present in *Moon*.

## 2.   Plaintiffs Rely on Unprotectable Elements to Claim that *Hurricane* Infringes on *MSD PT2*

24    Plaintiff's theory as to the released version of *Hurricane* is that it "contains a

25    clear interpolation of compositional elements from [MSD PT2], including the

26    bassline, and harmonic structure, forming the musical foundation of the work."

27    Fact 84-85.  Plaintiffs' expert Bennet—in his sole *direct* musicological

28    comparison—identifies a four-bar loop in *MSD PT2* as the purported zone of

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

MARTORELL LAW APC
Litigation & Trial Counsel

1    similarity to a four-measure loop in the released version of *Hurricane*.  Fact 86.

2    Bennet charts the bassline and "upper voices" of the songs in his compositional

3    analysis.  Fact 87.  Therein, Bennet identifies only two similarities between them: (1)

4    a four-note "bass walkup" in the first measure of the bassline; and (2) the chord

5    progression in the following measures.  Fact 88.  Despite claiming similarity, Bennet

6    does admit these aspects of *MSD PT2* are not identical in *Hurricane*.  Facts 89-90.

### a.  The "Bass Walkup" is Not Protectable Expression

7

8        The "bass walkup" highlighted in Bennett's report must be filtered out for

9    purposes of the extrinsic test.  The Ninth Circuit is explicit that copyright does not

10   extend to tiny, stock musical building blocks—and specifically rejects attempts to

11   premise infringement on "just a few notes."  *Skidmore v. Led Zeppelin*, 952 F.3d

12   1051, 1069-1071 (9th Cir. 2020) (en banc).  In *Skidmore*, the Ninth Circuit, sitting en

13   banc, held: "We have never extended copyright protection to just a few notes," and

14   reiterated that "a four-note sequence common in the music field" is not protectable

15   expression.  *Id.* at 1071 (quoting *Granite Music Corp. v. United Artists Corp.*, 532

16   F.2d 718, 721 (9th Cir. 1976)).

17       Further, Defendants' expert Dr. Sloan points out that Bennet's own report

18   shows that the songs do not even share the same fourth note in this measure.  Facts

19   91-92.  Thus, the "bass walkup" is really just a three-note phrase.  *Id.*  The Ninth

20   Circuit has expressed considerable skepticism that something like this could be

21   protectable.  *See Skidmore*, 952 F.3d at 1071 ("One of our colleagues also expressed

22   skepticism that three notes used in a song can be copyrightable by observing that of

23   the 'only 123 or 1,728 unique combinations of three notes,' not many would be

24   useful in a musical composition."); *see also Id.* at 1071 ("The Copyright Office is in

25   accord, classifying a 'musical phrase consisting of three notes' as de minimis and

26   thus not meeting the 'quantum of creativity' required under *Feist*.") (*quoting*

27   *Copyright Office Compendium*, § 313.4(B) (3d ed. 2017)).

28       Once this three or four-note measure is filtered out, nothing protectable

MARTORELL LAW APC
Litigation & Trial Counsel

1   remains of Bennett's "bass walk-up" theory to carry Plaintiff's burden on the

2   extrinsic test.  See *Swirsky,* 376 F.3d at 845; *Cavalier*, 297 F.3d at 822.  Even apart

3   from filtration, Dr. Sloan explains Bennett's own analysis confines the claim to a

4   brief phrase and does not establish identity in the relevant musical content.  Facts 93-

5   96.

### b.  Plaintiff's Chord Progression is Also Not Protectable

7           Bennett's second claimed overlap is the chord progression shown in red at the

8   top of Figure 2 in his report—"Bb harmony (1 bar)" followed by "Gm7 harmony (2

9   bars)."  Facts 97-98.  "[C]hord progressions may not be individually protected

10  because they are basic musical building blocks."  *Gray v. Hudson*, 28 F.4th 87, 100

11  (9th Cir. 2022).  "Chords are ultimately just a combination of pitches played

12  simultaneously so a chord progression itself consists of multiple pitch sequences

13  playing out at the same time.  If the chord progression cannot be protected, the

14  individual pitch sequences forming the progression cannot be either."  *Id.* (citation

15  omitted).  Likewise, *Skidmore* recognizes that the law excludes "non-protectable

16  musical building blocks that no individual may own" and reiterates that the Ninth

17  Circuit has "never extended copyright protection to just a few notes."  *Skidmore,*

18  *supra*, 952 F.3d at 1069-1071.  Filtration would be proper here as Dr. Sloan notes

19  that "this a common harmonic descent that is generic in nature and not

20  musicologically significant."  Fact 99.  The only exception here would be a selection

21  and arrangement theory.  *See Swirsky v. Carey*, 376 F.3d 841, 848 (9th Cir. 2004)

22  ("Thus, although chord progressions may not be individually protected, if in

23  combination with rhythm and pitch sequence … infringement can be found.").

24  However, Plaintiff has not pleaded that theory and Bennett does not evaluate or

25  address it in his report.  Fact 100-101.  Even so, Bennett's report shows no rhythmic

26  similarity exists between the two four-measure loops in *MSD PT2* and *Hurricane*.

27  The "note-for-note comparison" Bennett relies on to show "rhythmic alignment"

28

MARTORELL LAW APC

Litigation & Trial Counsel

concedes its own purpose by expanding what is treated as a "match" to include "notes or chords that are harmonically equivalent to each other" and "rhythmic matches within a 1-16th note of rhythmic alignment." This evades the filtration required by the extrinsic test because "specific expressive elements" must be objectively compared and, here, Bennet broadens "similarity" beyond the purported protectable expression into functional equivalence and tolerance bands. *Folkens v. Wyland Worldwide, LLC*, 882 F.3d 768, 774 (9th Cir. 2018). Compounding this, Dr. Sloan independently has determined that the rhythms in the two compositions are, indeed, different. Fact 102.

### 3. Moon is Not Substantially Similar to MSD PT2

Bennett does not claim that the released version of *Moon* contains a sample of *MSD PT2*. Fact 103. In fact, Bennett never makes a direct analytical comparison between *Moon* and *MSD PT2*. Facts 104-105. In contrast, Dr. Sloan did perform this analytical comparison, concluding: "Put simply, there are no elements of 'MSD PT2' present in 'Moon.'" Fact 106. As discussed above, a direct comparison is the only legally viable method for Plaintiff to prove direct copyright infringement here. Plaintiff's expert Bennett openly explains their entire infringement theory for *Moon* is that its vocals are melodically similar to *Hurricane*, and also share a similar pitch sequence. Facts 107-109. Then, via pure reasoning and rhetoric, Bennett deduces that Moon's alleged melodic similarity to the released version of Hurricane "support[s] the conclusion" that Moon is derived from a demo version of Hurricane (HURRICANEV1) and thus "should be considered a derivative work of [that demo version of Hurricane] and, by extension, of [MSD PT2]." Facts 110-111. Ironically, at the beginning of his report, Bennett does state that Moon's "harmonic content differs from [MSD PT2]."

Even accepting Bennett's comparisons at face value, this analysis fails the extrinsic test because it does not supply the required specific, articulable similarities between *Moon* and *MSD PT2* in protectable expression. *See Folkens*, 882 F.3d at

MARTORELL LAW APC

Litigation & Trial Counsel

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

776; *Swirsky*, 376 F.3d at 844-45.  As explained by Dr. Sloan, this is also improper in a musicological sense because "MSD PT2 contains no lyrics or vocal melodies," "[t]he vocal melodies and lyrics that make up the most salient aspects of [*Hurricane*] and [*Moon*] are wholly original contributions by the Defendants," and, as a result, Bennett "relies on Defendants' own contributions to make this connection" between the songs.  Facts 113-116.  Nonetheless, Dr. Sloan found that "[c]omparing the final versions of 'Hurricane' and 'Moon' reveals that there is no similarity in the harmonic elements of the song."  Fact 117.  Further, that "none of the melodies in the vocal parts in 'Hurricane' or 'Moon' appear in 'MSD PT2.'"  Facts 118.  Since Dr. Sloan provided the only *direct* musicological comparison of MSD PT2 and Moon in the evidentiary record, which he found to have no similarities at all, there is no dispute of material fact that Moon and MSD PT2 are not substantially similar under the extrinsic test and Defendants are entitled to judgment as a matter of law on this claim.  *See Gray*, 28 F.4th at 97.

### F.    Plaintiff Cannot Recover Statutory Damages or Attorneys' Fees

Plaintiff's claim for statutory damages and attorneys' fees is barred by 17 U.S.C. § 412. The statute expressly prohibits the recovery of statutory damages or attorneys' fees for any infringement that commenced prior to the effective date of copyright registration, unless the work was registered within three months of first publication. Here, the *Donda* album was commercially released in August 2021; Plaintiff did not obtain registration until April 2024. (*See* https://publicrecords.copyright.gov/, Registration Number Pau4-220-628.) Given that infringement allegedly began in 2018 and certainly by 2021, and because Plaintiff did not register until 2024, Plaintiff is categorically barred from recovering statutory damages or attorneys' fees as a matter of law.

/ / /

/ / /

/ / /

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

MARTORELL LAW APC
Litigation & Trial Counsel

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Summary Judgment in favor of Defendants and against Plaintiff as to the entirety of the sole cause of action for copyright infringement.

Dated:  January 10, 2026

**MARTORELL LAW APC**

By:   /s/ Christopher A. Rosario
       Eduardo Martorell
       Christopher A. Rosario
       Evan Miller
       *Attorneys for Defendants*
       Defendants Ye f/k/a Kanye Omari West; Getting Out Our Dreams, Inc.; Getting Out Our Dreams II, LLC; Yeezy LLC; Yeezy Supply LLC; Ox Paha Inc.

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT