RUSS, AUGUST & KABAT
Irene Y. Lee, State Bar No. 213625
ilee@raklaw.com
Nathan D. Meyer, State Bar No. 239850
nmeyer@raklaw.com
Sarah Wang (*admitted pro hac vice*)
swang@raklaw.com
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone:   (310) 826-7474
Facsimile:   (310) 979-8268

Attorneys for Plaintiff
ARTIST REVENUE ADVOCATES, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA –WESTERN DIVISION

| | |
|---|---|
| ARTIST REVENUE ADVOCATES, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>KANYE OMARI WEST a/k/a "YE;" GETTING OUT OUR DREAMS, INC. a/k/a G.O.O.D. MUSIC, a California corporation; GETTING OUT OUR DREAMS II, LLC, a Delaware limited liability company; YEEZY LLC, a Delaware limited liability company; YEEZY SUPPLY LLC, a Delaware limited liability company; OX PAHA INC. f/k/a MASCOTTE HOLDINGS, INC., a California corporation; UMG RECORDINGS, INC., a Delaware corporation; UNIVERSAL MUSIC CORP., a Delaware corporation; UNIVERSAL MUSIC GROUP, INC., a Delaware corporation; KANO COMPUTING LIMITED, a United Kingdom private limited company; ALEXANDER NELSON KLEIN, an individual; ASHDUST LLP, a Delaware limited liability partnership; STEMPLAYER LTD, a United Kingdom private limited company; and DOES 1 through 10,<br><br>Defendants. | Case No. 2:24-CV-06018-MWC-BFMx<br><br>[Assigned to The Honorable Michelle W. Court, Courtroom 6A]<br><br>**PLAINTIFF ARTIST REVENUE ADVOCATES, LLC'S OPPOSITION TO DEFENDANTS YE F/K/A KANYE OMARI WEST; GETTING OUT OUR DREAMS, INC.; GETTING OUT OUR DREAMS II, LLC; YEEZY LLC; YEEZY SUPPLY LLC; AND OX PAHA INC. F/K/A MASCOTTE HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Hearing**<br>Date: February 27, 2026<br>Time: 1:30 p.m.<br>Courtroom:  6A<br><br>Trial: April 20, 2026<br>Final Pretrial Conf: April 3, 2026<br><br>Original Complaint Filed:<br>     July 17, 2024 |

1

## Table of Contents

**Page**

I.     INTRODUCTION ....................................................................................6

II.    THE MOTION SHOULD BE STRICKEN FOR FAILURE TO COMPLY WITH LOCAL RULE 7-3 ................................................8

III.   STANDING: THE ARTISTS PROPERLY TRANSFERRED RIGHTS TO ARA WHO VERY MUCH HAS STANDING ....................................10

IV.    NO IMPLIED LICENSE: THE MOTION MUST BE DENIED BECAUSE DEFENDANTS MISSTATE THE LAW AND DO NOT EVEN ATTEMPT TO MEET THE REQUIRED ELEMENTS OF AN IMPLIED LICENSE DEFENSE ................................................13

V.     THE SOUND RECORDING OF MSD PT2 APPEARS IN VARIANTS OF HURRICANE. ..................................................17

VI.    MSD PT2 AND HURRICANE ARE SUBSTANTIALLY SIMILAR UNDER THE EXTRINSIC TEST ................................................18

       A.    Defendants' Motion as to Similarity Is Directed Only to the Album Version of Hurricane. ..................................................18

       B.    Plaintiff's Expert Dr. Bennett Demonstrates Similarity Under the Extrinsic Test. ..................................................18

VII.   DEFENDANTS ARE LIABLE FOR COPYRIGHT INFRINGEMENT OF HURRICANE AND MOON BECAUSE THEY ARE UNAUTHORIZED DERIVATIVE WORKS OF MSD PT2 ....................22

       A.    The Plaintiff Prevails Under the Correct Law Because Hurricane and Moon Are Unlawful Derivatives of MSD PT2. ....................23

       B.    Defendants' Cases Are Inapposite Because They Involve Licensed Uses, While There Is No License Here. ............................26

       C.    Dr. Bennett Found Moon and Hurricane To Be Similar Under the Extrinsic Test. ..................................................28

VIII.  PLAINTIFF DOES NOT OPPOSE SUMMARY JUDGMETN ON ATTORNEY'S FEES OR STATUTORY DAMAGES ............................29

IX.    CONCLUSION ..................................................................................29

RUSS, AUGUST & KABAT

2

**PLAINTIFF ARTIST REVENUE ADVOCATES, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## **Table of Authorities**

**Page**

**Cases**

*A&M Records, Inc. v. Napster, Inc.*
239 F.3d 1004 (9th Cir. 2001)........................................................................14

*Ashton-Tate Corp. v.* Ross
916 F.2d 516 (9th Cir. 1990).........................................................................28

*Asset Mktg. Sys., Inc. v. Gagnon*
542 F.3d 748 (9th Cir. 2008).....................................................................*passim*

*Calco v. Ossur Ams., Inc.*
WL 694369 (C.D. Cal., Jan. 19, 2024) .............................................................9

*Cmtys. v. Centerline Hous. P'ship. I, L.P.*
2022 WL 17224665 (C.D. Cal., Aug. 9, 2022)................................................9

*Corbello v. DeVito*
777 F.3d 1058 (9th Cir. 2015)......................................................................11

*DC Comics v. Towle*
802 F.3d 1012 (9th Cir. 2015)...............................................................22, 27

*Eden Toys, Inc. v. Florelee Undergarments Co.*
697 F.2d 27 (2nd Cir. 1982).........................................................................25

*Effects Assocs., Inc. v. Cohen*
908 F.2d 555 (9th Cir. 1990).........................................................13, 14, 15

*Funky Films v. Time Warner Entm't Co.*
462 F.3d 1072 (9th Cir. 2006)......................................................................18

*Gray v. Hudson*
28 F.4th 87 (9th Cir. 2022)...........................................................................21

*Harvest Int'l Trading Co. v. Asia Pacific TW Int'l, Inc.*
2017 WL 2972336 (C.D. Cal., April 5, 2017) ................................................9

*I.A.E., Inc. v. Shaver*
74 F.3d 768 (7th Cir. 1996)..........................................................................13

*John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*
332 F.3d 26 (1st Cir. 2003)......................................................................15, 16

3

RUSS, AUGUST & KABAT

**Table of Authorities**

**Page**

*Metro-Goldywn-Mayer Studios, Inc. v. Grokster, Ltd.*
    518 F.Supp.2d 1197 (C.D. Cal. 2007) ...............................................................14

*Miller v. Brown*
    136 Cal.App.2d 763 (1955)..........................................................................7, 11

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.*
    795 F.3d 997 (9th Cir. 2015)...........................................................................22

*Pickett v. Prince*
    207 F.3d 402 (7th Cir. 2000)............................................................................24

*R.H. v. County of San Bernardino*
    2019 WL 10744836 (C.D. Cal., Sept. 25, 2019)..............................................9

*Reinsdorf v. Sketchers U.S.A.*
    922 F.Supp.2d 866 (C.D. Cal. 2013) ...............................................................27

*Silvers v. Sony Pictures Ent., Inc.*
    402 F.3d 881 (9th Cir. 2005).............................................................................22

*Singer v. Live Nation Worldwide, Inc.*
    2012 WL 123146 (C.D. Cal., Jan. 13, 2012) .....................................................9

*Skidmore as Trustee of Randy Craig Wolfe Trust v. Led Zeppelin*
    952 F.3d 1051 (9th Cir. 2020)...........................................................................20

*Sobhani v. @Radical.Media Inc.*
    257 F.Supp.2d 1234, 1240 (C.D. Cal. 2003) ...................................................24

*Sound & Color, LLC v. Smith*
    2025 WL 1232639 (9th Cir. Apr. 29, 2025) .....................................................19

*Swirsky v. Carey*
    376 F.3d 841 (9th Cir. 2004)...............................................................18, 20, 21

*Tempo Music Invs., LLC v. Cyrus*
    2025 WL 932967 (C.D. Cal. Mar. 18, 2025).........................................6, 10, 11

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*
    692 F.3d 1016 (9th Cir. 2012)....................................................................23, 27

*Williams v. Gaye*
    895 F.3d 1106 (9th Cir. 2018)...........................................................................19

**Statutes**

4

RUSS, AUGUST & KABAT

## Table of Authorities

                                                                                          **Page**

17 U.S.C. §103 ...........................................................................................................8, 23, 24

17 U.S.C. §106 ...............................................................................................................22, 24

17 U.S.C. §201 .....................................................................................................................10

17 U.S.C. §204 .....................................................................................................................11

Cal. Civ. Code §1698 ...................................................................................................6, 11, 12

L. R. 7-3 ........................................................................................................................8, 9, 17

**Other Authorities**

Melville B. Nimmer & David Nimmer
    Nimmer on Copyright §3.01 ........................................................................................25

Melville B. Nimmer & David Nimmer
    Nimmer on Copyright §3.05 ........................................................................................27

RUSS, AUGUST & KABAT

PLAINTIFF ARTIST REVENUE ADVOCATES, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

Defendants'[1] motion for summary judgment ("Motion") is based on egregious misstatements of law, fact, and procedure, and must be denied.

On standing, Defendants argue that ARA's lack of ownership in one of the four Artists' (Rahman) interest in the composition of MSD PT2[2] destroys ARA's standing to sue for infringement of the composition. Doc. 219-1 at 15:21-16:11. This is wrong as a matter of law: "[w]hen a co-owner transfers his or her interest [in the joint work], which the co-owner need not obtain consent from the other co-owners to do, the transferee stands in the shoes of the transferor, making the transferee a co-owner in the copyright [in the joint work]." *Tempo Music Invs., LLC v. Cyrus*, No. 2:24-cv-07910-DDP, 2025 WL 932967, at *5 (C.D. Cal. Mar. 18, 2025). Defendants' argument flatly ignores that three (Mease, Barsh, and Seeff) of the four Artists transferred to ARA their interests in the composition of MSD PT2. As a result, ARA stands in their shoes, making ARA a co-owner in the copyright having standing to sue for infringement of the composition.

Defendants' secondary standing argument is equally untenable. Despite the fact that the relevant Artists signed the Copyright Assignment, that the publishing administrator of those Artists (HH Music) also signed documents authorizing the Copyright Assignment, and that the administrator of the administrator (PEN Music) authorized the transaction orally, they assert that relevant stakeholders did not authorize the Copyright Assignment, thus destroying standing. Doc. 219-1 at 16:12-17:2, SS[3] 36, 50, PSS 119-123. This argument is wrong as a matter of law: "A contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties." Cal. Civ. Code §1698(b); *see also Miller v.*

---

[1] Unless otherwise indicated defined terms are as in the moving papers.
[2] Occasionally referred to in the record as "MSD 18": "MSD" stands for Mease, Sam [Barsh], Dan [Seeff].
[3] SS refers to Plaintiff's responses to Defendants' purported undisputed facts, filed concurrently. PSS refers to Plaintiff's statement of additional material facts, appearing immediately thereafter and continuing sequentially.

6

RUSS, AUGUST & KABAT

*Brown,* 136 Cal.App.2d 763, 775 (1955) ("[U]nder section 1698 of the Civil Code, an executed oral agreement may alter an agreement in writing, even though, as here, the original contract provides that all changes must be approved in writing. This is so because the executed oral agreement may alter or modify that provision of the contract as well as other portions."). Because the relevant Artists and their administrator signed the Copyright Assignment and associated documents and the oral authorization of the administrator's administrator was more than sufficient under California law, Defendants' attack on ARA's standing fails as a matter of law.

Defendants' implied license theory (Doc. 219-1 at 17:3-19:15) fails as a matter of law because it omits two of the three elements required to establish an implied license. In order to prove an implied license, one must prove "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, ***and*** (3) the licensor intends that the licensee-requestor copy and distribute his work." *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 754-755 (9th Cir. 2008) (emphasis added). The Motion makes no mention whatsoever of the first two elements. Because MSD PT2 was not created at Defendants' request, the first two requisite elements cannot be satisfied.[4] PSS 124-125. This simple fact disposes of Defendants' implied license argument as a matter of law.

Defendants' musicology arguments also fail as to both *Moon* and *Hurricane*. Defendants have failed to show, at all or as an issue of undisputed material fact, that either song is not derivative of MSD PT2.

As to *Hurricane*, Plaintiff has shown that *Hurricane*, which began as a video of Ye singing over MSD PT2, is derived from and substantially similar to MSD PT2 under the extrinsic test. PSS 153-158. Plaintiff's musicologist expert Dr. Joe Bennett submitted a detailed, fact-intensive report identifying multiple protectable elements

---

[4] The third element also cannot be satisfied as set forth in the body of this opposition, *infra*.

RUSS, AUGUST & KABAT

of MSD PT2 copied wholesale into the bulk of *Hurricane*. *Id*. As such, summary judgment must be denied as to *Hurricane*.

As to *Moon*, the facts are clear that (1) *Hurricane* is derivative of, and substantially similar to, MSD PT2, (2) *Moon* is derivative of, and substantially similar to, *Hurricane,* and (3) there is no license, implied or otherwise, for Defendants to copy, use, or otherwise exploit MSD PT2. PSS 124-126, 128, 159-164. Under these facts, Plaintiff has an ownership interest in *Hurricane* as well as works derivative of *Hurricane,* such as *Moon.* Defendants argue they should prevail based on side-by-side analyses of MSD PT2 and *Moon*, excluding *Hurricane*. For the purported proposition that Plaintiff has no interest in *Hurricane*, Defendants cite *Parts Geek*, *Reinsdorf,* and *Ashton-Tate,* all of which are inapposite. They dealt entirely with situations where the initial work was fully licensed by the plaintiffs. That is not the case here: there is no license for Defendants to use MSD PT2. Thus, under 17 U.S.C. §103, the right to create derivative works of MSD PT2, along with the right to create derivatives of the derivative works, was vested in the Artists and later in ARA. Given that there is no license for Defendants to create derivate works of MSD PT2, the Motion should be denied as to *Moon* as well.

Finally, the entire Motion should be stricken because Defendants failed to comply with Local Rule 7-3. Because of Defendants' failure, Plaintiff was deprived of an opportunity to discuss, let alone resolve, any of the issues raised in Defendants' untimely Motion, some of which could have been obviated had the parties had met and conferred in compliance with Local Rule 7-3.

Thus, the Motion should be denied as ignoring law, fact, and procedure.

## II.     THE MOTION SHOULD BE STRICKEN FOR FAILURE TO COMPLY WITH LOCAL RULE 7-3

Pursuant to Local Rule 7-3 and this Court's standing orders, "Counsel contemplating the filing of any motion must first contact opposing counsel to discuss thoroughly, preferably in person, the substance of the contemplated motion and any

8

RUSS, AUGUST & KABAT

potential resolution. The conference must take place in person, by telephone, or via video conference at least 7 days prior to the filing of the motion." Pursuant to this Court's scheduling order, summary judgment motions needed to be filed on or before January 9, 2025, making the meet and confer deadline January 2, 2026.

Counsel for Plaintiff heard nothing from counsel for Defendants on or before January 2, 2026, over the following weekend, or the following two days. On January 7, 2026, counsel for Defendants cold-called counsel for Plaintiff, which lasted five minutes. During that brief call, counsel listed a very short number of claimed topics for summary judgment, but did not meet and confer. Defendants then applied *ex parte* to continue the summary judgment motion. PSS 165. That application was denied. Doc. 224.

Defendants then filed incomplete versions of their moving papers on January 9, 2026, followed by revised versions on January 10, 2026, still having not even attempted a timely (or any) meet and confer.

This failure is an independent basis to deny their Motion in its entirety. Courts routinely deny summary judgment on this basis. *See, e.g., Calco v. Ossur Ams., Inc.*, No. SACV-22-01971-CJC-KES, 2024 WL 694369, at *1 (C.D. Cal., Jan. 19, 2024) ("Local Rule 7-3 is not 'just a piece of petty pedantry put down to trip up lawyers" and denying summary judgment); *R.H. v. County of San Bernardino*, No. 5:18-CV-01232-JLS-KK, 2019 WL 10744836, at *2 (C.D. Cal., Sept. 25, 2019), *Cmtys. v. Centerline Hous. P'ship. I, L.P.*, No. 8:22-CV-00296-JVS-JDE, 2022 WL 17224665, at *2 (C.D. Cal., Aug. 9, 2022); *Singer v. Live Nation Worldwide, Inc.*, No. SACV-11-0427-DOC-MLG, 2012 WL 123146, at *2 (C.D. Cal., Jan. 13, 2012) (motion for summary judgment denied for failure to comply with Local Rule 7-3); *Harvest Int'l Trading Co. v. Asia Pacific TW Int'l, Inc.*, 8:16-CV-978-JLS-PLA, 2017 WL 2972336 (C.D. Cal., April 5, 2017).

The Court should do so here as well. As stated in the Court's order denying Defendants' *ex parte* application, "The Ye Defendants have known since October

RUSS, AUGUST & KABAT

14, 2025, that the deadline to file a motion for summary judgment would precede the expert rebuttal deadline." Doc. 224 at 3. Defendants have known of the relevant dates for months; there is no excuse for their failure to meet and confer as they offered none. Accordingly, this Court should strike the entire Motion on this basis.

## III.   STANDING: THE ARTISTS PROPERLY TRANSFERRED RIGHTS TO ARA WHO VERY MUCH HAS STANDING

It is undisputed that the Artists, their publishing administrators HH Music and PEN Music, and all relevant individuals, authorized, consented, and agreed to the transfer of the copyright in MSD PT2 to ARA before the governing Copyright Assignment was fully executed on July 17, 2024. SS 34, 36, PSS 121-122. Indeed, the Artists signed attendant documents transferring the sound recording copyright as well as copyright in Mease, Barsh, and Seeff's shares of the composition before ARA filed its complaint. Ignoring these undisputed and indisputable facts and governing law, Defendants argue ARA has no standing to sue. None of their arguments hold any weight.

First, it is well established that "[t]he authors of a joint work are co-owners of copyright in the work" 17 U.S.C. §201(a) and that the transferee of some, but not all, co-owners' exclusive rights in the joint work has standing to sue for copyright infringement. *Tempo Music Invs., supra*, 2025 WL 932967, at *5. In denying defendants' motion to dismiss for lack of standing, *Tempo* reaffirmed the well-settled principle of copyright law: "[w]hen a co-owner transfers his or her interest [in the joint work], which the co-owner need not obtain consent from the other co-owners to do, the transferee stands in the shoes of the transferor, making the transferee a co-owner in the copyright [in the joint work]." *Id.* at *5. In *Tempo*, one (Lawrence) of the four co-owners (Mars, Lawrence, Levine, and Wyatt) of their joint copyrighted work transferred his entire ownership interest to Tempo. The *Tempo* court reasoned that "[b]y transferring all of that interest, Tempo now steps into Lawrence's shoes and is a co-owner of the exclusive rights of the copyright." *Id.*

PLAINTIFF ARTIST REVENUE ADVOCATES, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

RUSS, AUGUST & KABAT

"Because Lawrence as a co-owner could sue for infringement, Tempo as co-owner, in lieu of Lawrence, can sue for infringement without joining the other co-owners of the copyright." *Id.*

Here, three (Mease, Barsh, and Seeff) of the four co-owners transferred their entire ownership interest in the composition of MSD PT2 to ARA. PSS 121. In addition, the entirety of the sound recording copyright in MSD PT2 was transferred to ARA. PSS 120. That the fourth co-owner (Rahman) did not transfer his rights in the composition of MSD PT2 to ARA has no bearing on this case whatsoever. Just like Tempo had stepped into Lawrence's shoes and was found to have standing to sue in lieu of Lawrence, ARA has stepped into the shoes of Mease, Barsh, and Seeff and has standing to sue in their stead for copyright infringement in the composition of MSD PT2. Contrary to Defendants' characterization, 17 U.S.C. §204(a) does not require *all* co-owners of a joint work to be party to a transfer. As discussed above, a plaintiff transferee, like Tempo in *Tempo,* or ARA in the present case, has standing to sue in place of less than all co-owners of a joint work. *Tempo*, at \*4-5; *see also Corbello v. DeVito*, 777 F.3d 1058, 1066 (9th Cir. 2015) (clarifying the distinction between exclusive rights and exclusive ownership and reaffirming "another well-settled principle of copyright law: the right of one joint-owner to sue third party infringers without joining any of his fellow co-owners . . . "). In support of their assertion that the transfer from Mease, Barsh, and Seeff is somehow insufficient to give ARA standing to sue, Defendants cite no law, because none exists.

Defendants' second argument is equally untenable, inconsistent, and disingenuous. It is long-standing and well-settled that a written agreement may be modified by a subsequent oral agreement so long as the modification is fully performed. Cal. Civ. Code §1698(b) ("A contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties"); *see also Miller v. Brown,* 136 Cal.App.2d 763, 775 (1955) ("[U]nder section 1698 of the Civil Code, an executed oral agreement may alter an agreement in writing, even

RUSS, AUGUST & KABAT

11

though, as here, the original contract provides that all changes must be approved in writing. This is so because the executed oral agreement may alter or modify that provision of the contract as well as other portions."). Thus, the lack of a signature from PEN Music in the written copyright assignment agreement to ARA does not defeat ARA's standing. First, as conceded in Defendants' SUF, PEN Music *did* agree to the transfer, as Michael Eames so testified unequivocally. SS 36, 50, PSS 119. The lack of a writing to that effect does not render PEN Music's oral agreement ineffective. A party may—and in this case did—waive the requirement of a writing. Cal. Civ. Code §1698(b); *Miller* at 775.

Indeed, the fact that PEN Music's agreement was not in writing does not defeat the effect of the copyright assignment Barsh and Seeff granted to ARA in the same way Mease's *oral* agreement with PEN Music does not defeat its effect. Tellingly, Defendants readily acknowledge PEN Music's agreement with Mr. Mease even though it was not in writing: it was "oral and implied." Doc. 219-1 at 14:21-15:2, SS 53. But, they refuse to apply the same logic and ignore the governing law when it comes to PEN Music's agreement to waive the requirement of a writing.

For the same reasons detailed above, Mease's transfer of his rights in MSD PT2 to ARA was effective because PEN Music's oral agreement with HH Music was sufficient just like Mease's "oral and implied" agreements with PEN Music that Defendants embrace.

Fundamentally, it is apparent from the record that Barsh, Seeff, and Mease and the principals of both HH Music *and* Pen Music authorized the transfers of their exclusive rights in MSD PT2 to ARA. SS 34, 36, 50, PSS 119. It is also apparent that the transfer documents were timely signed prior to the filing of the complaint.[5]

---

[5] Defendants assert, in a footnote (n.3) that there are "fabrications" in the assignment documents. As Defendants have not moved for anything on this frivolous point there is no need to include it in the separate statement or burden the Court with extensive deposition testimony on the topic, but should it arise at trial, the record, including contemporaneous documents, plainly shows that there was an inadvertent scrivener's error in the first signed version of the assignment (the first version included Mr. Rahman as assigning composition rights), the error was realized within

12

SS 34, PSS 122. Defendants' cavil attempts to challenge ARA's standing fail on this simple fact. Nobody in the chain of title has objected to the transfer. All individuals and entities in the chain have testified under penalty of perjury unequivocally that they had authorized the transfer of Mease, Barsh, and Seeff's entire rights in MSD PT2 to ARA. SS 36, 50, PSS 119. The undisputed facts show ARA *does* have standing. At the very least, there is a disputed issue of material fact so Defendants' Motion must be denied on the standing issue.

## IV.  NO IMPLIED LICENSE: THE MOTION MUST BE DENIED BECAUSE DEFENDANTS MISSTATE THE LAW AND DO NOT EVEN ATTEMPT TO MEET THE REQUIRED ELEMENTS OF AN IMPLIED LICENSE DEFENSE

In an effort to distract from their inability to satisfy the requirements of implied license set forth in *Effects Assocs., Inc. v. Cohen,* 908 F.2d 555 (9th Cir. 1990), adopted in *Asset Mktg. Sys., Inc. v. Gagnon,* 542 F.3d 748 (9th Cir. 2008), Defendants omit the first two elements in their entirety, which they do not attempt to, and cannot, show. The Ninth Circuit has been consistent and clear: "we have held that an implied license is granted when '(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work.' *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996) (citing *Effects,* 908 F.2d at 558-59)." *Asset Mktg.*, 542 F.3d at 754-755. Further, "the Ninth Circuit has explained that the implied license doctrine in copyright cases is to be very narrowly construed. In *Napster*, the Ninth Circuit stated that '[c]ourts have found implied licenses only in 'narrow' circumstances where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it.'" *Metro-Goldywn-Mayer Studios, Inc. v.*

hours, and the page containing the error was replaced with the correct page by agreement of all the parties (removing Mr. Rahman as a composition assignee) before the complaint was filed. Meyer Dec. Ex. T (contemporaneous e-mail).

13

RUSS, AUGUST & KABAT

*Grokster, Ltd.*, 518 F.Supp.2d 1197, 1226 (C.D. Cal. 2007) (citing *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001)).

It is apparent from the records that MSD PT2 was *not* created at any of the Defendants' request, nor was it delivered to any of the Defendants in response to such a request. PSS 124, 125. As such, Defendants' argument that they "held an implied license to use the Work [MSD PT2] in *Hurricane* and *Moon*" fails on its face. Doc. 219-1, 17:3-19:15.

What Defendants have done in their Motion is omit any reference to the dispositive first and second elements of the implied license defense. Instead, they presented only on the third element: "(3) the licensor intends that the licensee-requestor copy and distribute his work." *Asset Mktg.*, 542 F.3d at 755. As to the third element, the Ninth Circuit applies a three-factor test which Defendants quote in their Motion. Doc. 219-1, 17:19-23. However, courts do not reach the third element—nor do they analyze its three-factor test—unless and until the first two elements are met.

Applying the governing test, there is no license here. First, Defendants do not claim they "request[ed] the creation of the work," so the first predicate element is not met, and the defense of implied license fails. Second, there is no claim that the Artists made MSD PT2 and delivered it to the licensee who requested it. The second predicate element is also not met, presenting a second failure of the defense of implied license. As such, the Motion must be denied as a matter of law.

The cases cited by Defendants are illustrative of the law as described above. In *Effects Assocs. v. Cohen,* 908 F.2d 555 (9th Cir. 1990), the defendant commissioned the plaintiff to create certain special effects footage for his movie, pursuant to a letter agreement, for a fixed price. So, the *Effects* court found that the plaintiff created works *at the defendant's request*. When the defendant failed to pay in full, the plaintiff brought a copyright infringement action and lost because the plaintiff *created* the works at issue *for*, and *delivered them to,* the defendant intending for him to use them in his movie, thereby implicitly granting nonexclusive

14

RUSS, AUGUST & KABAT

license to the defendant. *Effects,* at 559 ("Effects created a work at defendant's request and handed it over, intending that defendant copy and distribute it.").

In *Asset Mktg. Sys. v. Gagnon, supra*, Gagnon created software for AMS for many years, pursuant to a written contract under which he was paid for many years. When Gagnon attempted to sue for copyright infringement after the relationship soured, the court held that the license, which all agreed had been created, was not revocable. *Id.*, at 750-53.

Finally, in *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.,* 332 F.3d 26 (1st Cir. 2003), the architect created site plans and construction drawings for a client, who then became insolvent. When the defendant acquired the site and plans in an insolvency proceeding and attempted to use the plans, the architect sued for copyright infringement. The court found no implied license because the architect had no relationship with the defendant: the site and plans were not created at the request of the defendant, nor were they delivered to the defendant or intended for the defendant to copy and distribute. *Id.*, 332 F.3d at 40-42.

It is worth noting that Defendants cite no cases finding an implied license when the two parties were not in a contractual relationship with agreement on, among other things, price. In *Effects,* there was a letter agreement, and in *Asset Mktg. Sys.,* there was a technical services agreement.[6] Because the first two elements of an implied license are not mentioned, let alone met, in Defendants' Motion, it must be denied as a matter of law.

The entirety of Defendants' Motion on implied license is limited to the third element, taken out of context.[7] As stated in *Asset Mktg.*, the three-factor test applies in the context of works that are requested by, and delivered to, the licensee based on that request. Since those predicates are not met and those two elements of an implied

---

[6] In *Danielson,* when the defendant acquired the plans through an intermediary there was held to be no license.

[7] This likely goes without saying, but all three *elements* of implied license must be established by Defendants to present an implied license effect. As to the third element (intent), the three factors in establishing intent are weighed.

15

license cannot be established, the three-intent factors are not relevant here, and the Motion must be denied.

Assuming, *arguendo*, that they were deemed to be relevant here, the three factors for the third element of intent all favor Plaintiff. As to whether MSD PT2 arose out of a short-term or an ongoing relationship, this factor favors Plaintiff since there was no relationship between Plaintiff and the Artists on the one side and Defendants on the other side. It bears noting that in *Danielson*, cited by Defendants on this point, the court held that parties without a direct contractual relationship to the architect did *not* have an implied license. *Danielson, supra,* 332 F.3d at 50-42. As to whether the creator used written contracts stating that the copyrighted materials could only be used with his or her permission, this factor favors Plaintiff or is inapplicable. Again, in *Asset Mktg.,* this factor dealt with the context of the actual contract that did exist between AMS and Gagnon. Here, since there was *no* relationship between Defendants and the Artists, this factor either favors Plaintiff or is inapplicable. *Asset Mktg., supra,* 542 F.3d at 750-53. Finally, the "creator's conduct during the creation or delivery of the copyrighted material" factor is equally inapplicable as this factor addresses the period of "creation or delivery." Because Defendants did not request the Artists to create the Work at issue and there was no agreement between the parties, Defendants focus on conduct that took place after-the-fact. However, such conduct is not considered relevant under this factor. As to the actual conduct during "creation and delivery," it favors Plaintiff. For example, there were no statements by or on behalf of Rahman or any of the Artists for that matter "at the time of the creation and delivery" suggesting MSD PT2 could be used without compensation first being agreed upon. *Asset Mktg., supra,* 542 F.3d at 756.

Simply put, MSD PT2 was not created at Defendants' request, so the factors from *Asset Mktg. Sys.* are inapplicable. To the extent the three-factor intent test is found to be applicable, it favors Plaintiff.

PLAINTIFF ARTIST REVENUE ADVOCATES, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants raise other implied license arguments that have no link to any case law. The purported "celebration" after the fact is not indicative of anything other than that the Artists hoped their copyrighted Work would lead to appropriate compensation, which has not occurred, leading to this lawsuit. As to the alleged compensation to the Artists, that was solely a result of the unilateral actions of Defendants in choosing to allocate minimal shares to the Artists, and did not require any authorization by Artists. SS 28, PSS 126. There is no evidence in the record of any agreement on splits, because there is none.

It bears emphasizing what Defendants are proposing by their Motion: they argue that the mere circulation of a composer pack pursuant to standard hip-hop practices constitutes an implied license for *anyone* to use the work. No court has come close to so holding, the cases do not support such a result, and this Court should not so hold. The Motion should be denied.

## V.  THE SOUND RECORDING OF MSD PT2 APPEARS IN VARIANTS OF *HURRICANE*

As detailed in the Bennett Report, the MST PT2 Sound Recording appears in variants of *Hurricane* prior to its album version. PSS 131, 133. Defendants were paid considerable sums by Apple and others for the use of those versions of *Hurricane*. PSS 132. As such, a genuine issue of material fact exists with respect to evidence from which a jury could reasonably render a verdict in favor of Plaintiff and thus summary judgment cannot be granted in connection with the sound recording.

Plaintiff does note that it concedes the sound recording was not used in the album version of *Hurricane*. However, because Defendants failed to conduct a meet and confer in compliance with Local Rule 7-3, Plaintiff was not provided with an opportunity to discuss, let alone resolve, the issue, prior to Defendants' filing of their untimely motion. PSS 165.

17

## VI.  MSD PT2 AND *HURRICANE* ARE SUBSTANTIALLY SIMILAR UNDER THE EXTRINSIC TEST

Defendants' motion for summary judgment as to similarity between the original Work at issue, MSD PT2, and *Hurricane* should be denied as the similarities are significant.

### A.  Defendants' Motion as to Similarity Is Directed Only to the Album Version of *Hurricane*.

Defendants' Motion as to similarity appears to be directed only at the released album version of *Hurricane*, which is only one of the six representative versions of *Hurricane* or its predecessor *80 Degrees* at issue in this case. PSS 133. Defendants' Motion is silent on whether the five remaining versions of *Hurricane* infringe MSD PT2. As Plaintiff's expert Dr. Bennett demonstrated using spectral analysis and forensic listening, the earliest versions of *Hurricane* sampled the sound recording of MSD PT2. PSS 131. It was only after Defendants sought but were refused permission to use MSD PT2 that Defendants interpolated MSD PT2—meaning that they replaced the sound recording of MSD PT2 by replaying key aspects of the MSD PT2 composition. PSS 134-135. Therefore, this opposition brief likewise focuses solely on the released album version of *Hurricane*.

### B.  Plaintiff's Expert Dr. Bennett Demonstrates Similarity Under the Extrinsic Test.

As to the released album version of *Hurricane*, Defendants' arguments on substantial similarity under the extrinsic test relies on a distortion of the law and facts, including Dr. Bennett's expert report. Summary judgment should be denied.

Summary judgment "is not highly favored on the substantial similarity issue in copyright cases…," *Funky Films v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006), and are reserved for "permitting summary judgment in *clear* cases of non-infringement." *Swirsky v. Carey*, 376 F.3d 841, 848 (9th Cir. 2004). If anything, this is a clear case of *infringement*, as discussed below. In determining similarity,

18

the Ninth Circuit applies a two-part test: "an objective extrinsic test and a subjective intrinsic test." *Swirsky*, at 845. The extrinsic test involves a three-part analysis where: (1) the plaintiff identifies similarities between the copyrighted work and the accused work, (2) of those similarities, the court "filters out" any similarities based on unprotectable material or authorized use, and (3) on the remainder, the court determines whether the scope is entitled to "broad" or "thin" protection. *Sound & Color, LLC v. Smith*, No. 23-2680, 2025 WL 1232639 (9th Cir. Apr. 29, 2025).

First, Defendants falsely accuse Dr. Bennett of failing to conduct the extrinsic test. This is a mischaracterization. In his opening report, Dr. Bennett states that "each HURRICANE iteration contains protectable composition elements of MSD18." PSS 136. As Dr. Bennett explains in his declaration, he always applies the extrinsic test whenever he serves as an expert, whether for plaintiff or defendant, to determine any element of a musical work that is unprotectable. PSS 137. Here, Dr. Bennett did not find any non-protectable element in the four bars of MSD PT2 at issue. PSS 138. In his opening report, Dr. Bennett transcribes the four bars of MSD PT2 at issue, which he then compares bar-by-bar and note-by-note with the album version of *Hurricane*. PSS 139-140 (showing Fig 3 from his opening report including audio files). As shown in the transcription in his report, all four bars of MSD PT2 at issue contained protectable elements. PSS 141. Therefore, Dr. Bennett identified the protectable composition elements of MSD PT2 used in his comparison to the album version of *Hurricane*.

Second, Defendants mischaracterize Dr. Bennett as identifying only two protectable elements in MSD PT2: what Defendants call the "bass walkup" and "chord progression." Doc. 219-1 at 25. Dr. Bennett's opening report identifies multiple protectable elements of MSD PT2, and under his analysis, did not find any musical elements that were unprotectable. PSS 142. Under the Ninth Circuit, "[m]usical compositions are not confined to a narrow range of expression." *Williams v. Gaye*, 895 F.3d 1106, 1120 (9th Cir. 2018). "[M]usic … is not capable of ready

19

classification into only five or six constituent elements," but is "comprised of a large array of elements, some combination of which is protectable by copyright." *Swirsky*, 376 F.3d at 849. Dr. Bennett explicitly states in his summary that the album version of *Hurricane* "contains a clear interpolation of compositional **elements** from MSD18, **including** the bassline, and harmonic structure, forming the musical foundation of the work." PSS 143. Indeed, in his transcription of MSD PT2 used in comparing to the album version of *Hurricane*, Dr. Bennett showed the various compositional elements, including but not limited to melody, harmony, rhythm, structure, and meter, among other elements such as key and tempo. PSS 144.

Third, Defendants claim that the "bass walk up" and "chord progression" are not protectable expressions. Doc. 219-1 at 25-27. These claims are unfounded. Defendants' own expert, Dr. Nathaniel Sloan, did not submit an opening expert report arguing that any portion of MSD PT2 is unprotectable. PSS 145. On the "bass walk up," Defendants attempt to reduce the "bass walk up" to "just a three-note phrase." Doc. 219-1 at 25. Nothing in Dr. Bennett's report suggests that such a reduction could be made. PSS 146-148. Dr. Sloan notably also did not submit any prior art in rebuttal on the "bass walk up." *Id.* Thus, *Skidmore as Trustee of Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051, 1071 (9th Cir. 2020) is inapposite, where the jury there was instructed that copyright "does not protect **ideas**, **themes** or **common** musical elements, such as … short sequences of three notes." At no point has Dr. Bennett opined that the "bass walk up" is merely an idea, theme, or common musical element. PSS 148.

On the "chord progression," Dr. Sloan introduces for the first time in rebuttal three "prior art" references, purportedly sharing the same "chord progression" as MSD PT2. PSS at 150-152. But Dr. Sloan's "prior art" references rather support that the "chord progression" in MSD PT2 is protectable. *Id.* Like Dr. Bennett, Defendants searched but did not find *any* prior art with the same "chord progression," much less with the "bass walk up." PSS 149-151. Further, the purported prior art Dr. Sloan

20

RUSS, AUGUST & KABAT

identified post-date MSD PT2 thereby failing to function as prior art on its face. PSS 152. Thus, this case is distinguishable from *Gray v. Hudson* involving Katy Perry's hit "Dark Horse" and the Christian rap song entitled "Joyful Noise." 28 F.4th 87 (9th Cir. 2022). There, the Ninth Circuit agreed with the district court that the ostinatos that overlap between the two works "consist of a manifestly conventional arrangement of musical building blocks." *Id.* at 101-102. This is in stark contrast to MSD PT2, where not only are the so-called "bass," "melody," and "chord progression" protectable, but the various elements in combination are also protectable.

Fourth, Defendants dismiss a "selection and arrangement theory" as an alternative to the "filtration" test because they claim the Plaintiff "has not pleaded that theory and [Dr.] Bennett does not evaluate or address it in his report." Doc. 219-1 at 26. This is again a misstatement. Dr. Bennett in his report evaluates various characteristics of MSD PT2, including but not limited to melody, harmony, rhythm, structure, and meter, among other elements, and the similarity of these elements between MSD PT2 and *Hurricane*. PSS 144. Defendants ask the Court to dismiss this theory out-of-hand and commit what the *Swirsky* court has condemned as "an incomplete and distorted musicological analysis" by "pull[ing] … elements out of a song individually, without also looking at them in combination." 376 F.3d at 846, 848 (reversing summary judgment and remanding because plaintiff's expert "has provided 'indicia of a sufficient disagreement concerning the substantial similarity of [the] two works.'"). Here, Defendants' attempt to reduce protectable elements of MSD PT2 to mere unprotectable elements fails. Further, there is more than enough in Dr. Bennett's report alone to support infringement under the "selection and arrangement" theory.

Defendants manufacture that Dr. Bennett's report somehow "shows no rhythmic similarity exists between the two four-measure loop in *MSD PT2* and *Hurricane*." Doc. 219-1 at 26. But Dr. Bennett's report actually discusses in the

21

context of "rhythmic matches within a 1-16th note of rhythmic alignment" that "the extent of similarity between the works [MSD PT2 and album version of Hurricane] is *so significant* that it is, in my Opinion, musically impossible that this level of similarity could have arisen through coincidence aka Independent Creation." PSS 153.

Dr. Bennett has provided far more than an "indicia of disagreement," and thus summary judgment should be denied.

## VII.    DEFENDANTS ARE LIABLE FOR COPYRIGHT INFRINGEMENT OF *HURRICANE* AND *MOON* BECAUSE THEY ARE UNAUTHORIZED DERIVATIVE WORKS OF MSD PT2

ARA and Rahman hold exclusive rights to prepare derivative works based on MSD PT2, including *Hurricane* and *Moon*. Section 106 sets forth an exhaustive list of exclusive rights. 17 U.S.C. §106; *see Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 887 (9th Cir. 2005) (en banc). "They are the rights 'to do and to authorize' others to do six things with the copyrighted work: to reproduce the work, *to prepare derivative works based upon the work*, to distribute copies of the work, to perform the work publicly, to display the work publicly, and to record and perform the work by means of an audio transmission." *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1002 (9th Cir. 2015) (emphasis added) (quoting 17 U.S.C. 106). If, as here, an unauthorized third party prepares a derivative work, the copyright owner can sue for infringement. *DC Comics v. Towle*, 802 F.3d 1012, 1023 (9th Cir. 2015).

Defendants' use of MSD PT2 in *Hurricane* and *Moon* infringe on the Plaintiff's exclusive right "to prepare derivative works based upon the work [MSD PT2]." Defendants do not dispute, but rather concede, that *Hurricane* was based on MSD PT2 [SS 19], and that Defendants attempted to negotiate with the Artists on authorizing the use of MSD PT2, which the Artists never granted. SS 29, PSS 126.

22

Russ, August & Kabat

Indeed, all four Artists are credited on *Hurricane* and Defendants' musicologist acknowledges the similarity between *Hurricane* and MSD PT2. SS 26, PSS 127, 129. *Moon* was also based on *Hurricane*. PSS 128. Again, the Artist Rahman was credited on *Moon*, and one of Defendants' engineers conveyed to some of the Artists' publishing administrator, Mr. Eames, that *Moon* was based on *Hurricane*. SS 26, PSS 129. The Plaintiff's musicologist also showed the bar-by-bar similarity between *Hurricane* and *Moon*, showing musically that *Moon* was derived from *Hurricane*. PSS 157-164.

### A.      The Plaintiff Prevails Under the Correct Law Because *Hurricane* and *Moon* Are Unlawful Derivatives of MSD PT2.

Defendants' primary argument appears to be a legal one that the Plaintiff is not entitled to assert infringement over a "derivative of a derivative." Defendants are wrong as a matter of law.

It is well settled that "copyright protection for a derivative work 'does not extend to any part of the work in which such [preexisting] material has been used ***unlawfully***. § 103(a). Thus, if a third party uses preexisting work in violation of the Copyright Act, the resulting derivative work is not entitled to copyright protection." *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d at 1016 (9th Cir. 2012) (emphasis added); *see* 17 U.S.C. §103(a) ("The subject matter of copyright . . . includes compilations and derivative works, but protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully.").

Here, *Hurricane* was created, employing the preexisting MSD PT2 material, without the Artists' permission. PSS 124-127, 154. *Moon* was also created, employing the preexisting *Hurricane* material, which contains the preexisting MSD PT2 material, without the Artists' permission. PSS 128, 157-164. Thus, *Moon* is as equally unauthorized as *Hurricane* to the extent it is based on *Hurricane*.

There is a circuit split as to whether the original work must "pervade" the unauthorized derivative work for that work to infringe. The Seventh Circuit and Second Circuit have offered, in dicta, two different standards, and the Ninth Circuit has not reconciled the "potentially conflicting authorities." *Sobhani v. @Radical.Media Inc.*, 257 F.Supp.2d 1234, 1240 (C.D. Cal. 2003). This Court does not need to resolve the split because, as discussed below, Plaintiff prevails under either standard.

Plaintiff prevails under the Seventh Circuit's precedent. The Seventh Circuit has offered that an unauthorized derivative work is not entitled to any copyright protection, regardless of whether the copyrighted work pervades the derivative work. So here, because *Hurricane* was unlawfully derived from MSD PT2, and *Moon* was derived from *Hurricane*, both *Hurricane* and *Moon* infringe MSD PT2 under Sections 106 and 103(a).

Indeed, courts have specifically held that when a derivative work is unauthorized, the author of the derivative work has no rights even in the original elements of the derivative work. In *Pickett v. Prince*, 207 F.3d 402, 406 (7th Cir. 2000), the plaintiff Pickett made a guitar roughly in the shape of the copyrighted symbol owned by the Artist f/k/a Prince and brought an infringement suit against Prince's guitar. Pickett argued that even though he was not authorized to use Prince's copyrighted symbol, he created a derivative work inspired by the symbol and he was entitled to the original elements of his derivative work. The plaintiff Pickett wrongly interpreted Section 103(a) as "authorizing a person other than the owner of the original work to make a derivative work, merely forbidding him to infringe the original." *Id.* at 406. The *Pickett* court explicitly rejected his interpretation. Writing for an unanimous panel, Judge Posner concluded that Section 103(a) should not be read "as ***qualifying*** the exclusive right of the owner of a copyright of the original work to make derivate works based on that work." *Id.* (emphasis added). Because "the only copyright that Pickett claims Prince infringed is a copyright that Pickett

RUSS, AUGUST & KABAT

24

had no right to obtain, namely a copyright on a derivative work based on Prince's copyrighted symbol," Pickett was not entitled to protection of purported "original elements" of his guitar design. *Id.*

The Seventh Circuit's reasoning is also supported by Professor Nimmer, who, in explaining the nature of a derivative work, found that: "[A] work will be considered a derivative work only if it would be considered an infringing work if the material that it has derived from a pre-existing work had been taken without the consent of a copyright proprietor of such pre-existing work. **It is saved from being an infringing work only because the borrowed or copied material was taken with the consent of the copyright owner of the prior work**, or because the prior work has entered the public domain." 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright §3.01, at 3–3 (hereafter Nimmer on Copyright) (emphasis added).

Moreover, Plaintiff prevails even under the Second Circuit's standard. The Second Circuit offered a different standard, namely, that copyright protection does not extend "to derivative works if the pre-existing work ***tends to pervade*** the entire derivative work." *Eden Toys, Inc. v. Florelee Undergarments Co.*, 697 F.2d 27, 34 n.6 (2nd Cir. 1982) (emphasis added) (finding in *dicta* that if a manufacturer-licensee did not have authorization for the owner of the "Paddington Bear" copyright to create a derivative work, then its derivative copyrights would be invalid because the original work would "tend[] to pervade the entire derivative work"). Defendants here appear to argue that a derivative work, such as *Moon*, is only unlawful if the original work "pervades" it entirely—regardless of whether the creator of the original work had authorized its use.

As discussed, *Moon* is an unauthorized derivative of an unauthorized derivative. Plaintiff put forth evidence sufficient to establish that MSD PT2 pervades *Hurricane*, and that *Hurricane* pervades *Moon*. For example, the Plaintiff's musicologist expert Dr. Joe Bennett opined that "[o]f the 4:03 runtime of

25

HURRICANE21, 100% consist of compositional material derived from [MSD PT2]." PSS 155. Dr. Bennett explained that while earlier versions of *Hurricane* took the sound recording of MSD PT2, the released version of *Hurricane* "contains a minimally adapted replay (interpolation) of the first four bars [of MSD PT2], while maintaining and featuring the same bass notes and chords, and proceeding throughout…." *Id.* Dr. Bennett also opines that he calculated "the percentage of MOON's composition time that includes the melodic elements that are … derived from HURRICANE …." *Id.* at 26. His methodology is "to identify any bars in MOON in which West sings one of the melodic elements (of HURRICANE) previously identified. Any bar that contains these melodies is counted; any that contains no melodic material, or clearly different melodic material (from HURRICANE) is not counted." *Id.* Based on this methodology, Dr. Bennett concludes that the released version of MOON contains 52% composition time that is derived from HURRICANE. *Id.* Dr. Bennett also shows comparisons of specific melodic material (*i.e.*, the bars) in *Moon* that is derived from *Hurricane*, and concludes that *Hurricane* and *Moon* "are melodically extremely similar." *Id.* At the very least, fact questions abound as to whether MSD PT2 "pervades" *Hurricane* and *Hurricane* "pervades" *Moon*, such that the issue cannot be resolved at summary judgment.

**B.     Defendants' Cases Are Inapposite Because They Involve Licensed Uses, While There Is No License Here.**

Defendants state that "Plaintiff cannot rely on a lineage methodology" because they must prove that there is similarity between MSD PT2 and *Moon* directly, without relying on *Hurricane*. But Defendants cite no law in support of their theory. Tellingly, courts in this Circuit have found the very opposite: "[i]n sum, as a leading copyright commentator explained, 'if the material copied was derived from a copyrighted underlying work, this will constitute an infringement of such work regardless of whether the defendant copied directly from the underlying work,

or indirectly via the derivative work.'" Nimmer on Copyright § 3.05, at 3–34.31 *see also DC Comics v. Towle*, 802 F.3d 1012, 1024 (9th Cir. 2015). And as Dr. Bennett has shown, there is similarity between MSD PT2 and unauthorized *Hurricane, and* between unauthorized *Hurricane* and unauthorized *Moon*. PSS 154, 161. Defendants cannot escape liability by relying on purported original elements of *Moon* that are not derived from *Hurricane*, and therefore, they claim, are not derived from MSD PT2. If anything, their introduction of purported original elements raises additional fact issues thereby barring summary judgment.

Indeed, Defendants' cases support that *unauthorized* derivative works are not entitled to protection. Defendants pluck a statement from *Parts Geek*, leaving out the context that "copyright protection for a derivative work '***does not*** extend to any part of the work in which such [preexisting] material has been used ***unlawfully***.'" *Parts Geek*, 692 F.3d at 1016. And "if a third party uses preexisting work in violation of the Copyright Act…the resulting derivative work is not entitled to copyright protection." *Id.* All of Defendants' cases are highly distinguishable.

In *Parts Geek*, founders of a software company sold the company to the plaintiff. The founders and the plaintiff disagreed as to whether the underlying software itself and subsequently made modifications thereto were part of the sales where the first version of the software was developed by an independent contractor who maintained ownership in it. He also made the modifications but as an employee of the company, and, later, of the plaintiff. *Id.* at 1016. The Ninth Circuit held that a jury could reasonably infer that the modifications to the software were owned by the plaintiff, as they were very much authorized by the independent contractor.

In *Reinsdorf,* Reinsdorf took photographs for a Skechers marketing campaign; Skechers modified the photographs for the campaign. *Reinsdorf v. Sketchers U.S.A.*, 922 F.Supp.2d 866, 871 (C.D. Cal. 2013). Those modifications were plainly licensed by Reinsdorf. After Reinsdorf purported to revoke the license, he sued Sketchers for infringement. Denying summary judgment on copyright infringement, the *Reinsdorf*

RUSS, AUGUST & KABAT

27

court, in relevant part, held there was an issue of fact as to whether Reinsdorf and Skechers were joint authors of the photographs.

Finally, in *Ashton-Tate,* two programmers fought over the rights in a resulting program but there were no questions that the creation was fully authorized. *Ashton-Tate Corp. v.* Ross, 916 F.2d 516, 522 (9th Cir. 1990). That is not the case here. The Artists did not authorize Defendants' creation of *Hurricane* or *Moon.*

Defendants' criticism of a "joint authorship" is also misplaced. Defendants mischaracterize Dr. Bennett's report as assuming that "joint ownership automatically carries into a derivative work." Dkt. 219-1 at 23. Rather, as discussed above, Dr. Bennett shows how MSD PT2 is compositionally similar to *Hurricane*, and *Hurricane* is compositionally similar to *Moon.* PSS 154, 161. Dr. Bennett does not take the shortcut that Defendants are falsely accusing him of taking in finding that *Hurricane* and *Moon* are derivative works. As Defendants' own case makes clear, joint authorship presumes that the derivative work was ***lawfully authorized***, *i.e.*, used by a co-author of the original work (in this case, MSD PT2) or licensed for use. *Ashton-Tate Corp. v.* Ross, 916 F.2d 516, 522 (9th Cir. 1990). Here, Defendants were neither co-authors of MSD PT2 nor had a license to use MSD PT2. PSS 124-126. Under Defendants' own authority, as unlawful users of MSD PT2, Defendants are liable for infringement of *Hurricane* and *Moon.*

### C. Dr. Bennett Found *Moon* and *Hurricane* To Be Similar Under the Extrinsic Test.

In addition, Dr. Bennett showed that *Moon*, unlawfully derived from *Hurricane*, is also similar under the extrinsic test. As discussed in Section VI, Dr. Bennett performed the extrinsic test in comparing the similarity between MSD PT2 and *Hurricane*. Because *Moon* is undisputably derived from *Hurricane*, Dr. Bennett also performed the extrinsic test in comparing the similarity between *Hurricane* and *Moon*. He opined that "[g]iven that each HURRICANE iteration contains protectable compositional elements of MSD18, [Moon's] replication of melodic

28

RUSS, AUGUST & KABAT

material . . . necessarily imports those protectable elements." PSS 157-164. In comparing *Hurricane* and *Moon*, Dr. Bennett finds similarity between "the respective vocal toplines" in the album versions of *Hurricane* and *Moon*, including, among other things, the precise "[e]xact matches of pitch and rhythm" in various phrasing. PSS 163. He therefore concludes that *Hurricane* and *Moon* "are melodically extremely similar." PSS 164.

In conclusion, *Moon*, being derived from MSD PT2 through *Hurricane*, infringes MSD PT2 because *Hurricane* was not authorized. As such, summary judgment should be denied.

## VIII. PLAINTIFF DOES NOT OPPOSE SUMMARY JUDGMETN ON ATTORNEY'S FEES OR STATUTORY DAMAGES

As to statutory damages and attorney's fees, Plaintiff agrees that the registrations were not sufficiently early to permit an award of such damages, and do not oppose summary judgment on that basis. Had Defendants actually met and conferred on this issue, the parties would have resolved this issue without having to burden the Court.

## IX. CONCLUSION

As discussed above, Defendants' Motion was filed in violation of Local Rule 7-3 and misstates the governing law and facts. Accordingly, it should be denied.

DATED: February 6, 2026          RUSS, AUGUST & KABAT

By: _____
Nathan D. Meyer
Attorneys for Plaintiff Artist
Revenue Advocates, LLC

RUSS, AUGUST & KABAT

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2026, a true and correct copy of the foregoing document was served electronically on all counsel listed below:

**MARTORELL LAW APC**
Eduardo Martorell
Christopher Rosario
Evan Miller
Playa District
6100 Center Drive, Suite 1130
Los Angeles, CA 90045
emartorell@martorell-law.com
crosario@martorell-law.com
emiller@martorell-law.com
jsotolongo@martorell-law.com
rrodriguez@martorell-law.com
ydavis@martorell-law.com

*Attorneys for Defendants*
*Kanye Omari West a/k/a "YE," Getting Out Our*
*Dreams, Inc. a/k/a G.O.O.D. Music, Getting Out Our*
*Dreams II, LLC, Yeezy LLC, Yeezy Supply LLC, and*
*Ox Paha Inc. f/k/a Mascotte Holdings, Inc*

                                        */s/ Nathan D. Meyer*

PLAINTIFF ARTIST REVENUE ADVOCATES, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

RUSS, AUGUST & KABAT