RUSS, AUGUST & KABAT
Irene Y. Lee, State Bar No. 213625
ilee@raklaw.com
Nathan D. Meyer, State Bar No. 239850
nmeyer@raklaw.com
Sarah Wang (*admitted pro hac vice*)
swang@raklaw.com
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone: (310) 826-7474
Facsimile: (310) 979-8268

Attorneys for Plaintiff
ARTIST REVENUE ADVOCATES, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA –WESTERN DIVISION

| | |
|---|---|
| ARTIST REVENUE ADVOCATES, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> KANYE OMARI WEST a/k/a "YE;" GETTING OUT OUR DREAMS, INC. a/k/a G.O.O.D. MUSIC, a California corporation; GETTING OUT OUR DREAMS II, LLC, a Delaware limited liability company; YEEZY LLC, a Delaware limited liability company; YEEZY SUPPLY LLC, a Delaware limited liability company; OX PAHA INC. f/k/a MASCOTTE HOLDINGS, INC., a California corporation; UMG RECORDINGS, INC., a Delaware corporation; UNIVERSAL MUSIC CORP., a Delaware corporation; UNIVERSAL MUSIC GROUP, INC., a Delaware corporation; KANO COMPUTING LIMITED, a United Kingdom private limited company; ALEXANDER NELSON KLEIN, an individual; ASHDUST LLP, a Delaware limited liability partnership; STEMPLAYER LTD, a United Kingdom private limited company; and DOES 1 through 10, <br><br> Defendants. | Case No. 2:24-CV-06018-MWC-BFMx <br><br> [Assigned to The Honorable Michelle W. Court, Courtroom 6A] <br><br> **PLAINTIFF ARTIST REVENUE ADVOCATES, LLC'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 1 [DKT. 248]** <br><br> <u>**Hearing**</u> <br> Date: April 3, 2026 <br> Time: 1:30 p.m. <br> Courtroom: 6A <br><br> Trial: April 20, 2026 <br> Final Pretrial Conf: April 3, 2026 <br><br> Original Complaint Filed: <br> July 17, 2024 |

## I.    INTRODUCTION

Plaintiff's damages are highly relevant and reliable as they are apportioned so as to relate to Defendants' infringement of the MSD PT2 sound recording[1] only. Further, they are based solely upon revenues related to the first listening party, where *Hurricane*—containing the sound recording through its entirety—was played ("Hurricane LP1"). These revenues reflect: (1) ticket sales for the listening party, (2) Apple's payment for the exclusive right to record and stream it, (3) merchandise sold at the listening party, and (4) sales of the Yeezy x GAP round jacket Ye sported at the listening party which was strategically marketed and timed for pre-order the very next day. Plaintiff thus more than satisfied its requirement to "formulate the initial evidence of gross revenue duly apportioned to relate to the infringement." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004).

Further, Plaintiff has presented evidence far more than sufficient to establish a requisite causal nexus between the infringing work and each revenue stream. Having been the only song on the *Donda* album that was leaked and teased for more than three years, Hurricane LP1 was by far the most anticipated and streamed song upon its release. Because "profits from the sale of concert tickets are direct," Plaintiff is entitled to profits generated from ticket sales. *Structured Asset Sales, LLC v. Sheeran*, 632 F.Supp.3d 192, 200 (S.D.N.Y. 2022). Similarly, profits from Apple's $1.25M payment are direct because "direct profits arise from the sale of the infringing good" and the profits here arose from Defendants' sale of the right to record and stream the entire listening party, which contains Defendants' infringing Hurricane LP1. *Id.* Given that Hurricane LP1 was the most anticipated song on the upcoming *Donda* album and thus drove attendance to the first *Donda* listening party, Plaintiff is also entitled to indirect profits generated from merchandise sold there.

[1] Pending the Court's ruling on Plaintiff's motion for reconsideration (Dkt. 241), Plaintiff's current damages are based upon Defendants' infringement of the sound recording only. Plaintiff reserves the right to pursue damages based upon Defendants' infringement of the composition subject to the Court's ruling.

2

RUSS, AUGUST & KABAT

They are analogous to profits Timex generated from selling watches at the trade shows where it played Polar Bear's copyrighted work without license. *Polar Bear*, 384 F.3d 712. Finally, as for the Yeezy x GAP round jacket, "the evidence before the Court is that GAP released a pre-order link shortly after Ye wore GAP's Round Jacket at his July 2021 listening party." Dkt. 213 at 6. Given the strategic marketing of the jacket and timing of its release, there is a causal link sufficient to support that the infringing lead song played at the listening party contributed to sales of the very product, sales of which Defendants used the listening party to promote and advertise.

Although not required, Plaintiff then further apportioned each revenue stream to reflect Defendants' infringement of Hurricane LP1 only. Plaintiff's damages expert Doug Bania meticulously counted and conservatively applied the numbers of streams for each song on the *Donda* album and included only the revenues proportional to the number for *Hurricane*: 21% for ticket sales, Apple's payment, and merch sales, and 14% for jacket sales. He then further apportioned 50% to reflect Plaintiff's forensic musicologist Joe Bennett's analysis that MSD PT2 accounts for 50% of Hurricane LP1, which leads to the total damages in the amount of $500,016 thereby attributing over 95% of the $10.2M revenues generated from the first *Donda* listening party to factors other than copyright at issue.

Accordingly, Mr. Bania, Dr. Bennett, and Prof. Greene should be permitted to present their respective testimonies concerning damages, all of which are highly relevant and reliable as they are related to Defendants' infringement of the sound recording only and based upon revenues generated from the first listening party only.

## II.    ARGUMENT

### A.    Plaintiff's Damages Are Highly Relevant and Reliable as They Are Based Solely Upon Defendants' Infringement of the MSD PT2 Sound Recording in Hurricane LP1.

Dr. Bennett opined, using reliable forensic musicology testing, that the following works contain the sound recording of MSD PT2 in their entirety: *80*

3

*Degrees*, 80DEG18, 80DEG18V, HURRICANEV1, HURRICANELP1, and Listening Party 1. *See* accompany opposition to Defendants' MIL No. 2. Such opinion is directly relevant to establishing that Defendants had access to the MSD PT2 sound recording and took it wholesale when creating these infringing derivative works.[2] It also illustrates the musical linage of Defendants' infringing activities.

Similarly, his analyses of the later versions of *Hurricane* and *Moon* are highly relevant and reliable in showing that there is no license or estoppel and Defendants' infringement was calculated and willful. Contrary to Defendants' assertion, the Artists did not intend Defendants to use MSD PT2 without fair compensation. When the Artists and Defendants could not reach an agreement on how revenues should be split, Defendants manufactured a duplicate sound that imitates the sound recording and then replaced the Artists' original sound recording (sample) with their simulated sound (interpolation). This demonstrates that Defendants were fully aware that the Artists did not authorize, but objected to, their use of MSD PT2.

Knowing that they did not have the right to use MSD PT2, Defendants made a calculated and deliberate decision to remove the sample from the versions of *Hurricane* but that was *after* the first listening party already occurred. Dr. Bennett's tests so confirmed: HURRICANELP2, HURRICANELP3, HURRICANE21, MOON21, Listening Party 2 and Listening Party 3 no longer contain audio sample of MSD PT2 but contain instead the interpolation of its compositional elements. Ex. 3 at 5-26. Dr. Bennett's tests, analyses, and opinions establish the willful nature of Defendants' infringement. In light of the Court's order (Dkt. 232), Plaintiff's current damages are limited to Defendants' infringement of the sound recording in Hurricane LP1 only, which Ye conceded. *See* Ex.[3] 8 (Ye Depo at 95:5-25). Dr. Bennett's tests so confirmed, as detailed in Plaintiff's opposition to Defendants' MIL

---

[2] Defendants explain that the *Hurricane* and *80 Degrees* "titles are thematically linked in that a hurricane can only form when temperatures reach 80 degrees Fahrenheit." (Dkt. 219-1, pg. 6).

[3] All Ex. References are to the Second Omnibus Meyer Declaration.

RUSS, AUGUST & KABAT

2. Further, his analysis is reliable and conservative in that Defendants' use of MSD PT2 accounts for only 50% of Hurricane LP1. Ex. 3 at 23; Ex. 4 at 15-22. The Court should thus permit Dr. Bennett to testify as an expert on these matters.

**B.    Plaintiff Does Not Seek Damages Outside the Statute of Limitations or for HURRICANEV1.**

While they are highly relevant and reliable in refuting license and estoppel and demonstrating the willful nature of Defendants' infringement, 80DEG18, 80DEG18V, or other versions of *80 Degrees* are not the bases for damages. To the extent there are any damages attributable to 80DEG18, 80DEG18V, or other versions of *80 Degrees*, Plaintiff has been consistent and clear that it does not pursue them in compliance with 17 U.S.C. § 507(d). Similarly, Plaintiff does not seek damages for HURRICANEV1. Accordingly, there are no opinions, testimonies, or other forms of evidence that need to be excluded.

**C.    Plaintiff Is Entitled to Profits from Ticket Sales, Apple's Payment, Merch Sold at the Listening Party, and Sales of the Yeezy x GAP Round Jacket which Defendants Used the Listening Party to Promote and Advertise.**

**1.    Profits from the Listening Party Ticket Sales Are Direct.**

Quoting *Mackie*, 296 F.3d 999, 914 (9th Cir. 2002), the court in *Sheeran*, 632 F.Supp.3d 192 (S.D.N.Y. 2022) reaffirmed that "[d]irect profits arise from the sale of the infringing good" and held that "profits from the sale of concert tickets are direct." *Id.* at 200. Thus, Plaintiff are entitled to profits generated from selling tickets to the first *Donda* listening party at Mercedes-Benz Stadium in Atlanta, Georgia. Because "Defendants did not provide financial information regarding ticket sales, attendance, pricing, expenses, or any related financial data for the Listening Parties," Mr. Bania searched and obtained sufficient facts and data about the number of tickets sold and their prices from four independent and reliable sources. Ex. 6 at 14, 51 (Schedule 4b). He then conservatively adopted 40,000 tickets sold although two of

RUSS, AUGUST & KABAT

the four sources indicated that 42,000 tickets were sold. *Id.* He then took an average of the lowest ticket price ($20) and the highest ticket price ($120) and multiplied the average price ($60) by 40,000 tickets, resulting in $2,400,000 in gross revenues from the ticket sales. *Id.* at 15, 50 (Schedule 4a), 51 (Schedule 4b).

He then meticulously counted the numbers of streams for each song on the *Donda* album and included only the revenues proportional to the number for *Hurricane*. *Id.* at 15, 57-60. Specifically, he noted Hurricane had been streamed 509,950,519 times as of December 11, 2025, which represented 21% of the total number of times the fifteen songs on the listening party's setlist were streamed. *Id.* Thus, the gross revenues from ticket sales attributable to Hurricane LP1 amount to $513,330. *Id.* at 15. This is the very method of calculation the plaintiff in *Sheeran* used which the court allowed to be presented at trial. *Sheeran*, 632 F.Supp.3d at 201. Here, Mr. Bania went even further. He apportioned an additional 50% to reflect Dr. Bennett's analysis that MSD PT2 accounts for 50% of Hurricane LP1, reducing the total damages based upon ticket sales to $256,665. Ex. 6 at 23-24. Mr. Bania's methodology is well-tested, reliable, and relevant and should be presented at trial.

### 2. Profits from Apple's Payment for the Exclusive Right to Record and Stream the Listening Party Are Direct.

It is well established that "[d]irect profits [are] those that are generated by selling an infringing product." *Polar Bear* at 710. Here, Apple entered into an agreement under which it paid $1.25M for the exclusive right to record and stream the entire first listening party. Ex. 19; Ex. 6 at pages 18-19, 54 (Schedule 6). Under its terms, Defendants sold the right to make and stream video and audio recordings of the first listening party which includes Defendants' infringing Hurricane LP1. Thus, profits arising from Apple's $1.25M payment are direct. When calculating the relevant gross revenue, Mr. Bania applied the same 21% to apportion and then Dr. Bennett's 50% to further apportion, reducing the total damages based upon Apple's payment down to $133,680. Ex. 6 at pages 19, 23-24, 54 (Schedule 6).

6

RUSS, AUGUST & KABAT

Assuming, *arguendo,* profits from Apple's payment were found to be indirect, courts have consistently held that "§ 504(b) is 'expansive enough to afford parties an indirect profits remedy under certain conditions.'" *Polar Bear* at 710 (citing *Mackie*, 296 F.3d at 914). While "[t]he copyright owner is entitled to recover . . . any profits of the infringer that are attributable to the infringement" 17 U.S.C. § 504(b), "Plaintiff seeking to recover indirect profit damages 'must proffer some evidence . . . [that] the infringement at least partially caused the profits that the infringer generated as a result of the infringement." *Mackie*, 296 F.3d at 911.

Here, having been the only song on the *Donda* album that was leaked and teased for over three years, *Hurricane* was the most anticipated and streamed song. Ex. 20 ¶¶127-141. Of the 32 tracks on the *Donda* album, *Hurricane* was the lead single upon release. Ex. 25. It garnered Ye a Grammy for Best Melodic Rap Performance, which helped Ye tie Jay-Z for the most Grammy wins by a rapper. Ex. 20 ¶50. Its first publication dates back to September 2018 when Ye previewed the track by posting the video of himself singing *80 Degrees* over the MSD PT2 sound recording. Exs. 8 (Ye Depo at 76: 5-12), 21. It reportedly had millions of views and sparked interest as his next album entitled *Yandhi* was scheduled to release a couple weeks later.[4] Ex. 20 at 26 n. 72. Ye scrapped and never released *Yandhi*, but various versions of *80 Degrees* and *Hurricane* leaked, building further excitement and anticipation as Ye announced the release of the *Donda* album in 2021. Thus, it comes as no surprise that *Hurricane* was the most anticipated and streamed song on *Donda* upon its release.

Further, *Hurricane* was the song that Ye leveraged to negotiate himself out of the UMG recording agreements which he once characterized as "modern day slave ships". Ex. 22. In January 2019, Ye and his companies filed a lawsuit demanding to be released from them. Ex. 24. The lawsuit resulted in a settlement dated June 30,

---

[4] https://www.essence.com/celebrity/kanye-west-delays-yandhi-album-again/ (cited in Ex. 20 at 26 n. 72; quoting Defendant Ye's ex-wife Kim Kardashian-West of tweeting about *Yandhi*, "TRUST ME it is worth the wait").

Russ, August & Kabat

2021, three weeks before the first *Donda* listening party. Ex. 23. Its terms revealed that UMG agreed to release Ye, but on the condition that he delivers one studio album consisting of specific unreleased recordings, the first of which (on the list) is "Hurricane." *Id.* at 2, 11. They further revealed that Ye negotiated a discount of his distribution fee from 17% to 5% for his future albums Donda 2 and Vultures 1. Exs. 23, 24. Ye therefore leveraged *Hurricane* to escape his contractual obligations to UMG and benefited from the 12% discount in distribution fee. Ex. 20 ¶¶137-141; Ex. 7 (Bania Depo at 152:12-153:9).

Ignoring Plaintiff's expert opinions on causation based on these facts, Defendants attack a strawman by arguing that Plaintiff's experts did not conduct "consumer interviews with polling, [or] focus groups and double-blind testing." Dkt. 248 at 3. But where, as here, the causal link between Hurricane LP1 and Defendants' revenues are so apparent, such "testing" is not necessary. Indeed, the *Polar Bear* court accepted, without requiring any consumer or market testing, plaintiff's expert "conclu(sion) that approximately 10% to 25% of trade show sales are the result of excitement created by the booth promotion." *Id.* 384 F.3d at 712.

Having been leaked and anticipated, Hurricane LP1 built enough excitement for Apple to pay $1.25M to record and stream the first *Donda* listening party where Hurricane LP1 was prominently featured. Thus, the causal nexus is more than sufficient to support Plaintiff's entitlement to profits from Apple's payment.

### 3. Plaintiff's Expert Testimonies Establish the Requisite Causal Connection Between Merchandise Sale at the Listening Party and Defendants' Infringement.

In attacking Plaintiff's damages based upon merch sale at the first listening party, Defendants rely on *Polar Bear*. However, it omits that the *Polar Bear* court readily recognized and upheld profits resulting from the first two of the three sources: (1) Timex's sale at trade shows where it played Polar Bear's copyrighted material without license; (2) Timex's sales from the use of a still image in a

8

RUSS, AUGUST & KABAT

promotion with Mountain Dew; and (3) the overall enhancement of Timex's brand prestige. *Id.* at 711-712. At trial Polar Bear estimated that it was entitled to recover between $1.7M and $3.2M in Timex's profits and jury awarded Polar Bear $2.1M. In vacating the jury verdict, the *Polar Bear* court found no connection to support the purportedly enhanced Timex brand prestige. However, the court fully acknowledged and accepted Polar Bear's expert "Hansens' testimony established the requisite causal connection" to support Timex's sales at trade shows where it played Polar Bear's film without license and the promotion with Mountain Dew. *Id.*

As detailed in Section II.C.2 above, *Hurricane* was the first song on the *Donda* album that was leaked and the only song that was teased for years. Because the *Yandhi* album was never released, various versions of *80 Degrees* and *Hurricane* continued to leak from 2018 through 2021, building further excitement and anticipation as Ye announced the release of the *Donda* album in 2021. Thus, it is reasonable to connect *Hurricane* played for the first time to a large audience at the first *Donda* listening party to merchandise attendees bought at the very listening party. Profits Defendants generated from selling merch at the listening party where Hurricane LP1 was played are analogous to profits Timex generated from selling watches at the trade shows where the copyrighted film was played. *Polar Bear*, 384 F.3d 712. Further, just like "the customers who ordered Timex Expedition watches through the Mountain Dew promotion would have seen the advertisement [containing the infringing image]", the customers who purchased merchandise at the first *Donda* listening party were present there and would have heard the infringing Hurricane LP1 played at the listening party.

When calculating the relevant gross revenue related to the merch sales at the first listening party, Mr. Bania conservatively applied the same 21% to apportion and then Dr. Bennet's 50% to further apportion, reducing the total damages down to $51,426. Ex. 6 at pages 16-17, 23-24, and 53 (Schedule 5).

RUSS, AUGUST & KABAT

**4.    Plaintiff Has Presented Sufficient Data and Facts to Establish the Causal Nexus Required to Recover Profits Generated from the Yeezy x GAP Jacket Sales.**

In June 2020, GAP and Yeezy Supply LLC entered into a fashion collaboration agreement and timed debuting the Yeezy x GAP round jacket at the first *Donda* listening party—with merchandise coming out for the first time a year later. From countless outfit choices, Defendants made a conscious decision to have Ye introduce the Yeezy x GAP round jacket by sporting it for the entire duration of the listening party. Defendants then timed the jackets to be available for pre-order the very next day. Exs. 26, 27.  Given the import of *Hurricane* in the *Donda* album, Plaintiff is entitled to recover profits generated from the Yeezy x GAP round jacket that was "aptly timed" around the first *Donda* listening party where Hurricane LP1 was expected to be played and in fact played.

Courts have permitted plaintiffs to recover indirect profits with a nexus that is more attenuated than here. The plaintiff in *Polar Bear* was found to have "established requisite causal connection" to recover profits Timex generated from trade shows where the infringing video was played. *Polar Bear* at 712. There, Plaintiff presented no record to indicate that the plaintiff's video was anticipated or expected before the trade shows, unlike *Hurricane* was before the first *Donda* listening party. *Id.* It was also acknowledged that Polar Bear "demonstrated a sufficient causal nexus" to recover profits from the Mountain Dew promotion simply by presenting a booklet which contained a still image from the infringing video. *Id.* at 712-713. Unlike here, there was nothing in record to indicate that the release of Timex watches was pre-planned around the release of the still image or the booklet itself. *Id.* Further, the profits here are only associated with the Yeezy x GAP round jacket, and not any other products such as hoodies or shirts that were later released as part of the collaboration and prominently featured in the *Hurricane* music video, thus further narrowly tailoring the profits to the infringing Hurricane LP1 only.

10

RUSS, AUGUST & KABAT

Thus, with the sufficient causal nexus, the total gross revenue generated from the Yeezy x GAP jacket is $5,943,466. Ex. 6 at 56 (Schedule 8). To "formulate the initial evidence of gross revenue duly apportioned" to Hurricane LP1, Mr. Bania first applied the 14% royalty rate from the Yeezy x GAP agreement to reflect the portion paid to Defendants, then applied an additional 14% to reflect the number of streams for *Hurricane* in relation to the rest of the tracks on the *Donda* album, and then Dr. Bennet's 50% to further apportion, reducing the total relevant gross revenue based upon the Yeezy x GAP jacket down to $58,246. *Id.* at 20-24, ¶¶56-60.

Because Mr. Bania's analysis and reasoning are sound and based upon sufficient data through reliable sources and methodologies, his opinions will help the jury determine a damages award and should be permitted at trial.

## II.     CONCLUSION

As detailed above, Defendants do not challenge the qualification of Mr. Bania, Dr. Bennett or Prof. Greene to testify as an expert with respect to damages issues. Despite the limited financial information produced by Defendants in this case, Mr. Bania, Dr. Bennett, and Prof. Greene managed to search and obtain sufficient data and information from reliable sources, applied them conservatively and reliably through well-accepted tests and methodologies. Thus, they should be permitted to present their respective testimonies concerning damages resulted from Defendants' infringement of the MSD PT2 sound recording based upon revenues generated from the first *Donda* listening party.

DATED: March 20, 2026          RUSS, AUGUST & KABAT

                               By: /s/ *Irene Y. Lee*
                               _____
                               Irene Y. Lee
                               Attorneys for Plaintiff
                               Artist Revenue Advocates, LLC

11

## **CERTIFICATE OF SERVICE**

I certify that counsel of record who are deemed to have consented to electronic service are being served on March 20, 2026, with a copy of this document via the Court's CM/ECF systems per Local Rule CV-5(a)(3). Any other counsel will be served by electronic mail, facsimile, overnight delivery and/or First Class Mail on this date.

/s/     *Irene Y. Lee*

RUSS, AUGUST & KABAT

12

ARTIST REVENUE ADVOCATES, LLC'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 1