UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| ARTIST REVENUE ADVOCATES, LLC, | ) | CASE NO: 2:24-cv-06018-MWC-BFM |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| KANYE OMARI WEST, ET AL, | ) | Wednesday, May 6, 2026 |
| | ) | (9:04 a.m. to 11:59 a.m.) |
| Defendants. | ) | (1:05 p.m. to  4:06 p.m.) |

JURY TRIAL - DAY 3

BEFORE THE HONORABLE MICHELLE WILLIAMS COURT,
UNITED STATES DISTRICT JUDGE, PRESIDING

**APPEARANCES**:            SEE PAGE 2

Court Reporter:            Recorded; CourtSmart

Courtroom Deputy:          Claudia Garcia-Marquez

Transcribed by:            Exceptional Reporting Services, Inc.
20079 Stone Oak Pkwy
Suite 1105-237
San Antonio, TX 78258
361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

<u>APPEARANCES</u>:


For Plaintiff:                IRENE Y. LEE, ESQ.
                              NATHAN MEYER, ESQ.
                              SARAH W. WANG, ESQ.
                              JEFFERSON E. CUMMINGS, ESQ.
                              Russ August & Kabat
                              12424 Wilshire Boulevard
                              12th Floor
                              Los Angeles, CA 90025
                              310-826-7474


For Defendants:               EDUARDO MARTORELL, ESQ.
                              EVAN LOUIS MILLER, ESQ.
                              NICOLE KENNEDY
                              CHRISTOPHER ROSARIO, ESQ.
                              Martorell Law
                              6100 Center Drive
                              Suite 1130
                              Los Angeles, CA 90045
                              323-840-1200

Also present:                 MILO YIANNOPOULOS

3

<u>INDEX</u>

| PLAINTIFF'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GREGORY JOHNSON | 7 | 25/68 | 85 | |
| YE, AKA KANYE OMARI WEST | 88/111 | 125 | | |
| JOSEPH BENNETT | 142 | 158 | 172 | |
| KEVIN GREENE | 178 | 190 | 209 | 210 |
| DOUG BANIA | 211 | | | |

| EXHIBITS | MARKED FOR ID | RECEIVED |
|---|---|---|
| 60 | | 124 |
| 73 | | 110 |
| 112 | | 11 |
| 116 | | 15 |
| 140 | | 23 |
| 157 | | 22 |
| 376 | | 171 |
| 423 | | 106 |
| 576 | 151 | |
| 577 | 151 | |
| 5083 | | 49 |
| 5107 | | 50 |
| 5175 | | 79 |
| 5183 | | 78 |
| 5196 | | 75 |
| 5197 | | 72 |

EXCEPTIONAL REPORTING SERVICES, INC

4

**INDEX (CONTINUED)**

| EXHIBITS | RECEIVED |
|----------|----------|
| **5198** | **80** |
| **5201** | **82** |

5

**Los Angeles, California; Wednesday, May 6, 2026; 9:04 a.m.**

**(Call to Order)**

**(Jurors present)**

**THE CLERK:** Calling case LA-cv-24-6018, Artist Revenue Advocates, LLC versus Kanye Omari West, et al.

Counsel, please state your appearances for the record, starting with plaintiff.

**MS. LEE:** Good morning, Your Honor, may it please the Court, Irene Lee of Russ, August & Kabat representing the plaintiff. With me are Nate Meyer, Sarah Wang, Jay Cummings, and Mr. Britt Monts for ARA. Thank you.

**THE COURT:** Good morning, everyone.

**(A chorus of good morning)**

**MR. MARTORELL:** Good morning, Your Honor, Edwardo Martorell on behalf of the Ye defendants. And with me are Nicole Kennedy, Evan Miller, and Christopher Risario.

**THE COURT:** Good morning.

**MR. MARTORELL:** Good morning.

**THE COURT:** Okay. So we are set to resume trial, and I see that Mr. Johnson is here. Sir, if you could come forward, we're going to swear you in again, and then you'll have a seat on the witness stand, and we'll resume with your testimony.

**THE CLERK:** Please raise your right hand.

//

6

**GREGORY JOHNSON, PLAINTIFF'S WITNESS, SWORN**

THE CLERK:  Please be seated.

THE COURT:  Okay, good morning.

THE WITNESS:  Good morning.

THE CLERK:  Please state your name and spell your last name for the record.

THE WITNESS:  Gregory Johnson, J-O-H-N-S-O-N.

THE COURT:  Thank you.  And Mr. Meyer, before we start I do want to give my usual colloquy to the jury.

MR. MEYER:  Of course.

THE COURT:  As I reminded you yesterday and continue to emphasize to you today, it's important that you decide this case based solely on the evidence and the law that is presented here, so you must not learn any additional information about the case from sources outside of the courtroom.

To ensure fairness to all parties in this trial, I'll now ask each of you whether you have learned about or shared any information about this case outside of the courtroom, even if it was accidental.  If you think that you might -- may have done so, please let me know by raising your hand.  Seeing no hands raised.

I appreciate you listening to me, I'll do this rendition every morning.

If you'd prefer to talk to the Court privately in response to this question, please notify a member of the Court

Johnson - Direct / By Mr. Meyer                          7

staff at the next break, and thank you so much for your careful

adherence to the Court's instructions.

            Okay, Mr. Meyer, you may proceed.

                    **DIRECT EXAMINATION (CONTINUED)**

**BY MR. MEYER:**

Q    Good morning, again, Mr. Johnson.

A    Good morning.

Q    What is a performing rights organization?

A    I guess they call them PRO, ASCAP, CSACK, BMI, they

collect writer income from public performance, i.e., radio,

venue plays, restaurants, music plays, et cetera.

Q    Is that on the sound recording or the composition?

A    That's on the composition.

Q    Do PROs compensate artists for the use of their sound

recordings?

A    No.

Q    How are revenues in connection with a sound recording

compensated?

        **MR. MARTORELL:**  Objection, calls for expert opinion,

not a special knowledge on the topic.

        **THE COURT:**  Overruled, he can answer.

        **THE WITNESS:**  Typically that comes from the record

label who paya a royalty.

//

//

Johnson - Direct / By Mr. Meyer                    8

BY MR. MEYER:

Q    Is that automatic or is that negotiated?

A    That's negotiated.

Q    And do you have experience in this?

A    Yes.

Q    For how many years?

A    I've been representing producers, artists for over 20 plus years.

Q    How many licenses of the type you just described have you negotiated over the course of those 20 plus years?

A    I've been a part of, I don't know, a hundred plus.  The attorney actually negotiates and finalizes the deals.

Q    Okay.

        MR. MEYER:  All right.  I'd like to publish Exhibit 112.

        THE COURT:  Any objection?

        MR. MARTORELL:  One moment, Your Honor.  112?

        THE COURT:  112.

        MR. MARTORELL:  We do object on the basis of foundation and other objections, but maybe counsel wants to lay a foundation first?

        THE COURT:  Okay.  So what we'll do is we'll turn off the screen for the jurors so that you can show the witness and we'll lay the foundation.  Just one moment.

        (Pause)

THE COURT:  That's okay, I think I can do it from here.

So to our jurors, did the juror screens just go blank?

Okay.  Go ahead, Mr. Meyer.

MR. MEYER:  All right.

BY MR. MEYER:

Q    Mr. Johnson, do you see this email dated January 17th, 2022?

A    Yes.

THE COURT:  Oh, let's turn that screen off.

THE WITNESS:  Thank you for enlarging it.  Yeah. Yes, I can now.

BY MR. MEYER:

Q    Are you on this email chain?

A    Yeah, I'm cc'd.

Q    Were you involved in the email correspondence on this page and on the next page?

A    I'm just cc'd on this.

Q    Were you involved in any of the decision-making to send the bottom email to Ms. Reed?

A    Yes.

MR. MEYER:  All right, I'd like publish the exhibit.

THE COURT:  Yes, you may publish.

MR. MEYER:  Thank you.

Johnson - Direct / By Mr. Meyer                    10

MR. MARTORELL:  Just for the record, I do object on the basis of hearsay, Your Honor.

THE COURT:  Okay.  Are you moving the document into evidence?

MR. MEYER:  Not at this time, I'm only publishing, and I will not be using it for the truth of the matter, simply that it was sent.

THE COURT:  Okay.  So ladies and gentlemen of the jury, if you'll recall at the beginning of the trial when I gave you some of the initial instructions that I said that sometimes I may be admitting evidence for a limited purpose, this is one of those times.

So this document is not being offered for the truth of the things that are stated in it, but just that the statements were made.

Okay, Mr. Meyer, go ahead.

MR. MEYER:  Thank you.

BY MR. MEYER:

Q    What is Ms. Wise saying to Ms. Reed in plain terms in this January 17, 2022 email?

A    She's sending a copy of the Pro Tools, which is the recorded file, of MSD PT2, and she's saying it was created March 14th, 2018.

Q    Okay.  And the email before that is from Mr. Abdul-Rahman?

A    I can't see.  Okay, yes.

**EXCEPTIONAL REPORTING SERVICES, INC**

MR. MEYER:  All right.  I move to admit not for the truth of the matter, simply for it having been sent.

THE COURT:  Any objection?

MR. MARTORELL:  No objection, Your Honor.

THE COURT:  Okay, so Exhibit 112 is admitted for the limited purpose of showing that the communication was sent.

**(Exhibit Number 112 received in evidence)**

BY MR. MEYER:

Q    All right.  Now let's just note of the date of the email, Mr. Johnson?

A    January 17th, 2022.

MR. MARTORELL:  And Your Honor, we retract objections, it can be admitted in full.  I've now read it all.

MR. MEYER:  Okay.

THE COURT:  Okay, it is admitted in full.  Thank you.

BY MR. MEYER:

Q    All right.  Let's go back to Exhibit 111, which is in evidence, and we looked at yesterday, page 2.  And just can you note the date of the last email of the chain on 111?

A    November 12th, 2021.

Q    Oh, no, the very top, right there.

A    January 10th, 2022.

Q    So 112 we're now about a week past 111?

A    Yes.

Q    Okay.

Johnson - Direct / By Mr. Meyer                    12

MR. MEYER:  I'd now like to publish 116, which I believe was admitted yesterday before we ended for the day.

THE COURT:  116 has -- Ms. Garcia Marquez, I don't have it as being admitted, do you?

THE CLERK:  No, I just have it identified.

MR. MEYER:  Oh, then I'd like to --

THE COURT:  Okay.

MR. MEYER:  -- publish 116.

THE COURT:  Okay.  Any objection?

MR. MARTORELL:  No objection, Your Honor.

THE COURT:  Okay, you may publish.

BY MR. MEYER:

Q    And let's start of the bottom, this is another threaded email chain.

All right.  The first email is kind of long, it starts on page 5, right there.  This is an email from January 19th, 2022 from Debra Wise.  Were you ultimately on this email chain?

A    Yes.

Q    And again not seeking for the truth of the matter asserted, what is Ms. Wise telling Ms. Reed in this email?  And if you need me to scroll down we can do that.

A    She's stating the original authors of the composition, who the publishers were -- or publishing administrators, not publishers.  And she's stating that it's a preexisting work with new works -- she's stating it's a derivative work of what

Johnson - Direct / By Mr. Meyer                    13

the guys wrote in essence.

Q    And let's go down to page 8.  What is the number she is proposing for splits?

A    An aggregate, a total of 50 percent, 5-0 percent for the 4 writers, 12.5 each.

Q    And that's more than the 8 percent Ms. Reed was offering in her prior email?

A    Yes.

Q    Why was 50 percent appropriate?

A    Well when you create a song there's lyric melody and then there's musical composition, which musical composition comprises 50 percent of a song, and lyric melody comprises 50 percent of the song.

Q    Thank you.

        MR. MEYER:  Let's move up to page 3, the email from Michael Eames.

**BY MR. MEYER:**

Q    This is an email from January 22nd.  Were you at some point removed from the email chain and then put back on the email chain?

A    Yeah.

Q    And once Mr. Eames copied you did you read all the emails on the chain at the time?

A    I believe so.

Q    All right.

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Direct / By Mr. Meyer                    14

**MR. MEYER:**  Let's go to top of page 2.

**BY MR. MEYER:**

Q    And can you read your February 7th, 2022 email to Free out loud, please, for the jury.

A    Free, I told you from day one we would never agree to your proposed 10 or so percent regarding writer share for Khalil and his 3 cowriters, and in fact I told you I would need to discuss with them as well as I am not their publisher.

Q    Oh, and then the last sentence?

A    Now, we did discuss with Khalil and Boogz the producer fees and points, which are fine.

Q    What did you mean by the producer fees and points, which are fine?

A    Well what he had stated was that there were five -- I can't remember -- four or five other producers on the song, and if that's the case then what he proposed we would be comfortable with, but we hadn't heard the song at that point and we were never -- there was no collaboration, we weren't in the room, et cetera, so until we hear it, Khalil gets to hear it and make a determination, we needed to see what would happen, and then in negotiation Debra would -- Debra Wise, the attorney, would tie it off.

Q    And could you have done a producer deal for Mr. Abdul-Rahman without also settling the splits?

A    No, because he's got to convey his master ownership rights

Johnson - Direct / By Mr. Meyer                    15

in essence, so it needs to be a clear title.  So clear title means the underlying copyrights the songwriters need to agree on splits.

Q    So could you do a deal just on the fees and points?

MR. MARTORELL:  Objection, lacks foundation.

THE COURT:  Overruled, he can answer.

THE WITNESS:  It would have to be in the entire producer agreement.  It would be inclusive of the agreement, if that answers your question.

BY MR. MEYER:

Q    It does.  Can I --

MR. MEYER:  I'd move to admit 116.

THE COURT:  Any objection?

MR. MARTORELL:  No objection, Your Honor.

THE COURT:  Okay, Exhibit 116 is admitted.

(Exhibit Number 116 received in evidence)

BY MR. MEYER:

Q    So your email to Free is dated February 7th, 2022.  Do you recall a response from Free to this email?

A    No, I do not.

Q    To your recollection did anyone ever reach out to your team from Ye's team after February 20 -- February of 2022?

A    Not to my recollection, no.

Q    Were you or your team able to reach anyone on Ye's side after February of 2022 who can engage substantively?

Johnson - Direct / By Mr. Meyer                16

MR. MARTORELL:  Objection, lacks foundation, assumes facts not in evidence.

THE COURT:  Overruled, he can answer.

THE WITNESS:  No, not to my knowledge.  I know that Debra tried to reach out to who we thought were legal representatives of his at the time or moving forward, but I think she may have contacted one, but they were no longer representing Kanye at the time.

MR. MEYER:  All right.  I'd like to publish Exhibit 140.

THE COURT:  Any objection?

MR. MARTORELL:  No objection, Your Honor.

THE COURT:  Okay, you may publish.

MR. MEYER:  All right.  This is another threaded email, so let's start at the bottom.  And the first email starts on page 5.  Scroll up a little bit.  There you go, stop.

BY MR. MEYER:

Q    All right.  Is this your email dated November 28th, 2023 to Jeff Harleston?

A    Yes.

Q    Who is Jeff Harleston?

A    He's head of business affairs for all of the Universal Music Recordings worldwide I believe.

Q    So you were emailing Universal, not Ye, in this email?

A    Correct.

Johnson - Direct / By Mr. Meyer                    17

Q    Why UMG and not -- sorry -- why Universal and not Ye's people?

A    Because we hadn't gotten any response, I was trying to find out who was a representative for him at that time so we could try and follow up.

Q    And had you been successful in getting through to anyone?

A    No, Jeffrey directed us to the head of business affairs at Def Jam Recordings, which in essence was a distributor and marketing arm for Kanye's releases.

Q    And is Def Jam a Ye affiliated company or a Universal affiliated company?

A    Well it's a Universal affiliated company or owned company. I guess you could say there's an affiliation because Kanye's label G.O.O.D Music distributed and was marketed through Def Jam.

Q    But Def Jam is a Universal company?

A    Yes.

Q    Okay.  Let's move up to page 4, there's an email from you dated December 14th, 2023 to Odell Nails, do you see that?

A    That Odell sent to me?

Q    No, that you sent to Mr. Nails.

A    Let's see where it is.

Q    It's at the bottom of --

A    Okay.

Q    -- page 4.

Johnson - Direct / By Mr. Meyer                    18

A     Yes.

Q     Can you please read your email to Mr. Nails for the jury.

A     "Hi, Odell, checking in here as we would prefer to settle the matter with you as opposed to filing an action.  Any thoughts on where we are I can relay to Debra?  Thanks."

Q     And who is Odell Nails?

A     He's head of business affair at Def Jam.

Q     And I see his email address is at U Music, is that Universal Music?

A     Yeah, Def Jam is owned by Universal Music.

Q     All right.  Let's scroll up to Mr. Nails' response to you. Can you please read that for the jury.

A     "Hello Greg, we are in the process of communicating with artist counsel regarding this matter, and either he or I will get back to you on this as quickly as possible with the understanding that UMG's offices will be closing for the holiday season commencing tomorrow."

Q     All right.

A     "The foregoing is without prejudice to and all of Def Jam, UMG's rights, remedies, powers, privileges, defenses, and claims, whether in equity or at law, and hereby expressly reserved."

Q     All right.  When they say communicating with artist counsel do you understand that to be Ye's counsel?

A     Yes.

Johnson - Direct / By Mr. Meyer                    19

Q    All right.  This is December 14th.

MR. MEYER:  Let scroll up to the next email in the chain, please.

BY MR. MEYER:

Q    All right, we're now at January 26th, 2024, over a month later.  Had you heard from Ye's counsel in this interval?

A    No.

MR. MEYER:  All right.  Let's then look at the most recent email in the chain, the top email.  Right there.

BY MR. MEYER:

Q    This is February 7th, 2024.  What did you understand Mr. Nails was telling you here?

A    That he talked to Debra and that they are formally tendering this claim to artist's current legal representative who should be reaching out to you in order to attempt to address this matter, if he does not hear from me first.  Of course the foregoing is without prejudice to Def Jam.

Q    Okay.  So you understood that Def Jam was sending this onto Ye?

A    Yes, they're his representatives.

Q    And did you -- this was February of 2024, did you hear from anyone on Ye's side after this?

A    I did not personally hear from any of his representatives, and I don't believe, but I'm not for sure, that anybody called Debra, Khalil's attorney, after that.

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Direct / By Mr. Meyer                    20

Q    So if Ye's camp had been reachable and responsive in late '22 and '23 and '24, do you think we'd be here today?

MR. MARTORELL:  Objection, leading and argumentative.

THE COURT:  Overruled, he can answer.

THE WITNESS:  Honestly I don't know.

BY MR. MEYER:

Q    All right.  How did you get connected with ARA?

MR. MEYER:  And you can take the exhibit down.

THE WITNESS:  Through an attorney, Michael Tomasulo.

BY MR. MEYER:

Q    Did you negotiate the copyright assignment with ARA?

A    No.

Q    What was your role in connection with the copyright assignment?

A    Basically to communicate with the four -- or the three writers and the one producer in this case to bring forth any information they needed in order to make it happen.

Q    And what was transferred to ARA by the copyright assignment?

A    Dan, Sam, and Josh Mease, their songwriter ownership piece of the song, and with Khalil his SR or master recording rights and royalties and ownership.

Q    And did you have to sign documents in connection with the copyright assignment?

A    Yes.

Johnson - Direct / By Mr. Meyer                        21

Q    Do you remember what time of day you signed, morning, noon, night, evening?

A    I believe morning to noon, approximately.

Q    Okay.  There was some discussion during Mr. Monts' testimony about Docusign.

        MR. MEYER:  I'd like to publish Exhibit 157, which was shown to you at your deposition.

        THE COURT:  Is there any objection?

        MR. MARTORELL:  No objection, Your Honor.

        THE COURT:  Okay.  You may publish.

BY MR. MEYER:

Q    All right.  Is this the Docusign envelope for your signatures?

A    Yeah.

Q    Take a look at the top, is there a time zone referenced here?

A    Where am I looking?

Q    Near the top.

A    It says UTC5.

Q    And what does it say right after that?

A    Eastern time, U.S. and Canada.

Q    Is that New York time?

A    Eastern time would be New York time, yeah.

Q    And here in LA we're three hours behind New York?

A    Correct.

Johnson - Direct / By Mr. Meyer                    22

Q    All right.

       MR. MEYER:  Why don't we scroll down in to where it says when you signed.

**BY MR. MEYER:**

Q    Do you see where it says signing complete?

A    No.

Q    Do you see at the bottom of the page>

       MR MEYER:  Maybe we can zoom in a little bit.  Up, up.  To the bottom of page 1.

       **THE WITNESS:**  Oh, sign and complete.  Yeah, it says 10:46 a.m.

**BY MR. MEYER:**

Q    And that's New York time based on this document?

A    Yes.

Q    And that would be about 7:46 in the morning LA time?

A    Correct.

Q    All right.

       MR. MEYER:  Let's put up Exhibit 5200, which was shown -- actually before we do that I'd like to admit Exhibit 157.

       THE COURT:  Any objection?

       MR. MARTORELL:  No objection.

       THE COURT:  Okay, Exhibit 157 is admitted.

       **(Exhibit Number 157 received in evidence)**

       MR. MEYER:  And I'd also like to admit 140, which I

Johnson - Direct / By Mr. Meyer                    23

don't think we did.

THE COURT:  That's correct.  Is there any objection?

MR. MARTORELL:  Yes, hearsay on 140, Your Honor.

THE COURT:  And what is the response to that?

MR. MEYER:  These are not for the truth of the matter asserted, simply that these things were said.

THE COURT:  Okay.

MR. MARTORELL:  Your Honor, may I respond?

THE COURT:  Of course.

MR. MARTORELL:  They were for the truth of the matter asserted in my opinion.  I can elaborate if Your Honor would like or no?

THE COURT:  No, that's fine.

So I'm going -- so Exhibit 157 is admitted.  Exhibit 140 is admitted for the limited purpose of showing that the statements were made, not that the statements are true.  Okay?

**(Exhibit Number 140 received in evidence)**

THE COURT:  All right.  And then you said you wanted to publish --

MR. MEYER:  5200, which is already in evidence from Mr. Monts' testimony.

THE COURT:  5200 is already admitted, so you may publish.

//

//

Johnson - Direct / By Mr. Meyer                24

BY MR. MEYER:

Q    So I've got them side by side.  Exhibit 520 was shown to Mr. Monts yesterday.  Do you see a time zone indicated anywhere on Exhibit 5200?  And it's one page, we can just scroll down slowly.

A    That's the one you just --

Q    Yes, on the left.

A    Do I see times, yeah.

Q    Do you see a time zone described like you do on 157?

A    No.

       MR. MEYER:  We can take those exhibits down.

BY MR. MEYER:

Q    To your knowledge were any of the artists paid for the use of the MSD PT2 master at the July 22nd, 2021 listening party?

A    For the master, the SR, no.

Q    And do you think you would know if they had been?

A    Yes, and it would have just been Khalil.

Q    Did you ever agree to a license of MSD PT2 to Ye?

A    For -- no.

       MR. MARTORELL:  Objection, vague and ambiguous, overly broad.

       THE COURT:  Overruled, he can answer.

       THE WITNESS:  No, there was no license either on the SR, which we're here for today, or the underlying copyright.

       MR. MEYER:  I tender the witness.

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Cross / By Mr. Martorell                    25

THE COURT:  Okay, thank you.

Mr. Martorell?

MR. MARTORELL:  Thank you, Your Honor.

THE COURT:  You're welcome.

(Pause)

CROSS EXAMINATION

BY MR. MARTORELL:

Q    Good morning, Mr. Johnson, how are you?

A    Pretty good.

Q    Good.  Good to see you again.

You did not help create MSD PT2, correct?

A    Correct.

Q    You were not present when MSD PT2 was created, correct?

A    Correct.

Q    You do not know how MSD PT2 got to Ye's people, correct?

A    No, I do not.

Q    And the first time you heard about MSD PT2 was after Ye or whoever posted on Instagram in 2018 included MSD PT2 in that post, right?

A    Correct.

Q    MSD PT2 has no lyrics, true?

A    It's all musical composition.

Q    Okay.  But it also has no drums?

A    I think that's accurate.

Q    And the artist did not lose any potential deals concerning

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Cross / By Mr. Martorell                26

MSD PT2 because of Ye's usage of it, right?

A    No, I can't say that, because once he uploaded it, you know, artist that elk (phonetic) can't use it anywhere else, so any other potential artist or we do a lot of TV and film licensing, et cetera, it's kind of taken off the market, so.

**MR. MARTORELL:**  All right.  Your Honor, permission to read from Mr. Johnson's testimony on December 4th, 2025 from page 212, line 18 to line 25?

**THE COURT:**  Any objection?

**MR. MEYER:**  No objection.

**THE COURT:**  Go ahead.

**MR. MARTORELL:**  Sorry, Your Honor, to 213, line 18.

**THE COURT:**  Any objection?

**MR. MEYER:**  No, Your Honor.

**THE COURT:**  Okay.  Mr. Martorell, you may proceed.

**MR. MARTORELL:**  Thank you, Your Honor.

   **(Excerpts of Gregory Johnson's Deposition, read by Mr. Martorell)**

         "QUESTION:  All right" --

         Well first off, Mr. Johnson, you remember being deposed on December 4th, 2025?

         "ANSWER:  Yes.

         "QUESTION:  All right.  So how about all potential agreements MSD PT2 that you contend failed because of any action taken by the defendants?

Johnson - Cross / By Mr. Martorell                    27

"ANSWER:  If any actions failed?

"QUESTION:  Any deals that didn't go through because of something defendants did?

"ANSWER:  For MSD PT2, no, I don't think there's anything that I haven't produced.

"QUESTION:  Well is there anything that you can think of that exists?  I haven't seen anything.

"ANSWER:  Let's see, did we do anything, I might have produced something illegal regarding master rights for, you know, like the Apple show, but I don't recall though, that's the only thing I can think of.

"QUESTION:    What do you mean master rights for the Apple show?

"ANSWER:  Well because they used MSD for the first Apple show.

"QUESTION:  Okay.

"ANSWER:  But I don't believe -- I don't recall anything we sent it may have been discussed with, you know, legal, but I don't remember sending anything personally to them in that regard.

"QUESTION:  As you sit here can you think of anything else, any potential agreements that were lost for MSD PT2?

"ANSWER:  No."

//

Johnson - Cross / By Mr. Martorell                    28

**BY MR. MARTORELL:**

Q    So which is it Mr. Johnson, were there deals lost for MSD PT2 because of defenses' actions or not?

        **MR. MEYER:**  Objection, argumentative.

        **THE COURT:**  Overruled, you can answer.

A    Existing deals, there were no existing -- well there should have been an existing deal for the SR for the Apple show, there's -- they have to have a master license, which is pretty hefty for an Apple show, which would be considered a commercial release with a lot of stream.  So we -- but we never received any deals regarding it.

Q    Okay.  Maybe my question is not clear.  That would be --

A    Okay.

Q    -- for -- that would be a deal that you'd consider you should have been a part of for Ye's use of MSD PT2, right?

A    Okay, yes.

Q    I'm asking are there any opportunities that the artist lost because he used MSD PT2?

A    Well there are opportunities where possible were taken away because we couldn't use it anywhere else at that point. Once he uploaded it, and he is Kanye West and he has millions of followers, it's kind of attached to the artist, so other artists or folks won't want to use it at that point.

Q    Okay.  At your deposition you said no twice, so why are you saying a different answer now?

Johnson - Cross / By Mr. Martorell                    29

A    Well because you asked about deals, and to your point existing deals that were like on the table is how I interpret that from say other artists or opportunities, there were none at that time.

Q    Mr. Johnson, you were one of two managers for the plaintiff in this matter ARA, right?

A    Yes.

Q    You and Mr. Monts?

A    Uh-huh.

Q    You appeared for deposition both individually and as ARA's corporate designee, correct?

A    Repeat that again, I'm sorry.

Q    You appeared at your deposition both in an individual capacity and as the corporate designee for ARA?

A    I -- to be honest I don't know -- I believe so, I'm not sure.

Q    Okay.  You are also the principal of HH Music LLC, correct?

A    Yes.

Q    And what is the general business of HH Music?

A    Publishing administration.

Q    And you are the manager for Khalil Abdul-Rahman as well?

A    Yes.

Q    And you've acted as the publishing administrator for Dan Seeff?

Johnson - Cross / By Mr. Martorell                    30

A     Yes.

Q     And for Josh Mease?

A     No, not for Josh Mease.

Q     Okay.  You've acted as the publishing administrator for Sam Barsh?

A     Yes.

Q     And then who is Michael Eames?

A     Michael Eames --

Q     Eames.

A     -- is publishing administrator that actually does the collections for us.

Q     Okay.  He --

A     Then registers, copyrights, et cetera.

Q     So he essentially does what you do, publishing administration for the -- those artists?

A     Yes.

Q     Okay.  But he does more of the grunt work should we say?

A     I don't like to term it grunt work because it's key necessary, but he registers, copyrights, et cetera.

Q     Deals with numbers more?

A     Yeah, I guess you could say that.

Q     Deals with uploading and talking to digital service providers, things of that nature?

A     Digital service providers, not so -- I mean PROs, record labels about licenses for writers, not for the SR or master

Johnson - Cross / By Mr. Martorell 31

recording.

Q   As the manager for DJ Khalil your goal is to exploit the music, and exploit is not a bad term in the copyright context, it just means to market it, to monetize it, right?

A   Uh-huh.  Yes, that's one of the things we do.

Q   And so in doing so you coordinate with attorneys, business managers, publishers, A&R people, et cetera?

A   Yes.

Q   All right.  Let's take a look at Exhibit 5105, please. Permission to publish?

THE COURT:  Any objection?

MR. MEYER:  One moment.  Only relevance.

THE COURT:  5105 has already been admitted, so you can go ahead.

MR. MARTORELL:  Okay.

BY MR. MARTORELL:

Q   This is the publishing administration agreement between your company, HH Music, and Daniel Seeff?

A   Yes.

Q   And I believe Exhibit 5079 has already been admitted as well.  There's a similar agreement between HH Music and one of the other artists, Sam Barsh, right?

A   Yeah.

Q   All right.  So I'll just skip that.

Does HH Music have an administration agreement with

**EXCEPTIONAL REPORTING SERVICES, INC**

Johnson - Cross / By Mr. Martorell                    32

Michael Eames' company, PEN Music Group?

A    Yes.

        MR. MARTORELL:  Can we please turn to Exhibit 5107, and I request permission to publish?

        THE COURT:  Any objection?

        MR. MEYER:  Relevance.

        THE COURT:  So I will go ahead, I'm going to turn off the screen for the jury, I just did Ms. Garcia Marquez.

        THE CLERK:  It's back on.

        THE COURT:  Okay, thank you.

        And then you can go ahead and lay your foundation.

        MR. MARTORELL:  Sure, Your Honor.

        THE COURT:  And I'm sorry, this was 5107?

        MR. MARTORELL:  That's right.

        THE COURT:  Thank you.

BY MR. MARTORELL:

Q    This is the sub-administration agreement between HH Music and PEN Music Group, correct?

A    Yeah.  Yes.

Q    And within it, just to summarize -- why is this showing, it's showing Chris' phone.

A    Nice cat.

    (Laughter)

Q    There was a quick showing of a cat on the phone, which is what he's referring to.

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Cross / By Mr. Martorell                    33

Okay.  This administration agreement gave Mr. Eames the exclusive right to administer the composition copyright for the artists, Sam Barsh and Dan Seeff, correct?

MR. MEYER:  Objection, relevance.

THE COURT:  Overruled, he can answer.

THE WITNESS:  Well it's for the -- when you say the copyright, for the songwriting portion, not the SR or master.

BY MR. MARTORELL:

Q    I said the composition.  We're on the same page, right?

A    The musical composition.  Yes, it gives him the right to collect.

Q    The exclusive right to collect, right?

A    Honestly I would have to read it again to confirm that.

Q    Okay.  And so when I said the grunt work I didn't mean to say it was anything -- it's high level, difficult, almost accounting type work, right?

A    If you don't mind repeating that.

Q    Well Michael Eames receives royalty statements for the artists that you send him, right?

A    Uh-huh.  Yes, he does.  Well he should receive royalty statements, yes, sometimes he has to go dig them out, but --

Q    You mean push a label to or a performing rights organization to provide them, et cetera?

A    Yeah, or he may have to clean it up because we haven't figured out splits.

Johnson - Cross / By Mr. Martorell                    34

At a PRO a lot of people register stuff to get it in the system, but all the splits aren't settled, et cetera, so he has to go through with other publishers, et cetera, sometimes songwriters to figure out what adds up to 100 percent so that they can accurately pay out.

So that's what I'm saying, it's more layered than simply collecting the work.

Q    All right.  So you just said that sometimes people register with the PROs because the splits are not worked out, right?

A    Yes.

Q    That's a common occurrence in the music industry, correct?

A    It happens.

Q    It happens.  And you don't sue every time it happens, right?

A    No.

Q    What percentage of the time do you think it happens?

A    I don't know.  Well if it's been -- our copyright has been infringed then it happens more frequently I guess you could say, because there's no clarity, you want to get some clarity is the whole idea.

Q    All right.

          MR. MARTORELL:  Move to strike as non-responsive and a legal conclusion, Your Honor.

          THE COURT:  Motion is denied.

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Cross / By Mr. Martorell                          35

          MR. MARTORELL:  Okay.

BY MR. MARTORELL:

Q    HH -- I'm sorry -- Michael Eames' company, PEN Music

Group, reconciles these royalty statements and pays out the

artists, right?

A    Yeah.

Q    Pays them royalties?

A    Pays the songwriters, yes.  He collects --

Q    He takes --

A    -- and then pays out.

Q    He takes in the royalties from PROs and different

organizations --

A    And --

Q    -- pays out to the artist?

A    And record labels, et cetera.

Q    Right.

A    Any stream of revenue for the writer share comes through

him.

Q    Okay.

A    Whether it be label, PRO, et cetera.

Q    And so when we're talking about registering with the PROs

when the splits are not worked out as somewhat of a

placeholder, you did that in this case regarding MSD PT2,

correct?

A    Yeah, Michael did put some splits in as a placeholder,

Johnson - Cross / By Mr. Martorell                    36

yes.

Q    What percentage?

A    I don't recall.

Q    It added up to more than 30 percent for the 4 artists, right?

A    When he first did the placeholder I don't recall what he put in.

Q    And Michael Eames, through PEN Music Group, collected royalties relating to MSD PT2 from Hurricane, correct?

A    From MSD PT2 -- well at that point it's called Hurricane, so he would have been collecting from -- royalties from Hurricane for the songwriter portion, not the SR or master, which is totally separate.

Q    So the publishing and composition relates to the songwriting, right?

A    Yes.

Q    And the SR, the sound recording --

A    Uh-huh.

Q    -- is relating to the master sound recording, meaning what people hear, and that is -- the royalties from that come primarily from the music label; is that right?

A    Primarily from the music label.

Q    And the music label is Universal Music Group in this case?

A    Well the label I guess you could consider it's G.O.O.D. Music through Def Jam Recordings, Universal is the parent

Johnson - Cross / By Mr. Martorell                    37

company, which is the distributor, but they also own Def Jam.

I don't know -- I don't think they own G.O.O.D. Music.

Q    Well you were just talking about an email with a few

people and you were reaching out to Universal, right?

A    Yes.

Q    You considered that the label?

A    No, I considered that the distributor.

Q    Okay.  Universal owns Def Jam?

A    Correct.

Q    Who's the label here?

A    The label would be Def Jam.

Q    Okay.  So you reached out to people who worked for Def Jam

slash Universal, right?

A    Yeah.  Well I called Jeffrey Harleston, head of business

affairs at Universal, he said you should speak with the Def Jam

business affairs individual, and then we reached out to Def

Jam.

Q    A music label like Def Jam or Universal, let's --

Universal is known as the biggest in the industry, right?

A    One of the three, uh-huh.  One of the three biggest.

Q    All right.  And they won't release an album like Donda

until things are cleared; isn't that true?

          MR. MEYER:  Objection, foundation.

          THE COURT:  Sustained.

//

Johnson - Cross / By Mr. Martorell                    38

**BY MR. MARTORELL:**

Q    You -- we've talked a lot about the music industry here today, a lot about your experience --

A    Uh-huh.

Q    -- decades of experience in the music industry, you've answered several questions relating to your expertise in the music industry.  Do you believe you're qualified to note whether a music label like Universal would release on album like Donda if it had not cleared?

A    They're not supposed to, but what happens is the onus is on the label, not the distributor to have -- to hand in a cleared master.

Q    Def Jam handed in the clear master here, right?

A    No, they did not hand in a clear master.

Q    Free Maiden is who you were negotiating with, correct?

A    That's who I spoke with and he told me what he suggested they do.  I passed the ball on with that information to Khalil's attorney, and she negotiates that, and then memorializes it in a written agreement.

Q    Free Maiden thought you had a deal, correct?

A    I have no idea what he was thinking.  We had zero deal.

Q    Okay.  But he told you multiple times, come on, Greg, we had a deal on both the composition and the sound recording, right?

A    He said that in the email.  We did two calls and one --

Johnson - Cross / By Mr. Martorell                39

the first call was regarding the songwriting where I told him I did not see the 10 percent or whatever he was suggesting would be acceptable, but I also had to speak to the guys.  I don't have the authorization to make a decision on behalf of the writers, whether it's yea or in nay, I always have to go through them.

So it's a discussion, and then I pass the ball to the attorneys, they negotiate, and then that way we have a written agreement.  That's when we have a deal.

Q   So I'm not asking for your side of that story, right, I'm not asking for your version of that event, I'm asking if you understand that Free Maiden had a different version of the event?

A   That's what he stated in the email.

Q   Right.  You knew he was stating in the email, Greg, we had a deal on both the composition and the sound recording, true?

MR. MEYER:  Objection, argumentative.

THE COURT:  Sustained.

BY MR. MARTORELL:

Q   Did you know at the time whether Free Maiden believed he a deal with you?

A   He might have thought he had a deal on the production side, on the songwriting side I have no idea how he could possibly think that, because I told him flat out that I don't see the guys accepting 10 or so percent on the songwriting

Johnson - Cross / By Mr. Martorell                               40

side.

Q    Okay.  So my question is, he told you he did think that though, right?

A    He did not tell me that on a phone call on the songwriting side, no.

Q    He told it to you over email?

A    In the email he stated -- well I guess Ciara put the terms in and Free said that we had agreed to that.

Q    Okay.  And you're aware that Free Maiden reported to Def Jam and Universal that he had cleared MSD PT2, correct?

        MR. MEYER:  Objection, foundation.

        THE COURT:  Sustained.

**BY MR. MARTORELL:**

Q    Are you aware of whether Free Maiden reported to Universal and Def Jam that MSD PT2 had been cleared?

A    No, I don't know if he did or not.

Q    Okay.

    **(Pause)**

A    I have question, or can I ask?

        THE COURT:  No, no --

        THE WITNESS:  Okay.

        THE COURT:  -- you just need to wait for the next question.

        THE WITNESS:  Okay.

        THE COURT:  Thank you, sir.

Johnson - Cross / By Mr. Martorell                    41

BY MR. MARTORELL:

Q    You communicated with Free Maiden in 2020?

A    I believe we texted in 2020.

Q    So you communicated with him in 2020, correct?

A    I believe so.

Q    And you communicated with him in 2021?

A    Yes, in '21 for sure.

Q    And in 2022, right?

A    2022, I can't recall the date of the email chain that you're referring to, whether that -- I believe that was 2022.

Q    Okay.  So you agree that you communicated with Ye's camp about clearance before, during the release, and then after the release, right?

A    Well before and then after.

Q    And you said you did communicate with him in 2021, right?

A    Yes.

Q    Okay.  But you're saying not before August 29th, 2021?

A    No, I'm saying before, before the release.

Q    Right.  So before, during, and after.

A    Well I don't know what you mean by during.  Before the release --

Q    Let's say --

A    -- and then after the release.

Q    Let's say August 2021, did you talk to him?

A    I talked to him before the release.  I talked him before

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Cross / By Mr. Martorell                    42

the Apple show.

Q    July 22nd?

A    Okay, yeah.  I did not speak to him after that ever again.

Q    Okay.  I thought you said you spoke to him in 2022?

A    No, I didn't say I spoke to him in 2022, you stated communicated with, so I believe that was the email chain.

Q    I see.  Okay.

You communicated with him throughout, do you agree with that?

A    There are three times I guess you could say I communicated.  The two calls before the Apple show and then the email.

Q    And the text in 2020?

A    Yeah, and I can't recall the exact dates of the text.

Q    And you also spoke to an individual, Jahmal Gwin, he goes by the name BoogzDaBeast?

A    BoogzDaBeast, yeah, I don't know his real name.

Q    You know he's one of Ye's producers, right?

A    Yeah.

Q    And you spoke to Boogz specifically about MSD PT2, correct?

A    Yes.

Q    And you admit that you talked to Boogz about using the sound recording for listening party one, right?

A    No, because I didn't know they were going to use it

**EXCEPTIONAL REPORTING SERVICES, INC**

Johnson - Cross / By Mr. Martorell                    43

necessarily in listening party one.  They said they may use the record, I don't recall whether he specified they were going to play it at the show or not.

        MR. MARTORELL:  Your Honor, permission to read from page 60, lines 3 through 6?

        THE COURT:  Any objection?

        MR. MEYER:  No, Your Honor.

        THE COURT:  Please proceed.

BY MR. MARTORELL:

Q    "Q   So what Boogz was talking to you about was the use of the master sound recording relating to the first sound listening party, right?

     "A   Yes."

     You did talk to Boogz about using the sound recording at the first listening party; isn't that right?

A    I spoke to Boogz about the recording, and that's when we talked about producer advance and points.

Q    Okay.  So the answer is yes?

        MR. MEYER:  Objection, argumentative.

        THE COURT:  Sustained.

     (Pause)

        MR. MARTORELL:  Okay.

BY MR. MARTORELL:

Q    And what was your authority for negotiating the splits of behalf of the four artists?

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Cross / By Mr. Martorell                    44

A     I could have discussions, I can't negotiate final splits, I have to go talk to the writers, and that's what I customarily do and go back to them and say, hey, here's what's been presented.

Q     Okay.  Because that would be Michael Eames throughs his company, PEN Music Group, as the exclusive rights holder?

A     Well typically it would be Debra negotiating via the producer agreements where it's signed off on what the splits are.  So there'd be communication with her and then she would negotiate the splits.

Q     We sought to subpoena Debra Wise several times, where is she?

A     She's in LA.

Q     Okay.  Why isn't she -- is she going to testify in this trial?

A     That's not my call, she's available.

Q     Well why doesn't she come in?

A     I didn't know that she --

        MR. MEYER:  Objection, argumentative.

        THE COURT:  What's the objection?

        MR. MEYER:  Argumentative.

        THE COURT:  Sustained.

        MR. MARTORELL:  Okay.

        THE WITNESS:  I don't know.

        THE COURT:  You don't need to answer the question.

Johnson - Cross / By Mr. Martorell                        45

THE WITNESS:  Okay.

MR. MARTORELL:  All right.

BY MR. MARTORELL:

Q    Multiple times you said she was the one really negotiating these splits, right?  Like she was the one with the ultimate authority as the attorney; is that right?

A    Yeah.

Q    So pretty important to hear from her, no?

A    Sure.

MR. MEYER:  Objection, argumentative.

THE COURT:  Sustained.

BY MR. MARTORELL:

Q    Free Maiden lives in New Jersey, right?

A    I don't know where he lives.

Q    Have you talked to him recently?  Any reason to --

A    No.

Q    Any reason to know why he wouldn't come either?

MR. MEYER:  Objection, argumentative.

THE COURT:  Sustained.

Counsel, approach.

**(Begin Sidebar at 10:00 a.m.))**

THE COURT:  This whole line of questioning is completely irrelevant to anything that the jurors need to decide.  And he's also -- you're asking him -- the questions that you're asking are extremely argumentative.

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Cross / By Mr. Martorell                           46

I'll hear if you, but I'm going to ask that you move onto something else.

MR. MARTORELL:  I'll move on, Your Honor, but I mean I do think it's relevant to know why these people won't come.

THE COURT:  He doesn't -- how is he supposed to know? You can argue that in your --

MR. MARTORELL:  He's in contact with everyone.

THE COURT:  He just said he wasn't in contact with them.

You can -- I mean to the extent that you want to get this testimony out or this evidence out this is the wrong witness.

There's nothing stopping you from making this argument in your closing argument, I was anticipating that you would, but arguing with him we're not going to get anywhere.

MR. MARTORELL:  I hear you.

THE COURT:  Okay.

MR. MARTORELL:  I'll move on.  Thank you.

THE COURT:  Thank you.

MR. MEYER:  Thanks, Your Honor.

(End sidebar at 10:01 a.m.)

THE COURT:  Okay, Mr. Martorell, you may proceed.

MR. MARTORELL:  Thank you, Your Honor.

//

//

Johnson - Cross / By Mr. Martorell                47

**BY MR. MARTORELL:**

Q   Michael Eames was also involved with negotiating these splits, correct?

A   I don't think he was involved in negotiating the splits.

Q   Well he was copied on these emails, participated, gave you feedback, that type of thing?

A   He participated on -- he was on emails.

Q   Okay.  So did you ever talk to any of the -- anyone from Ye's camp before 2020?

A   Not that I recall.

Q   Okay.

        **MR. MARTORELL:**  Permission to post Exhibit 5083?

        **THE COURT:**  Any objection?

        **MR. MEYER:**  No, Your Honor.

        **THE COURT:**  Okay, you may publish.

**BY MR. MARTORELL:**

Q   This is an email thread from you to Sam Barsh and Dan Seeff dated September 24th, 2018, right?

A   Yes.

Q   Okay.  And you say, Kanye and Logic, and then you say, I sent Chey (phonetic) credits for Kanye Friday, will resend tomorrow.  That refers to Chey Pope, who frequently works with Ye, right?

A   Yes, he does.

Q   Okay.  So you also spoke to Ye's camp in 2018, right?

Johnson - Cross / By Mr. Martorell                48

A    Yeah.  If I said I'd send Chey credits I don't know if that was for this song or something else to be honest, because I know Chey from the business for a long time.

Q    Okay.  If we pulled up the Instagram post it would be from September 2018.  I can pull it up if everybody wants, but I think that's an uncontested date.

          THE COURT:  Do you have a question for him?

BY MR. MARTORELL:

Q    Would you agree with that timeline the Instagram post that Ye used MSD PT2 was September 2018?

A    I can't recall the exact date, but it was definitely 2018.

Q    Okay.  So this was sent shortly after that Instagram post, right?

A    I can't recall the exact date of the Instagram post.

Q    To your knowledge have your artists, Dan Seeff and Sam Barsh, every had any other track or composition or sound recording that ever reached Ye's people?

A    Not that I know of.

Q    So you're clearly talking about MSD PT2 here in 2018, right?

A    Yeah, if it's -- okay, I said Chey credits Kanye Friday, then that would be in reference to MSD PT2.

Q    Okay.  So when you told me the first time you talked to Kanye's camp in 2020 that wasn't accurate, correct?

A    Obviously that wasn't correct, that was inaccurate.

Johnson - Cross / By Mr. Martorell                49

Q    Okay.

A    Well no, I didn't say that either, I txt with Boogz previous to that --

Q    In 2020.

A    -- and email.  I believe I text with him or Free previous to that.

Q    Okay.  Let's turn to Exhibit 116, which counsel published. I don't know if it -- I can't remember if it was admitted.

        THE COURT:  It was, it was admitted.

        MR. MARTORELL:  Thank you, Your Honor.

        I would like to move Exhibit 5083 into evidence, Your Honor.

        THE COURT:  Any objection?

        MR. MEYER:  No, Your Honor.

        THE COURT:  Okay, Exhibit 5083 is admitted.

    **(Exhibit Number 5083 received in evidence)**

        MR. MARTORELL:  And also, Your Honor, Exhibit 5107, the administration agreement between HH Music and PEN Music Group, I neglected to move into evidence, and I'd like to do so now.

        THE COURT:  Any objection?

        MR. MEYER:  I don't think there's been a foundation laid that has any link to the sound recording.

//

//

Johnson - Cross / By Mr. Martorell                50

THE COURT:  I'm going to go ahead and admit it.  5107 is admitted.

(Exhibit Number 5107 received in evidence)

MR. MARTORELL:  All right, on the very bottom.  All right, let's zoom in as much as we can.

BY MR. MARTORELL:

Q    Okay.  So on January 19th, 2022 Debra Wise writes an email to Ciara Reed.  Who's Ciara Reed?

A    She was Kanye's attorney at the time.

Q    And she says, "Thank you for your response.  I understand that you need to confirm the facts, and in that regard please feel free to reach out to me if you have any questions or concerns."

She notes, "I did want to point out that I am the attorney for all four of the original authors of the original compositions, Khalil, Sam Barsh, Dan Seeff, and Josh Mease, hereinafter, separately, and collectively my clients.

In addition UMPG admins" -- do you believe she meant administrates?

A    I believe so.

Q    "Khalil's publishing, and Michael Eames at PEN Music Group administers Sam's, Dan's, and Josh's publishing."

So Michael Eames administered Josh Mease's publishing, correct?

MR. MEYER:  Objection, foundation.

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Cross / By Mr. Martorell                    51

THE COURT:  Sustained.

THE WITNESS:  As far as I know he --

THE COURT:  You don't have to answer the question.

THE WITNESS:  Oh, sorry.

BY MR. MARTORELL:

Q    You've worked with Josh Mease before, right?

A    No, I've never represented him, he writes with the guys from time to time, I'm not his publisher or work with him in any official capacity.

Q    You negotiated here on his behalf, right?

A    I didn't negotiate on his behalf, I discussed with him in reference to the guys that I administrated and then Khalil on the SR side, we had discussions about the percentages.

Q    That's -- I don't think that's accurate.  So you have testified that you spoke to Free Maiden --

THE COURT:  So hold on, hold on for one second. Whether or not you think something is accurate is not relevant. If you have a question to ask him please ask him the question.

MR. MARTORELL:  Okay.

BY MR. MARTORELL:

Q    Mr. Johnson, you've already testified that Free Maiden was talking to you about 10 percent for the 4 artists?

A    Right.

Q    Okay.  So you're talking to Free Maiden about Josh Mease's interest, yes or no?

Johnson - Cross / By Mr. Martorell                52

A    I was talking to him about all 4 writers, and I was stating that 10 percent was not going to -- I didn't think it would work, I would have to talk to them.

Q    So you were clearly negotiating on behalf of Josh Mease for his percentage, right?

MR. MEYER:  Objection, argumentative.

THE COURT:  Sustained.

BY MR. MARTORELL:

Q    So you were negotiating on behalf of Josh Mease for his percentage, right?

MR. MEYER:  Same objection.

THE COURT:  Overruled, you can answer.

THE WITNESS:  I represent Sam and Dan, they collectively told me what they felt would be fair.  I could just go back to them what was put in front of me, but I don't manage or publish Josh Mease, but collectively, yes, they -- the guys amongst themselves stated they were going to split it four ways, and since I represent Josh -- excuse me -- Sam and Dan, I have publishing administration agreements and Khalil as a manager, I had discussions with Free or he told me what he thought would be acceptable, and I told him I didn't think that would be the case.

BY MR. MARTORELL:

Q    To your knowledge did anyone other than you and Debra Wise ever negotiate for Josh Mease with regard to his percentage?

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Cross / By Mr. Martorell                53

A     Not to my knowledge, just Debra.

Q     Let's go back to the email.  It then says, "Specifically in regard to your response, I agree with Mr. Maiden and your statement that you believe there is no wiggle room in the publishing; however, the reason why there is no wiggle room is because my clients, as the original copyright owners of the preexisting work, upon which the work arises or derives, have the right to determine how much ownership they want of the new derivative song.

      As you know my clients authored an original composition known as MSD PT2 on March 14th, 2018."

      She then talks about copyrights, and then she says, "Pursuant to copyright law, the preexisting material employed in the derivative work is part of the copyrighted derivative work as a whole, but the copyright owner of the derivative work copyright does not obtain exclusive copyright rights in the preexisting material."

      So she's quoting copyright law.

          MR. MARTORELL:  If we could scroll down.  There -- no, oftentimes.

**BY MR. MARTORELL:**

Q     She repeats that they can also determine how much ownership they want in the derivative song.  And lastly that they can say no to the new song being released at all.

      I want to focus on that verbiage.  No one ever told Ye's

Johnson - Cross / By Mr. Martorell                              54

camp that they were saying no to the song being released,

right?

A    Not that I know of.

Q    Because everyone, including you, wanted the song released,

right?

          MR. MEYER:  Objection, argumentative.

          THE COURT:  Sustained.

BY MR. MARTORELL:

Q    You wanted the song released, correct?

A    Yeah, because at that point we can't use it anywhere else.

Q    Okay.  And as far as you -- I'll move on.

     So here she says, "Finally in a situation where the

proposed derivative use is not customary or reasonably expected

as the case here where 24 writers are claiming an interest in

the proposed derivative works, my clients would not have a

realistic opportunity to receive fair compensation for use of

their work and therefore have no incentive to agree to such an

absurd outcome."

     Do you consider 10 percent when there's 24 writers an

absurd outcome?

A    Yes, it's their musical composition that was written to.

As I stated typically musical composition is 50 percent share

and lyric melody is 50 percent share.  And actually the melody

came from the music.

Q    Okay.  There's actually 27 writers on Hurricane; isn't

Johnson - Cross / By Mr. Martorell                    55

that correct?

A    I don't know what the final number is.

        MR. MARTORELL:  Okay, if we can go down.

BY MR. MARTORELL:

Q    So then she says, "In order to avoid the infringement outcome my clients would agree to Kanye receiving 50 percent of 100 percent to divide with whomever he wants," meaning the other 20 some odd songwriters, right?

A    Yes.

Q    "And we would retain 50 percent on all derivative versions of our preexisting composition."

    So what she's saying is that 50 percent goes to 23 of the 27 writers and your 4 guys get the other 50 percent, right?

        MR. MEYER:  Objection, argumentative.

        THE COURT:  Sustained.

BY MR. MARTORELL:

Q    You understood that she was arguing that your 4 artists would get 50 percent and the remaining song writers would get the rest, right?

A    Yes.

        MR. MARTORELL:  Can you go down, please.  All right, now go to the next email, please.

Q    So going up one email.  Ciara Reed responds, "Hi Debra, thanks, management will be reaching out to your client to sort."  So she responds promptly, right?

Johnson - Cross / By Mr. Martorell                      56

A    What was the previous date, I'm sorry?

Q    January 19th, and she responds on January 20th.

A    Okay, yes.

Q    Okay.

        MR. MARTORELL:  So then the next email, please.

BY MR. MARTORELL:

Q    Free Maiden says, "Greg and I discussed and agreed on everything prior, that" -- he's referring to both the composition and the sound recording, you understood that when you read this, right?

A    I understood that that's what he's saying.

Q    Yeah.  He's saying this has been cleared, what are we talking about, right?

A    It hasn't been cleared, there's nothing in writing.

Q    No, I'm asking if you understood that that's what he was saying though.

A    I don't know if he felt it was cleared or not.

Q    Well if you agree on everything prior --

A    Cleared --

Q    -- that's clearing the work, right?

        MR. MEYER:  Objection, argumentative.

        THE COURT:  Sustained.

BY MR. MARTORELL:

Q    If in the music business you hear everything has been agreed upon relating to music, you understand that to mean

Johnson - Cross / By Mr. Martorell                    57

everything has been cleared, right?

A    No.

Q    Okay.

A    Because if it's not in writing you can't execute a license.

Q    If it's not in writing -- I'll move on.

He then says, "There really isn't anything to discuss, there are double digit people on the song," again referring to 27 writers, right?

A    Uh-huh.

MR. MEYER:  Objection, foundation.

THE COURT:  Sustained.

BY MR. MARTORELL:

Q    However many writers, 24, according to Debra Wise, 27 accordingly to others, that's what he's referring to, there are double digit people on the song, you understood that, right?

A    That's what she said, I don't know that Free said how -- exactly how many writers.  I know when we talked he said there were several other writers.

Q    Well he's saying there's double digit, so at least ten, right?

A    He's saying that or Ciara said that?

Q    On January 20th, 2022 at 7:36 a.m. Free made and sends this email.  He's saying that --

A    Okay.

Johnson - Cross / By Mr. Martorell                58

Q    -- right?

A    I see what he stated.

Q    Okay.  And then he says, "It's not stand up at all for him and Khalil to go against what we agreed on after the fact."

THE COURT:  What is your question?

BY MR. MARTORELL:

Q    He was saying to you that he didn't think you were being stand up, right?

A    That's what he states here.

Q    All right.  So next Boogz responds, again January 20th, the third email on January 20th, and he says, "It was discussed and agreed by DJ Khalil and his management that his cowriters, collaborators, shares, fees, and advances were to be handled internally by him and his team.

Just for clarity, their compensation and publishing, et cetera, will come out of whatever DJ Khalil received."

He's -- you interpreted that to mean that Boogz also thought there was a deal, right?

A    That's what Boogz stated.

Q    Okay.  And then Free Maiden says, "200 percent," basically like I completely agree with that, that's what you understood him to mean?

A    I'm looking at where he wrote that.  Where did Free say to -- oh, 200 percent, that's what Free said.

Q    Okay.

Johnson - Cross / By Mr. Martorell                    59

MR. MARTORELL:  Let's go up, please.

BY MR. MARTORELL:

Q    And then Michael Eames did participate in these negotiations as shown here, correct?

MR. MEYER:  Objection, misstates the document.

THE WITNESS:  He's saying that --

THE COURT:  The objection is overruled.

THE WITNESS:  -- I was excluded from the email chain. I don't consider that him negotiating anything.

BY MR. MARTORELL:

Q    Well he's part of this conversation is my point.

A    Yes.  Yes.

Q    Okay.  So --

MR. MARTORELL:  Let's go up, please.

BY MR. MARTORELL:

Q    So then on February 7th did you talk to any of these people from January 20th to February 7th?

A    Talk to, no.

Q    Did -- communicate with in any way?

A    Whatever is here on the email thread that would be it.

Q    Okay.  So was it your impression during that time that they -- well strike that.

So on February 7th Ciara Reed says, "Hi Debra,, per Free's email below, management has discussed everything from the beginning so I don't think there should be any issue with our

Johnson - Cross / By Mr. Martorell                    60

proposed terms below."

And these are the terms that Free and Boogz thought you had agreed to, correct?

A    Well they're in parts.  Boogz wasn't part of any conversation regarding publishing splits.

Q    I'm just asking if these are the terms that you understood them to say that you had -- that they thought you had agreed to?

A    Well like I said it was in parts.  I spoke with Free about publishing splits, I did not speak to Boogz about any type of publishing splits.  And when I spoke to Free in addition I told him I can't accept any deal, I have to speak to the guys, but that I did not think the proposed 10 percent would work.

Q    Okay.  So these are the splits Free thought you had agreed to with him?

A    Yes.

Q    Okay.

        MR. MARTORELL:  If we could go up, please.

BY MR. MARTORELL:

Q    So then we see Debra Wise say, "Dear Ciara, the production terms for both Hurricane and Moon stated below in your email of today's date were discussed and agreed upon."

So you did have a deal on the production side, right?

A    We discussed the splits for production in advance.

Q    And you agreed to the splits for production, correct?

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Cross / By Mr. Martorell                          61

A    For production we said those were okay, but we hadn't heard the song yet either, they said there were six other producers, and Khalil as a producer wasn't able to hear the music, so we're taking for granted what he's saying is accurate, that there's five other producers.

Q    Okay.  So if he had heard the music and signed off on it you'd be okay with those splits?

A    The production side of it you mean?

Q    Yes.

A    If he heard it and he felt it was okay, but that's up -- that's his interpretation, I can't speak for him, what he would feel.

Q    How could he not have heard it if it was publicly released seven months prior?

A    When we had the discussion it was before the Apple show.

Q    Okay.  But you're still saying --

        MR. MARTORELL:  So let's go up one email.

BY MR. MARTORELL:

Q    You say, "Free, I told you from day one we would never agree to your proposed --

A    Uh-huh.

Q    -- 10 or so percent regarding writers share for Khalil and his three cowriters."  So that's the songwriting side, right?

A    Uh-huh.

Q    But on the sound recording side you say, "And in fact told

Johnson - Cross / By Mr. Martorell                          62

you I would need to discuss with them as well, I am not their publisher.  Now, we did discuss with Khalil and Boogz the producer fees and points, which are fine."

A    Correct.

Q    So you're agreeing on February 27th (sic), 2022 that the production side are fine?

A    When we had the discussion I told him that was okay.

Q    On February 7th, 2022 you say they are fine, you don't say they were fine.

A    Okay, that's correct, that's what I stated.

Q    Okay.  So on February 7th, 2022 you had a deal for an exclusive license on the sound recording that is the subject of this lawsuit; isn't that true?

        MR. MEYER:  Objection, argumentative.

        THE COURT:  Overruled, you can answer.

        THE WITNESS:  We didn't have a deal because we didn't have it in writing, and the underlying copyright has to be included in the producer agreement, so the writer splits had to be agreed upon as well otherwise we can't submit a license.

BY MR. MARTORELL:

Q    This email is in writing, sir.

A    This is --

        THE COURT:  Do you have a question for -- wait.  Do you have a question for him?

//

Johnson - Cross / By Mr. Martorell                    63

**BY MR. MARTORELL:**

Q    This email is in writing, correct?

A    This email is in writing.

Q    And it includes the material terms --

        MR. MARTORELL:  Let's go down, please.

**BY MR. MARTORELL:**

Q    It includes the material terms, which are for the production, $10,000 advance, 8 percent publishing, 1 percent producer's percentage point, right?

A    Correct.

Q    So you have a deal in writing --

A    Excuse me.  I agreed -- what I said was it was okay on the production side.

Q    The production side is the sound recording side, right?

A    Correct.

Q    So this lawsuit has no merit because you have an express license in this email --

A    There's no license --

Q    -- allowing them to use the sound recording.

A    No, because --

        MR. MEYER:  Objection, argumentative.

        THE COURT:  Sustained.  If you have a question you can ask it, but you're just at this point just making arguments from the podium, which isn't appropriate.

        MR. MARTORELL:  My apologies, Your Honor.

BY MR. MARTORELL:

Q    So isn't it true that in this email you have agreed to a license that is in writing that relates to the sound recording that is at issue in this lawsuit?

A    I can't -- no one can agree to a sound license recording license until unless the master is cleared, it has to include the publishing splits as well.

Q    That is a legal conclusion is it not?

          MR. MEYER:  Objection, argumentative.

          THE COURT:  Sustained.

          THE WITNESS:  I don't --

BY MR. MARTORELL:

Q    Okay.  What is your basis for saying that?

A    Well because when we do producer agreements the underlying copyright is the first point of I guess a license.  If you don't have a song mechanical license in place you can't -- technically you can't release a record, and you don't have a cleared master because the production or SR recording is a part of the entire release.

          MR. MARTORELL:  Let's go up, please.

BY MR. MARTORELL:

Q    All right.  So Mr. Johnson, there is -- there was a written full producer's agreement for this sound recording that was presented to you, correct?

A    No, I never received a producer agreement, a full producer

Johnson - Cross / By Mr. Martorell                    65

agreement.

Q    You're sure about that?

A    I've not received one.

Q    Okay.  Who else -- if there was one who would have received it?

A    Debra Wise.

Q    Okay.  And if it was signed who all would receive it?

A    If it was signed by both parties meaning Khalil is the producer on the SR and somebody -- Kanye or a representative of Kaney's camp --

Q    It's be Free Maiden, right?

A    No, I don't think he -- I don't believe he had authorization to sign an agreement.  It would probably come from Kanye himself.

Q    No, right, I -- he would get Kanye's signature -- Ye's signature, he would send it to you guys, you guys would sign, and then the completed contract would be in the possession of Debra Wise and Free Maiden, correct?

A    No, it would probably come -- it would come from Ciara Reed, his attorney, it wouldn't come from Free Maiden.

Q    Okay.  So Ciara Reed, Free Maiden, and Debra Wise, right, they would have the final contract?

A    The attorneys would have the final contract.  So it would be Debra and Ciara.

Q    Okay.  DJ Khalil -- or Khalil Abdul-Rahman received that

Johnson - Cross / By Mr. Martorell                    66

$10,000 advance, correct?

A     No.

Q     Okay.  He received royalties from Universal, correct, for the sound recording?

A     No, he did not receive any advance from Universal for the sound recording.

Q     You're sure about that?

A     Yes.

Q     Okay.  Michael -- who would receive that royalty statement?

A     Royalty statement, there were no statements generated for the sound recording.

Q     Who would receive them if there were?

A     They would go on his Universal portal, which his business manager kind of minds or oversees.

Q     Do you know if anyone has looked for that?

A     Yes.

Q     Who?

A     His business manager.

Q     Okay.  Has Mr. Rahman looked for it himself?

A     Probably not.

         THE COURT:  Okay, it's 10:30, so we're going to take our morning break.

         THE WITNESS:  Okay.

         THE COURT:  We'll reconvene at 10:45.

67

To our jurors, please don't talk about the case amongst yourselves or with anyone else and don't do any research about any aspect of the case.

Sir, you can go ahead and step down and stretch your legs --

**THE WITNESS:**  Okay.

**THE COURT:**  -- we'll see you back here at 9:45.

**THE WITNESS:**  Thank you.

**THE COURT:**  Or 10:45.

**THE CLERK:**  All rise.

**(Jurors exit courtroom)**

**THE COURT:**  Okay, everyone can be seated.

Anything we need to talk about on the break?  Yes, Mr. Meyer.

**MR. MEYER:**  One very quick question.

Mr. Johnson is in the middle of cross, so are we sequestered from him?

**THE COURT:**  Sequester of Mr. Johnson, yes.

**MR. MEYER:**  Thank you.

**THE COURT:**  Yes.  Anything else?

**MR. MEYER:**  Not from plaintiff.

**THE COURT:**  Okay, any --

**MR. MARTORELL:**  Not from defense, Your Honor.

**THE COURT:**  All right.  We'll see you in 15 minutes.

**MR. MARTORELL:**  Thank you.

**THE CLERK:** All rise.  Court is in recess.

**(Recessed at 10:30 a.m.; reconvened at 10:47 a.m.)**

**(Call to order)**

**THE COURT:** Thank you, everyone can be seated.  Okay, Mr. Johnson, you are still under oath, okay?  Okay, Mr. Martorell, you may proceed when you're ready.

**MR. MARTORELL:** Thank you very much, Your Honor. Mr. Johnson, I'd like to turn to Exhibit 140, which I believe has been admitted for a limited purpose, Your Honor.

**THE COURT:** Yes.

**CROSS EXAMINATION (CONTINUED)**

**BY MR. MARTORELL:**

Q    And we're going to turn to the fourth page of Exhibit 140.  There we are.  You testified on direct examination that you reached out to Universal Music because you weren't hearing back from Ye's camp; is that right?

A    I reached out to Universal to have someone contact us.

Q    Because you claimed that Ye's Camp wasn't getting back to you; is that right?

A    When is this?  As of 2022, we spoke to Ciara.  After that, I spoke to no one.

Q    Okay.  But you also didn't reach out to anybody, did you?

A    Excuse me?

Q    You also didn't reach out to anyone, did you?

A    I did not, no.

Johnson - Cross / By Mr. Martorell                69

Q    Did anyone from your side reach out to anyone from Ye's side?

A    Yes.

Q    Who?

A    Well, Debra reached out after she talked to Def Jam.  I think they gave her a number for an attorney maybe in San Diego that she attempted to reach out to -- I believe at that point he had moved on, or he and Kanye had parted ways, and then she continued to try and find other attorneys that represented him.

Q    Right.  But there was no reach out to someone that you knew represented him at that point; is that correct?

A    I believe the gentleman in San Diego did represent him at one point when she talked to them or reached out.  My understanding is he had moved on, and there were a few other attorneys that they attempted to reach out that had worked with Kanye.

Q    Can you name any of them?

A    No.  There was a gentleman in Florida.  I believe his name is Eric.  I can't recall his last name.

Q    Okay.  So your side contends that Ye's side ghosted you all, but, in fact, we have negotiations from 2018 consistently until 2022, correct?

          MR. MEYER:  Objection.  Argumentative.

          THE COURT:  Sustained.  Just ask him a question.

//

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Cross / By Mr. Martorell                    70

**BY MR. MARTORELL:**

Q    From 2018 to 2022, you acknowledged consistent negotiations, right?

A    There was negotiation, yes.

Q    And after that, you can't name a single individual that you reached out to on the Ye side, correct?

A    Not that I reached out to --

MR. MEYER:  Objection.  Argumentative.

THE COURT:  Hold on for a second.  There's an objection.  Go ahead.

MR. MEYER:  Argumentative.

THE COURT:  Sustained.

**BY MR. MARTORELL:**

Q    After 2022, you cannot name an individual that anyone on your side reached out to, correct?

MR. MEYER:  Argumentative.

THE COURT:  Sustained.

MR. MARTORELL:  Let's go to Exhibit 5197, Your Honor.  I request permission to publish.

THE COURT:  Any objection?

MR. MEYER:  No, Your Honor.

THE COURT:  Okay.  You may publish.

Q    Mr. Johnson, on September 29th, 2021, Michael Eames sent you an email regarding splits for Hurricane and another song for Ye; is that correct?

Johnson - Cross / By Mr. Martorell                    71

A    Yeah.

Q    This is exactly one month to the day after Donda came out, correct?

A    Yes.

Q    And this demonstrates that he signed up with the performing rights organizations for all four artists, correct?

A    No.

Q    No.  You see where it says Hurricane on the left?

A    Yeah.

Q    And then it lists writers?

A    Right.

Q    And it includes Dan Seeff, one of the artists, Josh Meese, another of the artists, Khalil Abdul-Rahman, and Sam Barsh?

A    Uh-huh.  Yes.

Q    And then on the right, it has splits, 6.25 for each of them?

A    Yes.

Q    So he registered them for a combined 25 percent, isn't that correct?

A    Yes.  Yes, but he registered on the behalf of the writers he represents.  So he put what he felt was accurate.  In other words, he doesn't administrate Khalil's publishing.

Q    I see what you're saying.  So he registered three of them?

A    I don't know if he registered Josh's.

          MR. MARTORELL:  Your Honor, I move to admit Exhibit

Johnson - Cross / By Mr. Martorell                72

5197 into evidence.

        **THE COURT:**  Any objection?

        **MR. MEYER:**  No, Your Honor.

        **THE COURT:**  Exhibit 5197 is admitted.

    **(Exhibit Number 5197 received in evidence)**

**BY MR. MARTORELL:**

Q    So this, at a minimum, shows that you're aiming to register 25 percent, right, as a collective group.

A    It shows, yeah, 25 on ASCAP, 25 percent of writer share is 50 percent of publishing.

Q    So that's double, you're saying?

A    Yeah.

Q    Okay, so these numbers should be doubled?

A    No, the way you calculated on ASCAP, the 6.25 would represent 12.5 share per writer.

Q    Okay, 12.5 times 4, 50 percent?

A    Correct.

Q    Okay.  Let's turn to Exhibit 5196, please.

        **MR. MARTORELL:**  Permission to publish, Your Honor?

        **THE COURT:**  Any objection?

        **MR. MEYER:**  No, Your Honor.

        **THE COURT:**  Okay, you may publish.

Q    On January 18th, 2022, Michael Eames emailed you the list of proposed splits for Hurricane, correct?

A    Yeah, this came from -- I don't know who it came from.

Johnson - Cross / By Mr. Martorell                73

Q    Well, the subject line indicates it came from C.R. Reid, correct?

A    Okay, yes.

Q    So Ye's attorney, right?

A    Uh-huh.

Q    And here we see, this is the proposal for all the splits, correct?

A    Yeah, I guess this is her proposal for the splits.

Q    So this is Ye's album, Ye's song, she's proposing he gets less than a fifth, 19.5 percent, right?

A    That's what she's proposing.  When you say his song, it's all their song.  It's the guy's and Kanye's.

Q    He's the performer.

A    And the other lyric melody people.  As the artist, yes.

Q    And who is Abel Tesfaye?

A    I believe Abel is The Weeknd.

Q    So The Weeknd's taking only 8 percent, right?

A    That's what she proposes.

Q    And who's Dominique Armani Jones?

A    I don't know for sure.

Q    Lil Baby, correct?

A    That's possible.  I'm not 100 percent sure, but that's possible.

Q    Okay.  And for Khalil Abdul-Rahman, one of the artists, your client, they propose 8 percent.  The same as The Weeknd,

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Cross / By Mr. Martorell                          74

right?

MR. MEYER:  Objection.  Argumentative.

THE COURT:  Sustained.

BY MR. MARTORELL:

Q    They propose 8 percent for DJ Khalil, correct?

A    Yes, that's what they proposed.

Q    And you think that it's an absurd number, I think you've testified?

A    I don't remember saying absurd, but yes, I definitely don't think that is accurate.

Q    You don't think it's close to what your artists deserve, is that right?

A    Correct.

Q    Okay.  And you feel that they should not be in the same ballpark as The Weeknd or Lil Baby, is that right?

MR. MEYER:  Objection.  Argumentative.

THE COURT:  Sustained.

Q    Okay, 8 percent is more than almost every other writer on this list except for those individuals, and Boogz Da Beast at 10.5 percent, is that correct?

A    That's what they proposed.

Q    How is this not reasonable?  I'll strike that.

A    Well, because --

Q    I'll strike that, there's no question pending.

THE COURT:  He's going to ask a different question.

Johnson - Cross / By Mr. Martorell                    75

He's going to ask you a different question.

THE WITNESS:  Okay.

MR. MARTORELL:  All right, Your Honor, at this time I would like to move to admit Exhibit 5196 into evidence.

THE COURT:  Any objection?

MR. MEYER:  No, Your Honor.

THE COURT:  Exhibit 5196 is admitted.

(Exhibit Number 5196 received in evidence)

BY MR. MARTORELL:

Q    And at the bottom of the page we see Daniel Seeff, Sam Barsh, and Josh Meese, and it says shared with DJ Khalil, so the 8 percent was to be shared by all four, correct?

A    No.

Q    Well, they're proposing to share them for all four, right?

A    t says shared with DJ Khalil.  I don't know why it states that.  They each have their own writer's share.  If that's what she's proposing, then I guess the answer would be yes.

Q    Okay, and then we have Christopher Juelas.  That's 1.5 percent.  That's Nascent, right?

A    Okay.

Q    So he agreed to take only 1.5 percent.

MR. MEYER:  Objection.  Foundation.

THE COURT:  Sustained.

Q    And then Charles Njapa, that's 88 Keys, right?

A    That's who?

Johnson - Cross / By Mr. Martorell                    76

Q    88 Keys.

A    I don't know.

Q    Long-time Ye producer, you're not familiar with him?

A    I know 88 Keys' name, but I don't know his real name, so I wouldn't know.

Q    I see.  Mr. Johnson, did you ever receive a request from UMG Def Jam for DJ Khalil's wire or bank information to pay the advance?

A    What advance?

Q    The advance you agreed to for $10,000 for the sound recording.

         MR. MEYER:  Objection.  Argumentative.

         THE COURT:  Sustained.

BY MR. MARTORELL:

Q    Okay, did you ever receive a request from UMG or Def Jam for DJ Khalil's wire or banking information?

A    For a producer advance for Hurricane?  No.  Or Moon.

Q    You provided managing services through Grand Cru Entertainment as well, correct?

A    Yes.

Q    And Grand Cru Entertainment made the behind-the-scenes video that we've seen, Exhibit 13, is that correct?

A    We made a video.  I don't know if you've seen it or not.

Q    It's been played in this court.  It's a behind-the-scenes video.  It says Grand Cru Entertainment at the --

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Cross / By Mr. Martorell                    77

THE COURT:  Hold on for one second.  As you know, witnesses are excluded, so he hasn't been here for any of the other testimony.

MR. MARTORELL:  Okay.

BY MR. MARTORELL:

Q    Did you make a behind-the-scenes video that starts off with Grand Cru Entertainment?

A    Yes.

Q    Grand Cru Entertainment had a public website previously, correct?

A    Yes.

Q    Let's turn to Exhibit 5183, please.

MR. MARTORELL:  Permission to publish, Your Honor?

THE COURT:  Any objection?

MR. MEYER:  No, Your Honor.

THE COURT:  Okay, you may publish.

Q    Sir, is this an accurate image -- it's going to come up in a second.  Is it an accurate image of the Grand Cru Entertainment website around March 30th, 2025?

A    Yeah.  Yes.

Q    You understood the documents and records of Grand Cru Entertainment should be preserved throughout this case?

MR. MEYER:  Objection.  Argumentative.

THE COURT:  Sustained.

Q    Sir, did you deactivate this website during this

**EXCEPTIONAL REPORTING SERVICES, INC**

Johnson - Cross / By Mr. Martorell                78

litigation?

MR. MEYER:  Objection.  Argumentative.  Relevance.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  I deactivated the website, yeah.  Grand Cru, I don't operate that anymore.

MR. MARTORELL:  Your Honor, we move this exhibit into evidence.

THE COURT:  Any objection?

MR. MEYER:  No, Your Honor.

THE COURT:  Okay, Exhibit 5183 is admitted.

(Exhibit Number 5183 received in evidence)

BY MR. MARTORELL:

Q    Mr. Johnson, the reason the artists have not been receiving royalties anymore is due to the claims by you and Debra Wise, right?

A    Correct.

MR. MARTORELL:  Okay, permission to publish Exhibit 5175.

THE COURT:  Any objection?

MR. MEYER:  One moment.  No, Your Honor.

THE COURT:  Okay, you may publish.

Q    On December 5, 2023, Michael Eames sent you an email, notifying you that the copyright royalties for Hurricane were on a legal hold, correct?

A    Yes.

Johnson - Cross / By Mr. Martorell                    79

MR. MARTORELL:  Your Honor, I move to admit this exhibit please.

THE COURT:  Any objection?

MR. MEYER:  Will you scroll up to see that it's what was being described?  Yeah, no objection, Your Honor.

THE COURT:  Okay, Exhibit 5175 is admitted.

**(Exhibit Number 5175 received in evidence)**

BY MR. MARTORELL:

Q   Okay, on December 5, Amy Jonas from, it says U Music, that's Universal Music Group, right?

A   Yes.

Q   She says, Dear publishers, we are placing 100 percent of copyright royalties on legal hold for the song Hurricane, as recorded by Kanye West from the album Donda.  The legal hold is due a claim from Debra Wise's attorney, who represents clients, and we have the artist there, right?  Do you see that?

A   Yes.

Q   Okay, so this is -- was this the first time you understood that the royalties were being frozen due to your claims?

A   This is the first time in writing I had seen a legal hold.

Q   All right, let's turn to Exhibit 5198, please.

THE COURT:  I'm sorry, counsel, which number?

MR. MARTORELL:  5198.  Permission to publish, Your Honor, please?

THE COURT:  Any objection?

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Cross / By Mr. Martorell                80

MR. MEYER:  No objection.

THE COURT:  Okay, you may publish.

BY MR. MARTORELL:

Q    This is an image of Grand Cru Entertainment's Instagram. Is that Instagram profile; is that correct?

A    Yes.

Q    Do you see the five circles at the bottom?

A    Yep.

Q    Those are permanent stories on Grand Cru's page, correct, as of, well, this is as of December 4th, 2025?  Let me strike that.  Is this Instagram profile still active?

A    No.

Q    As of December 4th, 2025, it showed these permanent stories.  Do you agree with that?

A    Yeah.

MR. MARTORELL:  Your Honor, I move Exhibit 5198 into evidence.

THE COURT:  Any objection?

MR. MEYER:  No, Your Honor.

THE COURT:  Exhibit 5198 is admitted.

   (Exhibit Number 5198 received in evidence)

MR. MARTORELL:  All right, one of those stories is Exhibit 5201, and I would request permission to publish, Your Honor.

THE COURT:  Any objection?

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Cross / By Mr. Martorell                  81

MR. MEYER:  No objection.

THE COURT:  Okay, you may publish.

MR. MEYER:  I believe it's already in evidence.

THE COURT:  5201 has not been admitted.

MR. MEYER:  No objection.

THE COURT:  No, I heard you the first time.  I'm just waiting for counsel to put it on the screen because I've granted a request to publish.

(Audio played at 11:10 a.m.)

BY MR. MARTORELL:

Q   So you posted this on Grand Cru Entertainment's Instagram, correct?  Or your team did?

A   Yeah, my team, or it looks like Khalil posted it.

Q   Well, this is a Grand Cru story.  As we just said, it's one of those permanent stories that was found under the profile.  Did you have that done by your team?

A   I must have.

Q   The point is you were marketing that this occurred, right?

A   I stated that this occurred, yes.

Q   You were proudly putting out there to the public that Grand Cru Entertainment had an artist who had co-produced and co-written the music in this Instagram story?

A   Yes.

MR. MARTORELL:  Your Honor, I move to admit Exhibit 5201.

Johnson - Cross / By Mr. Martorell                  82

THE COURT:  Any objection?

MR. MEYER:  No.  No, Your Honor.

THE COURT:  5201 is admitted, and I'm again going to admonish counsel that to the extent there are duplicate exhibits that we admit things only once.

**(Exhibit Number 5201 received in evidence)**

MR. MARTORELL:  This is from the Grand Cru Entertainment --

THE COURT:  I understand.

MR. MARTORELL:  I'd like to turn to Exhibit 5019 and request permission to publish.

THE COURT:  Let's see.  5019 has -- no, it hasn't been.  Any objection?

MR. MEYER:  It's a duplicate of 86, which has been admitted, Your Honor.

MR. MARTORELL:  I'd like to publish Exhibit 86, since it's already been admitted, Your Honor.

THE COURT:  Okay, go ahead.

MR. MARTORELL:  Thank you.

BY MR. MARTORELL:

Q    This is indeed a group chat we have talked about.  We've referred to 5019 because it doesn't cover that initial text, but we'll go with this one.  This starts with a text from Sam Barsh on the top right; is that correct?  Do you recall?

A    I see Khalil's name.  I don't see Sam Barsh.

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Cross / By Mr. Martorell                    83

Q    I believe this is a text from Sam Barsh to D.J. Khalil, to you, to Dan Seeff, and to Elise Grand Cru, one of your employees, right?

A    Okay.  Yeah, like I said, I don't know if it's from Sam.

Q    Okay.  Keynotes.  Can we pull up

        MR. MARTORELL:  Your Honor, can we pull up 5019 so we can see the initial text?

        THE COURT:  Any objection to publishing 5019?

        MR. MEYER:  No, Your Honor.

        THE COURT:  Okay, you may publish.

BY MR. MARTORELL:

Q    He says, my cousin just texted me that the new Hurricane has Weeknd on it.  D.J. Khalil says, yep.  Then he says, trying to confirm if he has it right.  Dope, exclamation point.  And then you text, yes, that's correctamundo, mo amigos, exclamation point.  Then D.J. Khalil says, wild.  Then you provide a meme.  Looks like Johnny Drama for Entourage, right?

A    I don't know.  Yeah, that does look like Johnny Drama.

Q    And it says victory.  So you are celebrating that the Weeknd is going to be on Hurricane, right?

A    Yes.

Q    Why are you doing that?

A    Well, it increases the value.  And he's an amazing artist.

Q    So you're very excited to be part of this record?

A    Sure.

**EXCEPTIONAL REPORTING SERVICES, INC**

Johnson - Cross / By Mr. Martorell                    84

Q    And this is -- we can scroll up for the date.  August 5th, 2021.  This is after the listening party that's at issue in this case?

A    Yes.

Q    So do I have it right that as of this date, no one has complained about -- I'll -- strike that.

MR. MARTORELL:  Let's pull up Exhibit 5200, please, which I believe has been admitted into evidence, Your Honor.

THE COURT:  It has been.

BY MR. MARTORELL:

Q    All right, Mr. Johnson, we've been discussing the copyright assignment and subscription agreement.  Counsel asked you some questions.  So he actually asked you about this exhibit, correct?

THE COURT:  Do you have a question for him, a substantive question for him?

MR. MARTORELL:  I do.  I just want to lay foundation.

THE COURT:  Go ahead.  Just ask the question.

Q    Okay.  Mr. Johnson, you see where it says correction initiated on July 17th, 2024?

A    Yes.

Q    And then below that, if we can scroll down a little bit, it says you signed at 2:46 p.m., right?

A    That's what it states there.

Q    Okay.  The correction, you agree with me, comes before you

Johnson - Redirect / By Mr. Meyer                    85

signed?

A    It appears so.

        MR. MARTORELL:  No further questions, Your Honor.

        THE COURT:  Any redirect.

        MR. MEYER:  Yes, Your Honor.

    (Pause)

        MR. MEYER:  May I proceed, Your Honor?

        THE COURT:  Yes, you may.

                    **REDIRECT EXAMINATION**

**BY MR. MEYER:**

Q    Good morning again, Mr. Johnson.

A    Good morning.

Q    Let's take another look at Exhibit 116, which I think you've looked at with me and with Mr. Martorell.

        MR. MEYER:  And may I publish, Your Honor?

        THE COURT:  You may.

Q    I'm looking at this top email, the one from February 7th, 2022, from you.  Would it be possible to do a long-form agreement just on the fees and points without agreement on writer splits?

        MR. MARTORELL:  Objection.  Leading?

        THE COURT:  Overruled.  You can answer.

A    No, we need all.  That's one of the material terms.

Q    Why is your answer no?  Can you explain that more, please?

A    Because you need to know the writer share of the song for

Johnson - Redirect / By Mr. Meyer                86

each participant to add up to 100 percent, and that way you can execute.  Then you have a cleared master to release, or SR in this case.  It's SR, master recording.

Q    So can you do a deal on producer fees and points without a cleared master?

A    You can't complete a deal.  You can't have a signed agreement -- excuse me -- out of all those different points agreed to.

Q    So can you have agreement on terms without agreement on points for the writers?

A    Can you have what?  One more time.

Q    Can you have an agreement on all terms without having agreement on splits for the writers?

          **MR. MARTORELL:**  Objection.  Leading.

          **THE COURT:**  Overruled.  You can answer.

          **THE WITNESS:**  It says to have a signed producer agreement to have a fully executed agreement, you need to have the writer splits.

**BY MR. MEYER:**

Q    And can you have --

A    Master rights ownership or conveyance, in this case of Khalil's production, which would include whoever he had on his song version, I guess, MSD PT2.

Q    And could you --

A    That was included on Hurricane.

**EXCEPTIONAL REPORTING SERVICES, INC**

Johnson - Redirect / By Mr. Meyer                87

Q    My apologies.  And could you do that long form without agreement on splits?

A    No.  You can't complete it.  That's one of the material terms.

MR. MEYER:  Thank you, Mr. Johnson.

THE COURT:  Okay.  Any recross?

MR. MARTORELL:  Nothing further, Your Honor.

THE COURT:  Okay.  Thank you, Mr. Johnson.  You're excused.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  Okay.  Your next witness?

MS. LEE:  The plaintiff calls Ye.

THE COURT:  Okay.  Is someone getting him?

(Pause)

THE COURT:  Good morning, sir.  You can go ahead and come forward.  You're going to come all the way around this way, and you'll stop in front of Ms. Garcia Marquez.  She'll administer the oath, then you'll come around and have a seat in the chair in the witness stand right here.

**YE, A/K/A KANYE OMARI WEST, PLAINTIFF'S WITNESS, SWORN**

THE CLERK:  Thank you.  Please take a seat.  Please state your name and spell your last name for the record.

THE WITNESS:  It's just Ye, Y-E.

THE COURT:  Thank you.  Okay, Ms. Lee, you may

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee          88

proceed.

MS. LEE:  Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MS. LEE:**

Q    Good morning.  Please state your name for the record one more time.

A    Ye, Y-E.

Q    Do you go by any other name, sir?

A    No.

Q    Is it okay if I just refer to you as Ye instead of Mr. Ye?

A    Yes.

Q    Thank you.  Do you recall taking a deposition in 2025 sometime in August?

A    Yes.

Q    Thank you.  Why don't we go to Exhibit 370, which has been admitted.  Ye, I invite your attention to this music.  It's titled MSD PT2.  Have you heard of MSD PT2 music?

A    Yes.

Q    Thank you.  It was played during your deposition, but we're going to play it just one more time.  Is that okay?

A    Yes.

Q    Okay, let's play it.

**(Audio played at 11:22 a.m.)**

Q    Do you know that this work was created by four artists?

A    Yes.

EXCEPTIONAL REPORTING SERVICES, INC

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee        89

Q    Do you know their names?

A    No.

Q    I'm going to tell you their names.  DJ Khalil, Sam Barsh, Josh Meese, Dan Seeff.  Can you remember their names, sir?

             **MR. MARTORELL:**  Objection.  Relevance.

             **THE COURT:**  Overruled.  You can answer.

             **THE WITNESS:**  Yes.

**BY MS. LEE:**

Q    Before this lawsuit, before this case, you did not know any of the four artists, correct?

A    Correct.

Q    As far as you can remember, you had never met them, correct?

A    Correct.

Q    You've never communicated with them, correct?

A    Correct.

Q    As far as you can remember, you've never worked with them before?

A    Right.

Q    And you've never recorded with them, correct?

A    Correct.

Q    And you've never asked any of the four artists to create any musical work for you, correct?

A    Correct.

Q    So as far as you can tell, MSD PT2, the music we just

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee          90

listened to, wasn't created because you asked them to create, correct?

A    Correct.

Q    In fact, you've never even heard of the artists before this lawsuit, correct?

A    Correct.

Q    Do you recall your deposition that you took in August of 2025?  And do you remember testifying truthfully at the deposition?

A    Yes.

Q    Thank you.  Until your deposition, no one had ever told you about the artists, correct?

A    Not that I can remember.

Q    And you never followed any of the four artists on their Instagram, correct?

A    Correct.

Q    You don't actually even know whether they even have an Instagram account, correct?

A    Well, now I do because of this case.

Q    Okay.  Before the lawsuit, you didn't know whether they even had an Instagram account, correct?

A    Correct.

Q    And you never signed a license agreement where they permitted you to use MSD PT2, correct?

A    Correct.

Q    Let's turn to Exhibit 23.  Ye, this was the video and audio that was played during your deposition as Exhibit 37.  It's the identical one.  We just named it differently because we are in trial.  So we are using it at number Exhibit 23.  Right here, do you recognize the video?

A    Yes.

Q    This was the music video that was shot in downtown Chicago, correct?

A    Yes.

Q    Do you recall it was shot sometime around 2018?

A    Yes.

Q    Thank you.  In all honesty, I have a hard time recognizing everybody because I wasn't part of the video making.  But were you involved in the production of this video?

A    What do you mean by production?

Q    Making this video.

A    Yes.

Q    Just by looking at what's on the screen, do you know what's going on here?

A    Yes.

Q    Would you tell the jury and the Court what you see?

A    I see me and some gentlemen in front of a car.

Q    What kind of car is that?

A    A Ferrari, I believe.

Q    So that's you in the video getting into a Ferrari that

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee          92

appears to be in white color?

A    Yes.

Q    Why don't we watch?  And if you can't see or hear, please let us know.

    **(Video played at 11:27 a.m.)**

        **MS. LEE:**  Stop right there.  Thank you.  Can we scroll back just a tad bit so we can see the gentleman on the video?  Excellent.  Okay, that's really good.  Okay.

**BY MS. LEE:**

Q    Do you recognize the gentleman on the screen?

A    Yes.

Q    Okay, who are they?

A    That's me, and that's this artist named Bump J.

Q    The song in this video is called 80 Degrees, correct?

A    Yes.

Q    That's you singing in the sound recording, correct?

A    Yes.

Q    And this video of 80 Degrees features your vocals laid down over someone else's music, correct?

A    I don't know how to -- would I say that's someone else's music?  Because I added the drums.

Q    Okay, but what about the underlying music?

A    Yes.

Q    Thank you.  That music is a sampling of the music we heard earlier, correct?

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee          93

A     Yes.

Q     Correct?

A     Yes.

Q     At the very end of the music, as we see here on the screen, that's you in the music studio, correct?

A     Yes.

Q     Okay, and that was in downtown Chicago?

A     Yes.

Q     And in the studio, you mentioned Bump J.  Do you recall any other gentlemen who was in the studio with you?

A     Yes.

Q     Who were they?

A     I remember a producer named Ronnie J.

Q     Anybody else?

A     I can't recognize.

Q     And you recorded 80 Degrees back in 2018, correct?

A     Correct.

Q     And in 2018, you were working on an album at that time called Yandhi?

A     Yes.

Q     And the recording of 80 Degrees was part of your Yandhi sessions, correct?

A     Yes.

Q     The Yandhi album was never released, correct?

A     Correct.

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee                94

Q    You work with a producer who goes by the name Boogz Da Beast?

A    Yes.

Q    I may be mispronouncing, I apologize.  Is it Boogz or am I pronouncing correctly?

A    Yes.

Q    Thank you.  Before singing over the MSD PT2 sound recording for 80 Degrees, you didn't ask anyone if that MSD PT2 music was cleared, correct?

A    Correct.

Q    And in fact, no one told you that the music was clear, correct?

A    Correct.

Q    And you later changed the name of the song from 80 Degrees to Hurricane, correct?

A    Correct.

Q    And you initially named the song 80 Degrees because it has to do with something about you have to have 80 degrees to have a Hurricane.  Is that something you remember?

A    Yes.

Q    All right, let's turn to Exhibit Number 12, which has been admitted.  Before we play, just hold for a second.  I just want to make sure the witness and jury, everybody can see.  Before we play the video, I just want to let you know that we are in 2021.  And this is the public listening party, which took place

on July 22nd, 2021 at Mercedes Benz Stadium in Atlanta to debut your Donda album.  I'm representing that to you.  Is that okay?  Does it refresh your recollection as to what happened sometime in July 2021?

A     Yes.

          **(Video played at 11:32 a.m.)**

**BY MS. LEE:**

Q     I didn't make it to the listening party, but would you tell us what do we see on the screen?

A     You see a light made from a projection in the middle of a stadium.

Q     And do you see any person in the stadium as it appears on the screen?

A     I can barely see it, but I know I was there.

Q     Anybody else on the stage other than you?

A     No.

Q     Why don't we continue playing?

          **(Video played at 11:33 a.m.)**

Q     Did you hear someone singing?  Is that your voice?

A     The singing part is my voice.

Q     And on this day at the listening party, were you actually singing live?

A     No.

Q     Then how could the audience could hear your voice?

A     It was prerecorded.

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee          96

Q     Was anybody else other than you performing present on the stage at the listening party?

A     No.

Q     No dancers?

A     No.

Q     No musicians?

A     No.

Q     In this version of Hurricane played at the listening party on July 22nd, 2021, were you singing over the MSD PT2 sound recording?

A     Yes.

Q     The first listening party lasted about one hour, is that correct?

A     As far as I can recall.

Q     And do you recall how many songs you played as you sit here?

A     20.

Q     20, okay.  At that time, when you're on the stage at the listening party, is it fair to say you knew how many songs you played?

A     Yes.

Q     And it's been a while.  And just want to make sure, is there anything else?  If I show you, let's say, like set list, would that refresh your recollection as to how many songs were played at the listening party on July 22nd, 2021?

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee          97

A     Yes.

          MS. LEE:  Your Honor, permission to publish Exhibit No. 434?

          THE COURT:  Any objection?

          MR. MARTORELL:  One moment, Your Honor.  Yes, Your Honor.  Your Honor, we object on the basis of it lacking in foundation and being hearsay.

          THE COURT:  Okay.  It's my understanding that it's going to be used to refresh recollection.  It's not being moved into evidence at this time.  You may publish.

          MS. LEE:  Thank you.

BY MS. LEE:

Q     So what you see on the screen, and it has a number 434, that's just the trial exhibit number.  This is what we are presenting to you to refresh your recollection.  If you have a moment to review and let us know after you review if it has refreshed your recollection as to how many songs you played at the listening party on July 22nd, 2021 at Mercedes-Benz Stadium, Atlanta, Georgia.  It says Donda Listening Parties.

     (Pause)

Q     After having seen Exhibit 434, did it refresh your recollection as to how many songs were played at the listening party on July 22nd, 2021?

A     Yes.

Q     How many songs did you play at the listening party?

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee          98

A    15.

Q    And in a listening party like -- thank you.  We can actually take this down now that the recollection has been refreshed.  How is a listening party different from your traditional concerts?

A    A listening party you play the music -- at a traditional concert -- a listening party you play new music that people may have not heard before and a traditional concert you usually play songs that people have heard.

Q    Do you remember what you were wearing at the listening party?

A    Yes.

Q    What were you wearing?

A    I was wearing a red outfit.

Q    Do you remember the brand of the red outfit?

A    The jacket was by Yeezy Gap and the pants were custom and then the boots were Yeezy.

Q    Do you recall making the jacket you're wearing available for U.S. sale pre-order the very next day after the listening party?

A    No, I don't recall that.

Q    Did you sell merch at the listening party?

A    Yes.

Q    Did you have any involvement in designing any of your merch at the listening party?

A    Yes.

Q    Let's go to -- hold for a second.  At the listening party, do you recall selling long sleeve shirts?

A    I don't recall.

Q    Do you recall any of the products that you made available for sale at the listening party?

A    No.

Q    Do you remember being asked about the products you sold at the listening party during your deposition?

A    I don't recall.

Q    Would it refresh your recollection if you show you your answer under oath during your deposition, which took place on August 5th, 2025?

        MR. MARTORELL:  Objection, Your Honor.  Improper impeachment.

        MS. LEE:  I'm not impeaching, Your Honor.

        THE COURT:  I understand.  The objection is overruled.  She's asking about refreshing recollection.

BY MS. LEE:

Q    If you see, I guess, one of the merch sold, would that refresh your recollection as to what kind of products were offered at the listening party?

A    Yes.

Q    Thank you.  Why don't we go to Exhibit 421.

        MS. LEE:  Before you do so, permission to publish for

the sole purpose of showing one of the products.

THE COURT:  Any objection?

MR. MARTORELL:  No objection.

THE COURT:  Okay.  You may publish.

MS. LEE:  I apologize, Your Honor.  It's Exhibit No. 338.  I apologize, counsel.

THE COURT:  338.  Any objection to Exhibit 338?

MR. MARTORELL:  One moment please, Your Honor.

THE COURT:  Sure.

MR. MARTORELL:  Yes, Your Honor.  There's 403 concerns, 602, 805, and 901 concerns.

THE COURT:  338?

MR. MARTORELL:  Yeah.  We object on the basis of hearsay, foundation, and 403.

THE COURT:  Okay.

MR. MARTORELL:  It has --

THE COURT:  I'm sorry.  Go ahead.

MR. MARTORELL:  Information that we consider more prejudicial than probative.

THE COURT:  Okay.  So what I'm going to do is I'm going to turn off the monitors for the jury so that the witness can have his memory refreshed.  Okay.  Go ahead.  The monitors are off.

MS. LEE:  Thank you.  And if you can show just a portion, not the -- if you scroll and if you just show the

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee        101

product that was offered right there.  Thank you.

**BY MS. LEE:**

Q    Ye, do you see what's on the screen?

A    Yes.

Q    And do you see -- I would not describe what's on the screen, but did that refresh your recollection as to what was offered at the listening party as merchandise offered for sale?

A    Yes.

Q    What were the products that you offered for sale at the listening party as merchandise?

A    Well, I see this one item right here.

Q    Okay.  And how do you describe that item?

A    I would call it a long-sleeved T-shirt.

Q    Did you sell -- did that refresh your recollection as to any other products that you offer at the listening party?

A    No.

Q    Okay.  Did you offer this particular product online as well?

A    I don't recall.

Q    And do you see what's appearing on the product itself?  Is that visible to you?

A    Yes.

Q    Okay.  We can take it down.  Did you have any products that you offer at the listening party that had the word 7/22/2021 representing the date of the listening party?

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee        102

A    Yes.

Q    When you perform at the listening party, you didn't have the artist who goes by the name The Weeknd singing, correct?

A    No.

Q    In fact, it was after the first listening party, The Weeknd approached you and asked to be on your Donda album, correct?

A    Correct.

Q    So after the listening party, The Weeknd reached out to you and said, I want to be on the Donda album.  And how many songs do you have on Donda album?

A    Around 20.

Q    And did The Weeknd end up being on Donda album?

A    Yes.

Q    Which song did he play?

A    On Hurricane.

Q    Of 20 or so songs on Donda album, is there any other song The Weeknd sang?

A    No.

Q    Other than Hurricane.  Thank you.

        MS. LEE:  Let's turn -- oh, permission to publish Exhibit No. 423.

        THE COURT:  Any objection?

        MR. MARTORELL:  No objection, Your Honor.

        THE COURT:  Okay.  You may publish.

EXCEPTIONAL REPORTING SERVICES, INC

**MS. LEE:**  If you can enlarge just a little bit for aging eyes like mine.  Thank you.

**BY MS. LEE:**

Q    So do you see it says agreement, and then on the left side, you see Apple Confidential?

A    Yes.

Q    Thank you.  And it says this agreement is made and entered into as of July 22nd, 2021.  Do you see that, sir?

A    Yes.

Q    Okay.  That is the effective date.  Do you see that?

A    Yes.

Q    Thank you.  And then the agreement is entered on the day of the listening parties.  Do you recall that?

A    Yes.

Q    And it says, why don't we go to the last page?  Thank you.  If you scroll down just further.  Thank you.  If you scroll down, just perfect.  Toward the bottom of the screen, do you recognize a signature to be yours?

A    Yes.

Q    And then it says, after name, there's a handwritten Kanye West.  Did you write that?

A    It doesn't look like my writing.

Q    But you recognize a signature?

A    Yes.

Q    Was your name Kanye West on July 22nd, 2021?

A    Yes.

Q    Okay.  And were you the owner of the company at the time?

A    Of what company?

Q    Good point.  Let's go to the first page.  So in the second line, it says by and between Apple, Inc. and Very Good Touring, Inc., and then it says company, on behalf of, that's OBO, the artist professionally known as Kanye West.  So do you see that the company is defined as Very Good Touring, Inc.?

A    Yes.

Q    And were you the owner of that company at the time?

A    Yes.

Q    And you are identified as the artist, right?

A    Yes.

Q    So you signed the agreement on behalf of the company, correct?

A    Correct.

Q    Let's go to the second paragraph.  It says whereas, artist is participating in an event, and then in parentheses, again, it says event, but this time the first E is capitalized, in Atlanta, Georgia, on the effective day to promote artist's forthcoming album, Donda, and then now we have another term, album, as a defined term, and company wishes to grant Apple the right to make audio-visual and audio recording of the event, the event content, available on the terms and conditions herein.  I just read what is on the screen.  Were you able to

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee            105

follow along, sir?

A     Okay, yes.

Q     Okay.  Let's go to paragraph one.  It says, company hereby grants to Apple and its worldwide affiliates a worldwide exclusive license.  Do you see that, sir?

A     Yes.

Q     Do you know what you're granting, what license you're granting to Apple at the time?

A     I think it was for them to stream the listening party.

Q     Let's go to paragraph four.  Do you have the paragraph four in front of you?

A     Yes.

Q     In full consideration of the rights granted and the services promised herein, Apple agrees to, and in parenthesis small a, pay to company a total sum of $750,000.  Do you see that, sir?

A     Yes.

Q     Which is subject to Apple's purchase order and invoice requirements and company's timely execution and delivery of this agreement shall be payable in accordance with Apple's standard business practices and follows.  And then now we are moving on to a small, I think it's one.  It says an installment of $250,000 shall be payable upon the event date.  And do you remember the event date referenced in this document?

A     Yeah, it's the date we discussed earlier.

Q    Thank you.  And now the second installment of $500,000 shall be payable upon the date on which the album is delivered to Apple for distribution in special audio format.  And then moving on to the next portion.  B, initiate a marketing campaign worth at least $500,000 in value for the artist in support of the album.  Did I read that correctly, sir?

A    Yes.

Q    And here the artist, again, is referring to you, correct?

A    Correct.

Q    And the album is the Donda album that came out in August 2021, correct?

A    Correct.

        MS. LEE:  Your Honor, at this time we move to admit Exhibit 423.

        THE COURT:  Any objection?

        MR. MARTORELL:  No objection.

        THE COURT:  Exhibit 423 is admitted.

    **(Exhibit Number 423 received in evidence)**

BY MS. LEE:

Q    We can take it down.  Now we are in, I would like to invite your attention to 2019.  2019 before COVID.  Do you recall you and several of your companies brought a lawsuit against UMG and Bravado?

A    I don't recall.

Q    Do you remember seeking to be released from your

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee        107

obligations under the agreement you have with UMG?

A    I don't recall.

Q    You don't recall trying to terminate your agreement with UMG?

A    I don't recall.

Q    Did you have an agreement with UMG at some point in your career?

A    Yes.

Q    Do you recall when you first had an agreement with UMG?

A    Maybe in 2003.

Q    I would like to kind of focus the time in 2019 time period.  Were you still under the agreement with UMG?

A    I believe so.

Q    Did you make any effort to be released from that agreement sometime in 2019?

A    I don't recall.

        MS. LEE:  Permission to publish Exhibit 73, Your Honor?

        THE COURT:  Any objection?

        MR. MARTORELL:  One moment, Your Honor, please.

    (Pause)

        MR. MARTORELL:  Yes, Your Honor.  Relevance, foundation, and 403.

        THE COURT:  Okay.  So we're going to turn the jury screens off and you can publish to the witness and question

EXCEPTIONAL REPORTING SERVICES, INC

him.

          MS. LEE:  Thank you.

BY MS. LEE:

Q     Why don't we go to UMG-00027.  Right there.  I'll try not to describe what's on the screen, but do you see what's on the screen?  There are some words and there are some signatures.

A     Yes.

Q     Do you recognize some of the signatures that you see?

A     Mine.

Q     Did it refresh your recollection as to whether you had an agreement with UMG in 2019?

A     Yes.

Q     Do you remember entering into a settlement agreement with UMG in 2021?

A     I don't recall.

Q     Okay, let's go to the top page.  In the very top, I will not read from the screen, but can you just have a moment to read the date to refresh your recollection?

A     Yes.

Q     Did it refresh your recollection as to whether or not you had a settlement agreement with UMG sometime in 2021?

A     The date that I'm looking at says January 25th, 2019.  Oh, well, at the top.

Q     Yes, sir.

A     All right, yes.

Q    Yes to able to see or yes to did it refresh your recollection?

A    Yes, it does.

Q    Thank you.  Did it also refresh your recollection that you had a lawsuit with UMG and Bravado?

A    No.

Q    Let's go back to the UMG signature pages.  Where you see your signatures above it, do you recognize the company names?

A    Yes.

Q    Do you remember having a Bravado arrangement through your company Ox Paha, formerly known as Mascot Holdings, Inc.?

A    What's the question?

Q    The question is, at that time, you had a Bravado arrangement through your company called Ox Paha, formerly known as Mascot Holdings, Inc.?

A    Okay.  But what's the question?  You gave me a statement.

Q    No, I'm asking you, do you remember having an arrangement agreement with Bravado through your company called Ox Paha, that was formerly known as Mascot Holdings, Inc.?

A    I don't remember.

Q    Did you ever have a company called Mascot Holdings, Inc.?

A    Yes.

Q    Did the name of the company change to Ox Paha?

A    Yes.

Q    Are you still the owner of Ox Paha?

A     Yes.

Q     Who else owns Ox Paha?

A     Just me.

Q     Let's turn to page 16, UMG.  I'm inviting your attention to the second to the last paragraph, the penultimate paragraph. Would you have a moment to review?

A     Okay.

Q     Do you recall having a merchandise agreement with Bravado?

A     Yes.

Q     And do you recall, after seeing this, through this settlement agreement, you were released from your obligations under the merchandise agreement you have with Bravado, correct?

A     Correct.

          **MS. LEE:**  Your Honor, at this time, we move to admit Exhibit 73.

          **THE COURT:**  Any objection?

          **MR. MARTORELL:**  Relevance, Your Honor.

          **THE COURT:**  The objection is overruled and Exhibit 73 is admitted.

     **(Exhibit Number 73 received in evidence)**

          **THE COURT:**  It is 12 o'clock, so we're going to take a break for lunch.

          Sir, you can go ahead and step down.  Well, I need you back here at 1 o'clock, so we'll resume your testimony.  To our jurors, please remember, don't do any research about any

aspect of this case and do not discuss the case amongst yourselves or with anyone else.  Thank you very much, and I'll see everyone back here at 1 o'clock.

THE CLERK:  All rise.

(Recessed at 11:59 a.m.; reconvened at 1:05 p.m.)

(Jurors present)

THE CLERK:  All rise.  This United States District Court resumes in session.

THE COURT:  Thank you.  Everyone can be seated.  Okay.  All right.  I hope everyone had a nice chance to get a bite to eat.

Sir, you're still under oath, okay?

THE WITNESS:  Okay.  Thank you.

THE COURT:  Okay.  All right.  Ms. Lee, you may proceed.

MS. LEE:  Thank you, Your Honor.

Good afternoon, Ye.

**DIRECT EXAMINATION (CONTINUED)**

BY MS. LEE:

Q    We were looking at the settlement agreement that's dated June 30th, 2021 before the break; do you recall that?

A    Yes.

Q    Okay.  I would like to invite your attention to one of the pages that you saw before to refresh your recollection.  It appears on -- thank you.  And then you saw the signatures and

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee        112

you recognized them to be yours, correct?

A    Yes.

Q    And you signed four times on behalf of Kanye West,
Mascotte Holdings, Inc., Getting Out Our Dreams, Inc., and
Getting Out Our Dreams Two, Inc.; do you see that, sir?

A    Yes.

Q    And then you testified earlier that Mascotte Holdings,
Inc., its name has changed to Ox Paha; do you recall that, sir?

A    Yes.

Q    Okay.  And now you own hundred percent of Mascotte
Holdings, Inc. back in 2021.

A    Yes.

Q    Did you also own hundred percent of Getting Out Our
Dreams, Inc. in 2021?

A    Yes.

Q    Did you own hundred percent of Getting Out Our Dreams Two,
LLC in 2021?

        MR. MARTORELL:  Relevance, Your Honor.

        THE COURT:  Overruled.  You can answer.

A    Yes.

Q    If you see the signatures above where your signatures
appear, do you see some of the company names right under very
truly yours?  You see some signatures there.

A    Yes.

Q    Do you see Def Jam Recordings, a division of UMG

EXCEPTIONAL REPORTING SERVICES, INC

Recordings, Inc.?

A    Yes.

Q    Okay.  Next to that you see Bravado International Group Merchandising Services, Inc.

A    Yes.

Q    Okay.  The last one, bear with me, Universal Music Group; do you see a signature for that entity as well?

A    Yes.

        MS. LEE:  Thank you.

Q    So you signed the settlement agreement back in 2021 on behalf of yourself and the three entities, correct?

A    Yes.

Q    Now, looking at the company names above your name that we just went through, do you recognize now that this settlement agreement was between Def Jam Recordings, a division of UMG Recordings, Inc., Bravado International Group Merchandising Services, Inc., and Universal Music Group on one hand, and you and your three companies on the other hand, correct?

A    Correct.

        MS. LEE:  I'm going to invite your attention to the first page that we looked at, specifically the penultimate from the second paragraph from the bottom.  I did ask you to refresh your recollection by reading the second to the last paragraph.

        If you can enlarge just a tad bit for me, thank you.

Q    It says, the license of trademark and merchandising rights

agreement between Bravado International Group Merchandising

Services, Inc., and that entity is define as "Bravado," and

Mascotte Holdings, Inc., and we defined it as "Mascotte," dated

April 13, 2017, including any amendments thereto.

     And then they defined that agreement, and any amendments

thereto as merchandising agreement; do you see that, sir?

A    Yes.

Q    Okay.  So does it refresh your recollection that the

Bravado arrangement for merchandising you had was through your

company at the time called Mascotte Holdings, Inc., correct?

A    Correct.

Q    Okay.  And then when you reviewed this agreement with your

lawyers before signing this agreement, do you remember working

with attorneys who drafted these agreements for you?

A    Vaguely.

Q    Okay.  And then Bravado at the time handled your merch

sales all the way through 2021, correct?

A    Correct.

     **(Pause)**

         **MS. LEE:**  I'm inviting your attention back to the

2021 listening party.  So this agreement is dated June 30th,

2021.

         Few weeks later you're now having your public --

first public listening party on July 22nd, 2021.  There's no

question pending.  I just want to reset your focus.

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee          115

Q    And you testified earlier that at that time, you did have MSD Part Two sample in "Hurricane" that was played at the listening party; do you recall that, sir?

A    Vaguely.

Q    Okay.  Do you -- and then you removed that sample, MSD Part Two, after that first listening party because there was no clearance, correct?

A    I believe so.

Q    So the second listening party and third listening party, you did not have MSD Part Two sample, correct?

A    Well, actually what you're referring to as the first listening party is the second listening party because we had one in Vegas before so --

Q    Thank you for clarifying because my understanding was that the one in Vegas was more private.

A    It still was a listening party.

Q    I see.  So --

A    Yea.

Q    -- let me clarify.  One on July 22nd, 2021 listening party, I'm referring to that listening party as the first public listening party; does that help you understand my question as to the second and third listening party, or is that still confusing to you?

A    It's not confusing.  The --

          **MS. LEE:**  Thank you.

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee        116

A    -- first one was public also, just smaller.

Q    I see.  How many people attended your first Las Vegas listening party?

A    I'm not positive, maybe 500.

Q    Okay.  And how many people showed up at your listening party that took place on July 22nd, 2021 at Mercedes Benz Stadium in Atlanta, Georgia?

A    I'm not sure, but 30 to 50,000 people.

        MS. LEE:  Thank you.  All right.

Q    Just focusing on that listening party where Weeknd said -- so when we talk about Weeknd listening to your performance and the listening party, are we talking about the Las Vegas show or the first public listening party in Atlanta, Georgia?

A    The listening party in Atlanta, Georgia.

        MS. LEE:  Thank you.

Q    That took place on July 22nd, 2021, correct?

A    I believe so.

        MS. LEE:  Thank you.

Q    After that performance, or after you played that music at the listening party, you removed the MSD Part Two sample from "Hurricane," correct, --

A    Correct.

Q    -- because you did not have clearance?

A    Correct.

        **(Pause)**

**EXCEPTIONAL REPORTING SERVICES, INC**

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee        117

Q    And then the reason you removed the sample after the first listening party on July 22nd, 2021 is because the sample was not cleared, correct?

A    Correct.

        **(Pause)**

            **MS. LEE:**  When you enter into this settlement -- let me refocus our attention one more time.  Apologize, I was going back and forward.  We're still on Exhibit 73.  This is the settlement agreement you enter into with UMG and Bravado and Def Jam on June 30th, 2021.

        I just want to refocus.  There's no question pending, sir.

Q    By the time you enter into this agreement, you already had many versions of "Hurricane," correct?

A    Correct.

Q    How many versions do you think you had by the time we arrived in the middle of so June 30th of 2021?

A    I'm not sure.

Q    Can you give us the best estimate?

A    It would be completely a longshot guess.  I don't -- I'm not sure at all.

Q    Would 20 be approximate?

A    I don't know.

            **MS. LEE:**  Let's go to -- may we publish deposition transcript page 63, line one through page 64, line seven?

            **THE COURT:**  Any objection?

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee      118

**MR. MARTORELL:**  Sixty-three one through 64-7?

**MS. LEE:**  Yes, sir.

**(Pause)**

**MR. MARTORELL:**  Objection.  I don't think it really impeaches the witness, Your Honor.

**THE COURT:**  Okay.  You can go ahead and read it.

**MS. LEE:**  Thank you.

BY MS. LEE:

Q    Ye, I'm reading from your deposition transcript, page 63, line one.

"QUESTION:  What about from the first version or first instance of 'Hurricane?'

You testify:  "Yeah, I probably change a hundred times."

"QUESTION:  And a hundred times over the course of three years.

"ANSWER:  Over the course of years, I don't know how many years exactly.

"QUESTION:  But you would estimate it would be about a hundred.

"ANSWER:  Maybe it would be 30 something.  I don't know.

"QUESTION:  In the time leading up to the release of your *Donda* album in August of 2021, how close to that release were you finishing the completion of the

**EXCEPTIONAL REPORTING SERVICES, INC**

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee        119

final recording for 'Hurricane?'

"ANSWER:  I'm not sure.

"QUESTION:  Of the 30 versions that you have of 'Hurricane,' how many of those would you estimate would be in the month prior to the release of the album?

"ANSWER:  Ten of them.

"QUESTION:  In the three months prior to the album, how many versions would you estimate are there of 'Hurricane?'

"ANSWER:  Yeah, ten.

"QUESTION:  And the remaining ten versions, when were the first ten versions created?

"ANSWER:The first ten, I'm not sure, like within the years before."

**BY MS. LEE:**

Q    Do you remember testifying about how many versions you had before you released the *Donda* album?

A    Yes.

Q    Okay.  How many versions did you release or premier or leaked before you released the final version of "Hurricane?"

A    I'm still not sure.  I said I didn't know there also.

Q    We're still on Exhibit 73.  Do you remember the law firm who drafted this agreement for you?

A    No.

Q    Do you remember the Apple agreement that we talked about before?

A    Yes.

Q    Do you know the attorney named Ekwan Rhow?

A    Yes.

Q    Do you recall that he drafted the Apple agreement for you?

A    Now I do.

Q    Okay.  Is attorney name Ekwan Rhow, was he representing you in 2022?

A    Yes, I believe so.

Q    Okay.  Does he still represent you?

A    No.

Q    When did he stop representing you?

A    I don't recall.

Q    So sometime between 2022 and 2026?

A    Yes.

        **MS. LEE:**  Thank you.

        Let's go to UMG 26.

Q    Can you see the schedule one, and there's a title "Hurricane?"

A    Yes.

Q    Okay.  Do you recall that the settlement agreement release you from the UMG agreement upon delivering "Hurricane," "Life of the Party," and *Donda*?

A    No, I don't recall.

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee         121

Q    You don't recall that delivering "Hurricane" was a condition for the settlement agreement?

A    No.

        MR. MARTORELL:  Objection, lacks foundation.

        THE COURT:  Overruled.

**BY MS. LEE:**

Q    At the time you enter into this agreement, you already testify that you had multiple versions of "Hurricane" but you just can't recall how many, correct?

A    Right.

        **(Pause)**

        MS. LEE:  May we have permission to publish Exhibit 60?

        THE COURT:  Any objection?

        MR. MARTORELL:  One moment, please, Your Honor. Relevance, foundation, and 403, Your Honor.

        THE COURT:  Okay.  I'm going to -- we're going to turn the jurors' screens off so that you can examine him about this document.  And then we'll go from there.  Okay.  The screens are off.  Go ahead.

        MS. LEE:  Thank you.

        So, Ye, so you see the top righthand corner, you see the number 60, just means that is a trial Exhibit Number 60. That's not part of the document.  Thank you.  If you can see the signature --

**(Ms. Lee/co-counsel confer.)**

**BY MS. LEE:**

Q    Ye, so this is page 25 of a 36-page PDF document; do you recognize the signature under it's on the right side of the two-column table?

A    Yes.

Q    Okay.  And do you see the date noted there as well?

A    Yes.

Q    Okay.  Does it refresh your recollection as to the fact that you enter into this agreement with the entity whose name appears on the left column of the table?

A    What's the question?

Q    The question is, do you recall entering to this agreement?

A    Yes.

            MS. LEE:  Thank you.

            May we publish Exhibit Number 60, Your Honor?

            THE COURT:  Are you moving it into evidence or are you asking to publish?

            MS. LEE:  Publish.

            THE COURT:  Any objection?

            MR. MARTORELL:  No objection to publishing, Your Honor.

            THE COURT:  Okay.  Go ahead.

            MS. LEE:  Thank you.

//

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee        123

**BY MS. LEE:**

Q    So, Ye, you enter into this agreement on behalf of Easy (sic) Supply, LLC, correct?

A    Yes.

Q    And you sign this on June 25th, 2020.

A    Yes.

Q    And that is approximately about a year before you had your first public listening party on July 22nd, 2021, correct?

A    Yes.

Q    And then the entity you enter into this agreement is the Gap, Inc., correct?

A    Yes.

        **MS. LEE:**   Thank you.  Can you take me to the first page?

Q    Do you see the title of the agreement the Strategic agreement on the screen?

A    Yes.

Q    And this is a long-term, cobranded project between Easy Supply and Gap, correct?

A    Yes.

Q    And this agreement was for a ten-year term, correct?

A    Yes.

Q    And you served as a creative director for the Easy and Gap project.

A    Yes.

EXCEPTIONAL REPORTING SERVICES, INC

Q    And do you recall meeting representative for Gap at least 20 times under this agreement?

A    Yes.

        MS. LEE:  I move to admit Exhibit 60, Your Honor.

        THE COURT:  Any objection?

        MR. MARTORELL:  Same objections as before, Your Honor, relevance and 403.

        THE COURT:  The objections are overruled.  Exhibit 60 is admitted.

        **(Exhibit Number 60 was received in evidence)**

        MS. LEE:  Thank you, Your Honor.

**BY MS. LEE:**

Q    Focusing your attention to 2022 and 2023, you changed legal counsel several times in 2022, correct?

A    I don't recall.

Q    You changed licensing representatives several times in 2022.

A    I don't recall.

Q    And you changed legal counsel several times in 2023.

A    I don't recall.

Q    And you changed licensing representative several times in 2023.

A    I don't remember.

Q    Okay.  In 2022, if someone tried to reach your team or your representative in order to negotiate clearance for music

Ye, a/k/a Kanye Omari West - Cross / By Mr. Martorell    125

or license for music, who would be the person people needed to reach in 2022?

A    Would it be my lawyer?

Q    Who was your lawyer in 2022 for that purpose?

A    I think it was Ekwan but I don't recall.

Q    Anybody else?

A    No, not that I remember.

Q    How about in 2023?

A    I don't remember.

        MS. LEE:  I tender the witness, Your Honor.

        THE COURT:  Thank you.

        Mr. Martorell.

        MR. MARTORELL:  Yes, Your Honor.

        Good afternoon, Ye.  How you doing?

        THE WITNESS:  I'm doing good, thank you.

                    CROSS EXAMINATION

BY MR. MARTORELL:

Q    When did you first start creating music?

A    When I was five years old.

Q    And what caused that at five years old, what gathered your interest in music?

A    Just seeing Michael Jackson on TV.

Q    Okay.  Michael Jackson made an impression on you.

A    Yes.

Q    And when did you start releasing music commercially?

Ye, a/k/a Kanye Omari West - Cross / By Mr. Martorell    126

A    I would say commercially when I was 18, 19.

Q    And when did you first get your first plaque?

A    When I was 19.

Q    And what is a plaque in music?

A    It shows that you've sold a certain amount of records.

Q    And what does music mean to you?

A    Oh, music is everything.

Q    What do you mean by that?

A    It means it surrounds me at all times.  I'm constantly creating new ideas for it.  And I'm happy that I was able to contribute to the art form.

Q    And how many albums have you released?

A    Well, solo albums I've released 12.

Q    And pre-*Donda*, how many albums had you released?

A    Nine.

Q    And how many Grammy nominations have you received in your career?

A    Seventy-four.

Q    And wins?

A    Twenty-four.

Q    And as of let's say pre-*Donda*, do you know around the approximate number of Grammy nominations and wins?

A    Sixty something nominations and 20 something wins.

Q    All right.  Now, you said music is a big part of your life obviously.  Would you please bring us into that world?  What is

**EXCEPTIONAL REPORTING SERVICES, INC**

Ye, a/k/a Kanye Omari West - Cross / By Mr. Martorell    127

the process that you have for making music?

A    Well, a song could come from all different directions.  It could come from me just singing in the shower.  It could come from me making a new beat and listening to the beat and then adding the song then.  A song could be sent to me, yeah.

Q    I've heard you have a little bit of a grueling process in terms of making music; would you agree with that?

A    Yes.  I work very hard and make multiple versions of each song.

Q    What's that journey like; can you describe that a little further for the ladies and gentlemen of the jury?

A    It's hard but it's therapeutic because I want to deliver the best product to the audience and to my fans.

Q    And were you -- we ran some calculations.  Were you nominated to 85 percent of the Grammys -- for 85 percent of the Grammys year over year for a -- one second -- for a 14-year period, from 2005, 14 years after that?

        MS. LEE:  Objection, leading.

        THE COURT:  Sustained.

A    Yes, I believe so.

        THE COURT:  The objection was sustained.

        THE WITNESS:  Okay.

        THE COURT:  So if I sustain an objection, you don't answer.

        THE WITNESS:  Okay.

EXCEPTIONAL REPORTING SERVICES, INC

THE COURT:  Okay.

BY MR. MARTORELL:

Q    So in 2005, you released *College Dropout*, correct?

A    Yes.  I thought it was 2004 but yeah.

Q    You're right, 2004.  Two thousand five, you were nominated and received Grammys for *College Dropout*, right?

A    Right.

Q    Okay.  What was your next album?

A    *Late Registration*.

Q    That was released 2005, and you were -- received nominations and awards in 2006.

MS. LEE:  Objection, leading.

THE COURT:  Sustained.

BY MR. MARTORELL:

Q    Okay.  Did you receive Grammy nominations and Grammy awards for Late Registrations?

A    Yes.

Q    *Late Registration*.  What was your next album?

A    *Graduation*.

Q    That was released in when?  Do you have an approximate date as to when that was released?

A    Two thousand eight.

Q    And did you receive nominations and Grammys for that?

A    Yes.

Q    And did you receive Grammy nominations for the record

Ye, a/k/a Kanye Omari West - Cross / By Mr. Martorell    129

*American Boy*?

A    I don't recall.

Q    How about Swagger Like This (phonetic)?

A    Yes.  I believe we won a Grammy for that.

Q    Okay.  Do you remember the approximate year?

A    Around 2008.

Q    How about for the record *Run This Town*?

A    Yes.  I believe we won a Grammy for that.

Q    And how about for *Make Her Say*?

A    I don't recall.

Q    Approximately what year -- strike that.

       How about for *Power*?

A    I don't recall.

Q    Okay.  *My Beautiful Dark Twisted Fantasy*, did you receive any Grammy nominations and wins for that?

A    Yes.

Q    And how about *Watch The Throne*?

A    Yes.

Q    And how about the record *Brothers in Paris*?

A    What's the real name?

       **(Laughter)**

Q    Did you receive a Grammy for that record, sir?

A    Yes.

Q    How about *Yeezus*?

A    I believe so.

EXCEPTIONAL REPORTING SERVICES, INC

Q    And how about *Life of Pablo*?

A    I believe so.

Q    Okay.  All right.  What is your general process for starting a new record?  You've kind of taken us through the journey of how long and how many iterations, but what do you usually do to start?

A    Most often I'll start by making a new beat.

Q    And how many versions of a record do you go through before settling down on a final commercial release?  Let's say on average.

A    Well, we work on albums for like a year.  And we might work on a song five days out the week.  So the iterations are endless, sometimes over a hundred versions.

Q    And how many writers are on "Hurricane" approximately, if you recall?

A    Twenty something.

Q    How do you end up with 20 something writers?

A    Different people come to the studio at different times and contribute.

Q    And you allow them all in.

A    Yes.

Q    Do you think that's standard in the industry?

A    I think it's more standard now after I did it.

Q    You -- so would you say you opened up the tent very wide to let artists in and help you contribute?

A    Yes.

       MS. LEE:  Objection, leading.

       THE COURT:  Sustained.

BY MR. MARTORELL:

Q    Would you call yourself a big collaborator or a non-big collaborator?

A    A big collaborator.

Q    So if one of the artists in this case said you were a great collaborator, would you agree with that?

A    Yes.

Q    And how about in terms of giving people credit for contributing; would you categorize yourself as more generous or more frugal in that regard?

A    I think very generous.

Q    Okay.  Why do you say that?

A    I just prided myself -- I pride myself when people getting what they deserve.

Q    And how about with regard to sharing percentages?

A    Generous.

Q    Money.

A    Generous.

Q    And do you feel that you treat people fairly in negotiations?

A    Yes.

Q    Do you feel that you receive that back from everyone?

Ye, a/k/a Kanye Omari West - Cross / By Mr. Martorell    132

A    No.  I feel like a lot of people try to take advantage of me.

Q    Why do you say that?

A    As I sit in this courtroom today, I feel like people are trying to just figure out how to make more money than they would make on a different project because it's me.

Q    Do you think that the instrumental at issue in this case has been fairly compensated so far?

A    Yes.

Q    Why do you say that?

A    Because we went through a normal process to get it taken care of.

Q    Meaning reached out for preclearance, then sought clearance; is that what you're referring to?

A    Yes.

        MS. LEE:  Objection, leading.

        THE COURT:  The objection is sustained.

A    I reached out for --

        THE COURT:  Hold on for one second.  I sustained the objection.  The response is stricken from the record.

        THE WITNESS:  All right.

        THE COURT:  Mr. Martorell, please ask a different question.

//

//

Ye, a/k/a Kanye Omari West - Cross / By Mr. Martorell   133

**BY MR. MARTORELL:**

Q    Do you know if anyone reached out pre-release?

A    Yes, I believe so.

Q    Okay.  And do you know if there were genuine efforts to clear this album or this record?  Sorry.

A    I believe so.

Q    And with regard to -- let's take an industry standard. You've been in the industry since -- *College Dropout* was 2004 you said, but you -- why don't I just ask you.  When did you -- when do you consider yourself having entered the professional music industry?

A    When I was 18 releasing commercial songs, releasing songs commercially?

Q    Okay.  And how old are you now?  If you don't mind my asking.

A    Forty-eight.

Q    All right.  So we're talking about 30 years.

A    Yes.

Q    With that in mind, and your understanding of what's standard in terms of how much it costs to create music, would you say that you spend more money than most or less in terms of making your music?

A    More money than most --

Q    And what do you --

A    -- to make music.

Ye, a/k/a Kanye Omari West - Cross / By Mr. Martorell    134

Q    -- attribute that to?

A    All the iterations and how hard we work on the music.

Q    And do you involve a lot of people in a way that costs a lot of money?

A    Yes.

Q    Can you elaborate on that, give us some examples of how you do that?

A    Yes.  Flying different people in just to make a single part in a song, or to change the instrumentation to add something to the drums to come up with a hook, to come up with a few lines in the song.  We like spare no expense.

And we'll often record in different places around the globe, so then you get flights and hotels and food and car service and you know.

Q    And do you feel that you spend a lot on those efforts?

        MS. LEE:  Objection, leading.

        THE COURT:  Sustained.

BY MR. MARTORELL:

Q    Do you feel you spend a decent amount of money to make people comfortable or do you feel that you try to frugally limit cost as much as possible --

        MS. LEE:  Objection, leading.

        THE COURT:  Sustained.

//

//

Ye, a/k/a Kanye Omari West - Cross / By Mr. Martorell    135

**BY MR. MARTORELL:**

Q    You -- did you have anybody come to the listening party in Atlanta, Georgia?

A    Yes.

Q    Did you fly people in for that?

A    Yes.

Q    Was there music creation that took place in Atlanta, Georgia --

    **MS. LEE:**  Objection, leading.

    **THE COURT:**  Were you finished with your question?

    **MR. MARTORELL:**  I wasn't.

    **THE COURT:**  Okay.  Go ahead and ask the question.

    Sir, if you could just wait until the question is finished so I can hear whether or not there's going to be an objection, and then you'll be able to respond.

    Go ahead, Mr. Martorell.

**BY MR. MARTORELL:**

Q    In Atlanta, Georgia, in association with -- why don't we just describe the listening party and lay a foundation there?

    What is a listening party in your mind?

A    It's a place where you invite people to hear new music that you're working on.

Q    And is the music finalized?

    **MS. LEE:**  Objection, leading.

    **THE COURT:**  Overruled.  You can answer.

EXCEPTIONAL REPORTING SERVICES, INC

A    Often it's not.

Q    And for "Hurricane," was it finalized at the first listening party?

A    Definitely not.

Q    And how many songs at the first listening party were finalized?

A    I don't think any of them.

Q    So all of them were works in progress?

A    Yes.

Q    And did you finish them alone or with other people?

A    With other people.

Q    And how many other people are we talking?

A    Twenty something people.

Q    So did you fly all 20 in?

A    Yes.

Q    And you also have lived in Wyoming, for instance.

A    Yes.

Q    Have you ever flown anyone there to make music?

A    Absolutely.

Q    A lot of people?

A    Yes.

Q    So all of that creates cost in the making of music; am I understanding that correctly?

A    Yes.

           **MS. LEE:**  Objection, leading.

THE COURT:  Sustained.

(Pause)

BY MR. MARTORELL:

Q    Let's go back to that listening party.  Do -- this is a performance between you said I think 30 to 50,000 people, right?

A    Yes.

Q    Is that a production that is -- does the production for that listening party, the one on July 22nd in Atlanta, was it -- would you characterize it as smaller or bigger in comparison to industry standard?

MS. LEE:  Objection, leading.

THE COURT:  Sustained.

MR. MARTORELL:  Okay.

BY MR. MARTORELL:

Q    What is the difference between a listening party and a concert?

A    At a listening party, you usually play songs that people haven't heard.  And at a concert, you play songs that people have heard.

Q    Would you characterize holding a listening party in a stadium as a simple process?

MS. LEE:  Objection, leading.

THE COURT:  Sustained.

//

**BY MR. MARTORELL:**

Q    How would you characterize the effort that goes into holding a listening party in a stadium?

A    I say it took more effort to hold it in a stadium than to hold it in a smaller venue.

Q    And creating an event for that many people, can you just explain what that experience is like?

A    Well, you have to hire the right people to be able to pull that off.

Q    And what about like the stage design, do you do that alone?

A    No.  I hire people for that, I collaborate with them.

Q    And by hire, you pay them; is that right?

A    Yes.

          **MS. LEE:**  Objection, leading.

          **THE COURT:**  Sustained.

**BY MR. MARTORELL:**

Q    Do you feel you have a good understanding of what motivates your fans?

          **MS. LEE:**  Objection, leading.

          **THE COURT:**  Overruled, you can answer.

A    Yes, I do.

Q    Okay.  Do you think that the track "Hurricane" was responsible for the amount of people that came to your listening party on July 22nd, 2021?

**EXCEPTIONAL REPORTING SERVICES, INC**

A    No.

MS. LEE:  Objection, leading.

THE COURT:  Overruled.  You can answer.

A    No.

Q    Why do you say that?

A    Because people came to hear whatever I was going to play that was new.

Q    So if you had not played it, do you think there would have been a difference in the amount of people who attended?

A    No.

MS. LEE:  Objection, leading.

THE COURT:  Overruled.

A    No.

Q    Why do you say that?

A    Because people were showing up to hear whatever I had to play.

Q    And what about whether playing "Hurricane" or not would have influenced the streaming fee that Apple paid that we saw -- talked about; do you think that would have made a difference?

A    No.

Q    Why not?

A    Because Apple was paying for the collaboration of me and Apple.

Q    And how about you said merch was sold.  Do you think that playing "Hurricane" had any influence on the merchandise sold

Ye, a/k/a Kanye Omari West - Cross / By Mr. Martorell    140

at your show?

A    Often people buy merch before they even hear the music, so no.

Q    Do you think that "Hurricane" had any sort of special sort of anticipation?

A    No.

Q    Why do you say that?

A    Because people had no idea what I was going to play.

Q    You released that Instagram post, though, that had "Eighty Degrees" in it, right?

A    Yes.

Q    So do you think that that built anticipation in any way amongst your fans?

A    No.  They didn't know what I was going to play.

Q    Did you ever commercially release "Eighty Degrees?"

A    No.

Q    And "Eighty Degrees" added elements to MSD Part Two.

A    Yes.

Q    What elements did it add?

A    Drums, chorus, rap.

Q    And then how about as that evolved into "Hurricane," the finalized version, how did it change?

A    We added features on it.

Q    What do you mean by that?

A    Other established artists collaborated on the song.

Ye, a/k/a Kanye Omari West - Cross / By Mr. Martorell    141

Q    Who?

A    The Weeknd and Lil Baby.

Q    Do you consider them large artists?

A    Yes.

     MR. MARTORELL:  I have nothing further.

     THE COURT:  Okay.  Any redirect?

  (Pause)

     MS. LEE:  No redirect, Your Honor.

     THE COURT:  Okay.

     MS. LEE:  Thank you.

     THE COURT:  Thank you.

     Thank you very much, sir.  You're -- you can step down, you're finished.

     THE WITNESS:  Thank you.

  (Witness steps down.)

     THE COURT:  Okay.  And who is the next witness?

     MS. WANG:  Professor Joe Bennett.

     THE COURT:  Okay.  Professor, you're going to come forward, you're going to come around here.  And when you get to Ms. Garcia-Marquez, she's going to administer the oath.  And then you'll come around and you'll have a seat in the witness stand next to me.  Okay.

     THE CLERK:  Please raise your right hand.

//

//

EXCEPTIONAL REPORTING SERVICES, INC

Bennett - Direct / By Ms. Wang                    142

**JOSEPH BENNETT, PLAINTIFF'S WITNESS, SWORN**

THE CLERK:  Thank you.  Please state your name and spell your last name for the record.

THE WITNESS:  Yes.  My name is Joe Bennett, and the last name's spelled B-E-N-N-E-T-T.

THE COURT:  Thank you.

Okay.  Ms. Wang, you may proceed.

MS. WANG:  Good afternoon.

**DIRECT EXAMINATION**

**BY MS. WANG:**

Q    What is your name for the record?

A    My name is Joe Bennett.

Q    What is your educational background?

A    I have a Ph.D. in musicology from the University of Surrey in the UK, and a bachelor's in creative arts, music from the University of Northumbria, also in the UK.

Q    Dr. Bennett, what is your current profession?

A    I'm a music professor at Berklee College of Music in Boston.  And I'm also a forensic musicologist.

Q    Dr. Bennett, do you teach?

A    Yes.  I teach undergraduates and masters and Ph.D. students in various contexts.

Q    What is a forensic musicologist?

A    A forensic musicologist is a music expert who specializes in analyzing music, usually popular music and songs, to assist

EXCEPTIONAL REPORTING SERVICES, INC

Bennett - Direct / By Ms. Wang                    143

parties in understanding music similarity.

So a lot of the time I provide technical analysis of music in the context of helping the parties to understand copyrights.

Q    And how much of your professional work is made up of forensic musicology?

A    I would say it's about 60 percent.  As a guide, I spend two days a week on the campus teaching my students, and three, sometimes four days a week undertaking musicology projects.

Q    And around how many musical pieces have you assessed during your career as a forensic musicologist?

A    It's very difficult to put a hard number on it, but using 2025 as a guide, I worked on about 50 projects during last year.

And in any analysis project, I would do contextual listening, so I would analyze typically a hundred plus songs for any individual project.

So I suppose -- and I've been doing this work since 2007, so it must be tens of thousands of songs I would say that I've analyzed across my career.

Q    Have you published any articles in your field?

A    Yes.  My specialism in terms of peer-reviewed research is forensic musicology.  So I write about the practice of forensic musicology in peer-reviewed publications, and also the psychology and creative practice of songwriters.

Q    Have you been retained as an expert in this case?

Bennett - Direct / By Ms. Wang                     144

A      Yes, I have.

Q      And who retained you?

A      I've been retained by Artist Revenue Advocates, the
Plaintiffs in this case.  And I'm working with Russ, August,
Kabat law as the attorneys.

Q      Are you being compensated for your work?

A      Yes, I am.

Q      What's your rate?

A      I'm paid hourly at a rate of $400 per hour.  It's my usual
rate.

Q      And does that compensation depend at all on the outcome of
what the jury finds?

A      No, it does not.

Q      About how many hours have you spent on this case?

A      I would say approximately 60 hours so far over the last
year or so.

Q      And have all of that time been spent on the sound
recording?

A      No.  In the earlier part of the case I was asked to do
some analysis work relating to the composition.  So I would say
that perhaps of those 60 hours or so, perhaps 20 hours was
spent working on the analysis of the sound recording.

Q      And can you tell us the difference between the sound
recording and composition?

A      Yes.  Happy to do so.  So there are essentially two

EXCEPTIONAL REPORTING SERVICES, INC

Bennett - Direct / By Ms. Wang                         145

copyrights in music.  There is the composition, sometimes called the song or the musical work, sometimes called the publishing.

And that's the thing that the songwriter makes, so normally thought of as the melody, the musical accompaniment, and the lyrics.  And a sound recording is a recording of that song.

So when I'm explaining this to my students at Berklee, the example I like to give is The Beetles "Yesterday," which was recorded by The Beatles in 1965, appeared on the *Help!* Album. The Beatles made the first recording of that, and that was their sound recording.

And since that day in 1965, many people, actually more than a thousand people, have recorded a cover version of "Yesterday."

There's a Frank Sinatra version and a Boyz II Men version and so on.  And those are separate sound recordings.  But in each case, the songwriter is Lennon and McCartney.

So the composition or the song, the music work, is the thing made by the songwriter.  And the sound recording is a recording of that song.

Q     And does the sound recording also encompass a composition?

A     Yes.  Necessarily when you -- certainly in the context of copying, when you copy part of a sound recording, you are necessarily copying part of the musical work, you're copying a

Bennett - Direct / By Ms. Wang                146

section of the composition.

Q    You also mentioned copyright.  When does copyright exist in a piece of music?

A    My understanding of the law is that copyright subsists from the moment of creation, the moment you create it.

Q    Have you testified at trial before?

A    This is my first time giving verbal testimony.  I've given written testimony to courts in the U.S. and in the UK in the past.

Q    Have you served as an expert in other music copyright cases?

A    Yes, I have.

Q    And what is the opinion that you are prepared to give today?

A    My opinion is in two parts.  The first part is that the sound recording, MSD Part Two, was played back or sampled as part of the performance of "Hurricane," the sound recording of "Hurricane" that was played back at the listening party on 22nd of July, 2021.

     And the second part of my analysis demonstrates that the excerpt of MSD Part Two plays throughout "Hurricane," so it plays back to back throughout the duration of "Hurricane."

          MS. WANG:  I proffer Dr. Bennett as an expert in musicology.

          THE COURT:  Any objection?

MR. MARTORELL:  None, Your Honor.

THE COURT:  Okay.  Dr. Bennett may testify as an expert in this case.

BY MS. WANG:

Q    Starting with your first opinion, what songs did you analyze to reach your opinion?

A    I analyzed MSD Part Two itself, particularly the first 12 seconds, which is the part that my analysis demonstrates was copied in "Hurricane."

And then I provided comparative analysis of many developmental versions of "Hurricane," including one that had a different title in an early iteration.  It was referred to as "Eighty Degrees."  It was posted to Instagram at that time.

And I focused my analysis most recently and in most detail on the listening party version from 22nd of July, 2021.

Q    So starting with MSD Part Two, what analysis did you perform in connection with that piece of music?

A    So when I analyze a new piece of music, my first step is always to understand what's going on in the music, what parts are the instruments playing.

So my very first step would be to listen to it, often many hundreds of times.  Certainly that was the case in this example.

And then my first technical step would be to provide a transcription, that is I would write down what the instruments

Bennett - Direct / By Ms. Wang                    148

play in music notation.

            **MS. WANG:**  Can you please show your music notation?

And may I publish it?

            **THE COURT:**  Is it an exhibit?

            **MS. WANG:**  It is a demonstrative.

            **THE COURT:**  Okay.  And have you exchanged it with the defense?

            **MS. WANG:**  Yes.

            **THE COURT:**  Any objection?

            **MR. MARTORELL:**  Just to the extent that it relates to the composition, Your Honor.

            **THE COURT:**  Okay.  So the objection is overruled.  So if you have it, you can demonstrate it.

            **THE WITNESS:**  Thank you.

            So displayed on the screen right now is a simplified transcription of the first four bars, that is the first 12 seconds or so, of MSD Part Two.

            At the bottom of the picture, you see the bottom line of the picture is what musicians would call bass clef or bass staff.  And it demonstrates the part played by the bass player in MSD Part Two.

            And I'll attempt to sing it a little bit if I may. It goes something like dom, dom, dom, dom, do, do, do.

            And then in the second half of that four-bar sequence it settles down into a sort of a groove, and it goes, dom, bom,

Bennett - Direct / By Ms. Wang                      149

bom, bop-a-dom, bom, bom.  And you'll hear those pitches more accurately when we come to hear the audio.

And then at the top part of the picture you see in sheet music the melodic lines, the main melody that we hear: dah, dah, dah, dah, dah, dah, dah.  And that goes on for four bars.

So a bar in the case of this example consists of four beats.  So if you're counting or tapping your foot along to the music, it would be two, three, four.  That would be a bar.

And the vertical lines in the diagram denote the divisions between bars.  So we see in the diagram there four bars of music, which in the sound recording represents just a little over 12 seconds of the sound recording I analyzed.

**MS. WANG:**  Thank you, Dr. Bennett.

**BY MS. WANG:**

Q    In your opinion, is MSD Part Two original?

A    Yes.  I do not consider it to be derived from any other work or in any other way unoriginal.  It has a distinctive bass line, a distinctive melody, and a distinctive chord progression.  And those are the criteria I would normally use for measuring originality.

Q    You also mentioned that you analyzed "Hurricane" from the first listening party.  What did you do to analyze that version?

A    So I began with the same test that I would do, listen to

EXCEPTIONAL REPORTING SERVICES, INC

Bennett - Direct / By Ms. Wang                    150

it many, many times, often slowed down because music software enables us to do that.

And then same first step, which is to transcribe the instruments that I hear.  So that's the first test of is one thing the same as the other.  And I found it to be so.

Then I undertook some more highly technical tests.  There's a test called spectrum analysis which is where you can create a graph of the music where the X-axis of the graph is time and the Y-axis of the graph is frequency.

So the bass instruments are at the bottom of the picture, and the treble instruments, the higher instruments, are the top of the picture.  And in this way, we can get a 2D, very accurate visual representation of what's going on in the music.

I also undertook a thing called wave form analysis which is -- there's a similar thing where the X-axis of the graph is time.  But it measures loudness over time.

And in this case, as I stated earlier, we are talking about just a little over 12 seconds of the sound recording.

Q    How did you obtain a copy of the first listening party for your analysis?

A    I sourced it from the internet archive which was the best available high quality source I could find online.

It's my understanding that back in July, 2021, the listening party was streamed on video as a livestream.  I was unable to find a commercially available version many years

Bennett - Direct / By Ms. Wang                    151

later.  And I don't believe it's available as an audio only product.

So I've downloaded the internet archive version, imported that into software, and then used a very music industry standard bit of software called Audio Hijack that takes the sound file out of the video file.  I then have an audio file that I'm able to drop into my music analysis software.

Q    Do you have a demonstrative to show the jury how you compared MSD Part Two and "Hurricane" played at the first listening party?

A    Yes, I do.

MS. WANG:  May we display that?

THE COURT:  Not yet.  So before we do that, I'm going to mark this demonstrative that is currently on the screen as Exhibit 576, just for so we have a record of.  I know it's not going to be going back to the jury but I want to make sure that we hold -- we have a mark of it.

(Exhibit Number 576 marked for identification)

And then the next demonstrative will be labeled Exhibit 577, and it will be a demonstrative and not an exhibit for admission.

(Exhibit Number 577 marked for identification)

MS. WANG:  Thank you, Your Honor.

THE COURT:  Thank you.

MS. WANG:  So you prepared a demonstrative.

EXCEPTIONAL REPORTING SERVICES, INC

Bennett - Direct / By Ms. Wang                    152

May we please display it?

**THE COURT:**  Yes.

**BY MS. WANG:**

Q    Can you please tell us what we see on the screen?

A    Yes.  So this is the video that I sourced from the internet archive of the listening party itself as it was livestreamed from the stadium.

So it's the original video and the original audio.  It's a perfect digital copy that I was able to make from the internet source.

At the top obviously you see the date, the event, and the song title.  On the right, you see the duration of "Hurricane." And that -- those letters B-P-M denote the tempo.

I was able to measure the tempo to within one hundredth of a second.  And both MSD Part Two and "Hurricane" are at exactly the same tempo.

You'll see there on the left it says the word MSD Part Two plays.  And there I've integrated a counter into the video.  So each time MSD Part Two which as I explained earlier plays throughout "Hurricane," each time it repeats, the counter will go up by one, enabling us to keep count.

But for now, if I may I'd like to just play those first 12 seconds so that the jury can really hear clearly what's going on in the section at issue.

**MS. WANG:**  And, Mr. Cummings, can you please play the

Bennett - Direct / By Ms. Wang                    153

first 12 seconds?  Thank you.

**(Exhibit played at 2:04 p.m.)**

**THE WITNESS:**  Thank you.

So what we were hearing there was the first four bars of MSD.  At the very beginning, for the first six beats, all we were hearing was MSD and the crowd noise from the stadium, so bom, bom, bom, bom, ba, da, da.  So all of that, there's nothing else going on other than crowd noise and MSD Part Two itself.

And then from halfway through the second bar, we heard that melody, and see this in 3D, which is Ye's or another processed voice singing over the top of it.

So essentially what we're hearing is MSD Part Two playing over and over with things added, I understand by Defendants.  And later in the song, you'll hear that not only is the voice added but also drums an additional bass.

So to be clear, there is a bass line, an electric bass line played by a person in MSD Part Two, and then another bass has been added, over-dubbed as we would say in music.

So what I'd like to do now is play those first 12 seconds again and just listen out for the distinctive elements of MSD Part Two.

The most distinctive one and the easiest one to recognize, I suggest, is what I refer to as the bass walkup, the first thing we hear, bom, bom, bom, bom, and the bass much

Bennett - Direct / By Ms. Wang                          154

lower doom, doom, doom, doom.

And that's like a cue.  Every time you hear it, it's another iteration of MSD.  And I'm going to sort of highlight the little bits of melody that characterize MSD as we play this iteration.

So with that setup, I hope we could just play the 12-second excerpt one more time.

**MS. WANG:**  Yes.  Please proceed.

**(Exhibit played at 2:06 p.m.)**

**THE WITNESS:**  So here's the walkup, the bass.  Here comes the over-dubbed vocal.

**(Exhibit stopped)**

Okay, so there's a sort of a chiming sound in the background there, a vibraphone like sound, and that is part of MSD PT2.  So in the first 12 seconds all we hear is MSD PT2 and the vocal and then a little later around about 15 seconds in some drums are added and then base added a little further on.

So if possible what I'd like to do now is play the whole of *Hurricane* as it was played at the listening party and I will narrate what's happening vis-à-vis MSD PT2.

Q    Yes, please proceed.

**(Video played at 2:07 p.m.)**

A    We hear the crowd noise.  There's the walk up.  There's MSD.  Here's the vocal over the top.  And here is play number two and the walkup ascends again.  Here comes the drums, these

**EXCEPTIONAL REPORTING SERVICES, INC**

Bennett - Direct / By Ms. Wang                          155

are being added.  MSD is still playing.

And there's the walk up.  So this is play number three.

Bum, bum, bum, bum.  So there's the walk up again. This is play number four.

So you can hear there's all sorts of things going on with the vocal and then MSD on its own.  Now we hear a short rap section.  MSD is still playing throughout.

This is play number six.  Da, da, that little high vibraphone part in there.  And this is play number seven.

And here's play number eight.  Dum-dum-dum-da-da-da. Now the drums drop out here.  MSD's a little lower in the mix but it's still there.  And at this point Ye sings along with MSD PT2.  Ah, ah, ah.  He's now playing number nine.  And then he sings the MSD PT2 melody, a fragment, again here.  Ah-ah.

At this point MSD goes a little lower in the mix. It's more difficult to hear.  It's still there.  I marked that in blue.  And then MSD is still audible here.  Drums drop back in.  MSD is still playing.  Prolonged rap section coming.

This is play number twelve.  Da-da-da-dom-da-dom. There's the baseline.  There's the walk up again.  This is play number thirteen.

And here's play number fourteen.  So it's carrying on without a break with its -- throughout the run time.  Da-da-da-dom-da-dom-da-da.  There's the walk up again.  Play number

Bennett - Direct / By Ms. Wang                    156

fifteen.  Da-da-da-da-da-da-da-da.  And the walkup again.
Here's play number sixteen.

And here's play number seventeen, the walk up again.
Da-da-da.

And here is cycle number eighteen.  This is the last
complete cycle of MSD PT2 that we hear in *Hurricane*.

And halfway through bar two in playback number
nineteen the track fades out and then we hear the crowd
cheering and that's the end of the video.

Q    Dr. Bennett, how much of *Hurricane* at that first listening
party had MSD PT2 in it?

A    In terms of run time, 100 percent.

Q    Given your opinion that 100 percent of *Hurricane* at the
first listening party has the sound recording of MSD PT2, what
would you determine a music apportion to be for the song?

MR. MARTORELL:  Objection, lacks foundation.

THE COURT:  Overruled.

(To the Witness):  You can answer.

THE WITNESS:  So in my initial report when I analyzed
the MSD PT2 I suggested that it would be 50/50 in the musical
work, and I understand that's not a part of what we're here to
talk about today.  So in order get to an appropriate
apportionment for the sound recording I used my initial
measurement but tried to contextualize common practice in the
music industry, so I researched a number of case studies.

Bennett - Direct / By Ms. Wang                          157

The most parallel one with the situation we have here, which is that the sample is used throughout a hundred percent of the run time in an unending set of repeats, the case study that was most relevant was a song called *Every Breath You Take* recorded by the Police in the 1980s and it has a notable guitar riff.  I'll attempt to vocalize it here.  It's something like dum-dum-dum-dum-dum-dum-dum-dum-dum-dum-dum-dum.  Some of the jury might be familiar with it.  It was famously sampled in 1997 by an artist who then was publicly known as Puff Daddy in a song called *I'll Be Missing You* and it was sampled without permission so it was an unauthorized sample, which I understand is a parallel to the situation we have here.  In that particular case the settlement between the parties was 100 percent in favor of the creators of the earlier work, Sting of the Police in this case.

So with that example in mind, I would say 50/50 would be an extremely conservative way of apportioning the sound recording.  But that's what I would suggest as a method that has the advantage of being replicable.

Q    Does your analysis account at all for contributions from Defendants?

A    Yes, it does, and that's essentially the other 50 percent.  So when we listen to the music of *Hurricane* as it's played back at the listening party what we're hearing effectively is two sound recordings playing simultaneously.  We're hearing MSD PT2

Bennett - Cross / By Mr. Martorell                158

and then separately to that or on top of that we're hearing the

other sound recording made by Plaintiff, which is Ye's vocal,

the drums, and the added base.

So by that token, I suggest that's replicable because

we can say that two sound recordings are playing

simultaneously, so 50/50 does seem like a very measurable way

of apportioning that in a musical context.

MS. WANG:  Thank you, Dr. Bennett.  I will now turn

you over for questioning from Defendants' counsel.

THE COURT:  Thank you.

Mr. Martorell?

MR. MARTORELL:  Thank you, Your Honor.

(Pause)

CROSS EXAMINATION

BY MR. MARTORELL:

Q    Good afternoon.

A    Good afternoon.

Q    How are you, Prof. Bennett?

A    I'm very good, thank you.

Q    So again, you're being paid for your work on this case,

right?

A    Correct.

Q    Per hour.

A    Correct.

Q    And in 2025 you estimated that 35 to 40 percent of your

Bennett - Cross / By Mr. Martorell                159

business was litigation work, is that right?

A    Yes, I think that sounds about right.

Q    So you depend on this work?

A    It's part of how I make my living, that's true to say.

Q    You estimated at your deposition that you had already been paid somewhere between 25 and 50,000 dollars?

A    Yes.

Q    And you've been paid more since then, right?

A    Yes.

Q    What do you estimate it to be as of today?

A    I believe I have something like maybe $15,000 that is unbilled at the moment.  Something in that ballpark would be my estimate.  I haven't checked all of my billing records.

Q    Would you agree that you want to please your client?

A    I want to tell my client the truth and my understanding is my role as an expert is that I'm here to explain what's in the music in a truthful and accurate way.

Q    The source materials for your analysis of the listening party, they came from Plaintiff's counsel, right?

A    The source -- some of the source materials came from Plaintiff's counsel, correct.  And as I mentioned earlier, I also sourced the listening party video from the Internet archive.

Q    Right, that video.  Who uploaded it to the Internet archive?

Bennett - Cross / By Mr. Martorell                    160

A    Unknown, the unknown sources provided by the Internet archive.

Q    So you don't know where it came from?

A    No.

        MR. MARTORELL:  Let's play it actually, please.  Can we play the demonstrative that was recently marked?  577.

        THE COURT:  The video?  577.

        MR. MARTORELL:  Thank you, Your Honor.

    (Pause)

    (Video played at 2:18:08 p.m.)

        MR. MARTORELL:  Wind it to the beginning and pause it.

        So -- let's now play it.

    (Video played at 2:18:22 p.m.)

        MR. MARTORELL:  Pause it again.

BY MR. MARTORELL:

Q    There's no cheering from the crowd as this starts playing, do you see that?

A    I have not been asked to opine on the volume levels of the crowd.  I stated earlier that there are crowd noises throughout.  I did not measure the extent of crowd noises as particular parts of the run time.  I can hear cheering in the background of the mix certainly.

Q    Have you been to a concert -- you've been to concerts, right?

Bennett - Cross / By Mr. Martorell                161

A     Yes.

Q     Many?

A     Yes.

Q     And when someone, let's say Sting, plays their hit single first few notes start people start cheering.  That's been your experience?

A     Yes.

        MR. MARTORELL:  Let's restart it and see if we hear anything.

    **(Video played at 2:19:14 p.m.)**

**BY MR. MARTORELL:**

Q     Do you hear a little crowd noise here?

A     I can hear the crown noise in the background, yes.

        MR. MARTORELL:  All right, now let's hear the end, please.

    **(Video played at 2:19:36 p.m.)**

**BY MR. MARTORELL:**

Q     Do you hear any sound a lot louder at the end?

A     In that particular mix, yes.  Of course, I have no way of knowing what the production team would have done to mix the crowd noise with the played back track full broadcast, so I don't have access to those source files, but also, to be clear, I was not analyzed to -- sorry, I was not asked to analyze the crowd noise and its respective levels.  Suffice it to say that I detected crowd noise throughout and so I could hear it in the

Bennett - Cross / By Mr. Martorell                    162

mix.  But obviously, when something is mixed for broadcast or livestream, as in this case, you have no way of knowing what technical decisions have been made vis-à-vis balancing the noise of the crowd with the noise of the track.

         MR. MARTORELL:  All right.  We can take that down. Thank you.

BY MR. MARTORELL:

Q    You compared *Hurricane* -- or, sorry, MSD PT2 to Puff Daddy sampling Sting's *Every Breath You Take*, right?

A    I said it was a parallel situation in that an unauthorized sample had been used for 100 percent of the run time.

Q    Who has more -- more of a brand, Sting or the four artists in this case?

A    Well, Sting is, I believe, better known than the Plaintiffs in this case.  He's been around a very long time and has a substantial body of work.

Q    That's an understatement, right?

A    I suppose so.

Q    *Every Breath You Take* is one of Sting's biggest and most popular songs, right?

A    That's correct.

Q    One of the most recognizable of his songs.

A    Subjectively, yes.

Q    One of the most recognizable songs in music history.

A    I'm certainly very familiar with it, so I think a lot of

**EXCEPTIONAL REPORTING SERVICES, INC**

people are.

Q    Do you think anyone knew the instrumental that was sent to Ye?

A    As a musicologist, I analyze works by people who are very well known and people who are not so well known.  My understanding is that the issues I deal with which connect with originality, musicality, and copyright protectability are unconnected with the level of fame or brand of any of the parties involved.  So as a musicologist, I don't get involved in any matters of celebrity.

Q    That's right.  You are not a marketing expert, correct?

A    That's correct.

Q    You're not a royalties expert, correct?

A    I do sometimes help my clients with matters of royalties. For example, I measure the run times, in fact as in this matter, I measure the run times in musical terms, you know, how much music is being used.  So I've been advising clients, particularly music publishers and record companies, on matters -- on musical matters relating to royalties for many years.

Q    Prof. Bennett, I just asked you if you were a royalties expert.  Yes or no.

A    Royalties is not my primary area of expertise, but I have opined on royalties matters for my clients in the past.

Q    Prof. Bennett, I just asked you if you were a royalties

Bennett - Cross / By Mr. Martorell          164

expert.  Yes or no.

A    Royalties is not my primary expert -- area of expertise, but I do have some knowledge of royalties.  My main expertise is in musicology.

Q    So are you a royalties expert?  Yes or no.

A    I consider myself to have some expertise in matters of royalties, so I suppose that would be yes.  It's not my primary area.

          MR. MARTORELL:  Okay, I'd like to read from Page 189, Line 17, of Prof. Bennett's deposition that took place on February 4th, 2026.

          THE COURT:  Any objection?

          MS. WANG:  May I have the page number and line again? Thank you.

          MR. MARTORELL:  189, 17 through 24.

          MS. WANG:  189, 17 through --

          MR. MARTORELL:  24.

          MS. WANG:  Okay.  No objection.

          THE COURT:  Okay.  Mr. Martorell, go ahead.

          MR. MARTORELL:  Thank you, Your Honor.

     **(Excerpt of Deposition of Professor Bennett read by Mr. Martorell)**

          "QUESTION:  So what methodology would you suggest the jury implement?

          "ANSWER:  As a musicologist, I suggest that I -- both

Bennett - Cross / By Mr. Martorell                165

I and Dr. Sloan should be applying our skills to help people to understand the musical elements.  I am not a royalties expert.  I am not a marketing expert.  I don't think Dr. Sloan is, but I -- as I said, I have limited knowledge of his scholarship."

**BY MR. MARTOTELL:**

Q    So you yourself said at the time of deposition that you were not a royalties expert, right?

A    I stand by that statement with the nuance that I just explained, that it's not my primary area of expertise but to the extent that royalties overlap with musical measurements it's relevant to my work.

Q    And you would not know how to measure concepts like celebrity and branding by percentage, you agree to that?  You agree with that, right?

A    Correct, my methodology does not use that.

Q    So since you agree that your methodology does not measure concepts like celebrity and branding, how can you advise this jury as to the value someone like Sting or Ye brings to a record?  You can't, correct?

A    I disagree with that statement, respectfully, because my role is to measure the music and my understanding is that copyright protects all creators regardless of their level of celebrity or marketability or branding.  And as I freely admit, I'm not an expert in those things, but it is also my

Bennett - Cross / By Mr. Martorell                166

understanding that they are immaterial in matters of copyright, that is, copyright protects everyone however famous they are or not.

Q    Well, in terms of copyright infringement that makes sense, but we're talking apportionment.  We're saying if you assume copyright infringement, how much do you apportion to Ye's celebrity what Ye added to the song, what Ye brings to the table in terms of his fans, in terms of why they show up, all of that has to do with his celebrity and branding and his prior history, does it not?

A    I can only speak as a lay person in that regard. Obviously, famous people sell more tickets than people who are less famous for live events.  I think that's a reasonable inference.

Q    Right.  So your 50 percent for MSD PT2 doesn't take that into account at all, correct?

A    It does not.

Q    Your apportionment analysis is related to nothing other than the music, is that correct?

A    Yes in the -- with the caveat that I'm measuring duration of a sound recording, which is more of a technical -- or is a technical thing and a musical thing.  But yes, all of my measurements are quantitative and my recommendation of the 50 percent apportionment is based on the music industry case study that I mentioned.

Bennett - Cross / By Mr. Martorell                167

Q    You did not calculate how much money the alleged use of MSD PT2 generated, correct?

A    Correct.

Q    And you also put no value on how much MSD PT2 would have made on its own, correct?

A    Correct.

Q    You didn't look into any costs associated with the listening party?

A    No, I did not.

Q    So your opinion does not tell the jury any sort of indicators as to the revenue, profit, or damages caused by the MSD PT2 sample, right?

        MS. WANG:  Objection, foundation --

        THE COURT:  Sustained.

        MS. WANG:  -- argumentative.

        THE COURT:  Sustained.

BY MR. MARTORELL:

Q    So as you played the video you counted how many times MSD PT2 looped, right?

A    Correct.  I prefer the word repeated, but looped I guess is a synonym, yes,

        MR. MARTORELL:  One second, Your Honor, just jumping around here.

        (Pause)

//

EXCEPTIONAL REPORTING SERVICES, INC

Bennett - Cross / By Mr. Martorell                168

**BY MR. MARTORELL:**

Q    The video we saw did not come directly from Apple Music, right?

A    It came -- no, it did not.  It came from the Internet archive, as I previously stated.  I was unable to -- I did look in Apple Music.  It is not available from the livestream -- the livestream had not been archived and wasn't available as a stream or a commercial download product.  So the Internet archive source that I found was the best available evidence I could source for my analysis.

Q    And when I pointed out the applause you pointed out you don't know how the sound engineers recorded that, is that what you said?

A    That's true to say, I do not know how the sound engineers recorded it or how it was mixed for livestreaming.  All I could say is that when I technically analyzed the audio file, visually and auditorily the crowd noise showed up, it was present in the mix, and indeed it's present for us all to hear today.

Q    So, but the same thing applies for the entire video, you don't know what the engineers did to it and you don't know what the person who uploaded it did to it, right?

A    Correct.  So the only analysis I applied to the crowd noise was subtractive, and that is to try to ignore it so that I could concentrate on MSD PT2 and *Hurricane* to understand what

Bennett - Cross / By Mr. Martorell                169

was in the mix.  It's literally noise for the purposes of the analysis.

Q    So if there were authenticity questions relating to the video, meaning how authentically it captured all of the sound, you wouldn't know one way or another, right?

A    Could you clarify what you mean by authenticity issues and I'll try my best to answer.

Q    Whether it authentically captured the sounds that played at the listening party or whether it's been manipulated.

A    Well, all audio for livestream or broadcast is manipulated in some way.  It's just -- it's mixed, because that's what the presence of mixing is.  Everything we hear on TV and movies and records has been mixed and the listening party is no exception. So if you're using manipulated to mean mixing, music mixing, then yes, that's happening.

Q    Okay, but more than just music mixing.  If it was manipulated in a more severe way.  You wouldn't know because you don't know where it comes from, right?

A    I would know to the extent that MSD PT2 shows up in *Hurricane* at the listening party because I performed those technical tests that I mentioned, so I was able to authenticate that however it was mixed it was, in fact, MSD PT2 that we were hearing throughout the listening party performance.

Q    But for the rest of the video there's no way for you to confirm that the audio we heard in the video matches what was

Bennett - Cross / By Mr. Martorell                    170

in the live performance, right?

A    I confirmed that my analysis worked on the assumption that the video was authentic, that it was authentically the music that was heard at the listening party.  I have no reason to doubt that.  All three listening parties were available in the Internet archive but, as I said, that was the only source available to me for analysis.

          MR. MARTORELL:  I have nothing further, Your Honor.

          THE COURT:  Okay.  Thank you.

          Any redirect?

          MR. MARTORELL:  Oh, sorry.  Your Honor, I do have one more thing.  Can I --

          THE COURT:  Yes, go ahead.

          MR. MARTORELL:  Thank you very much.  I did want to play Exhibit 376.

          This is from your deposition, right, Prof. Bennett?

          I'll let it play.

          THE COURT:  376 is not in evidence yet.

          MR. MARTORELL:  Right.  Permission to play, Your Honor?

          THE COURT:  Any objection?

          MS. WANG:  No objection, Your Honor.

          THE COURT:  Okay, go ahead.

     (Audio played at 2:33:25)

          MR. MARTORELL:  Can you start it over, please?

EXCEPTIONAL REPORTING SERVICES, INC

Bennett - Cross / By Mr. Martorell                171

(Audio restarted and played)

BY MR. MARTORELL:

Q    This is -- this is the commercially released version, right, from your deposition?

A    Correct.  It sounds like it to me.  I obviously can't authenticate it right here, but from memory it does sound like the album version, I believe, of *Hurricane*.

MR. MARTORELL:  Your Honor, we'd like to move this into evidence.

THE COURT:  Any objection?

MS. WANG:  No objection.

THE COURT:  Okay.  Exhibit 376 is admitted.

(Exhibit Number 376 received in evidence)

MR. MARTORELL:  Okay, let's play it all, please.

(Audio played at 2:34 p.m.)

BY MR. MARTORELL:

Q    All right.  Professor Bennett, the sound recording does not appear -- the sound recording for MSD PT2 does not appear in the album version of Hurricane, correct?

A    That's correct.  My analysis demonstrates that.

MR. MARTORELL:  Okay.  No further questions.

THE COURT:  Okay.  Any redirect?

MS. WANG:  Yes, Your Honor.

THE COURT:  Okay.

(Pause)

Bennett - Cross / By Mr. Martorell                172

REDIRECT EXAMINATION

BY MS. WANG:

Q    Dr. Bennett --

MS. WANG:  Sorry, may I proceed?

THE COURT:  You may proceed.

Q    Dr. Bennett, Defense Counsel just asked you whether Exhibit 376, or the album version of Hurricane, contained the sound recording.  Did -- does -- did Exhibit 376 contain the composition of MSD PT2?

MR. MARTORELL:  Objection.  Irrelevant.

THE COURT:  Overruled.  You can answer.

A    Yes, in my opinion it's clearly the same song.  It's -- but the sample is not present.  So notable elements that I hope the jury will be able to hear, would be the notable walk up, dah, dah, dah, dah, that we heard in the original and aspects of YE's vocal melody.  And of course, many of the lyrics, most of the lyrics are the same.  So it's, yeah, it's essentially the same song, but a different sound recording.

Q    And how much of Hurricane contains the composition of MSD PT2 and album version?

MR. MARTORELL:  Objection.  Lack of relevance.

THE COURT:  Overruled.  You can answer.

A    Could you repeat the question, please?

Q    Yes.  How much of the MSD PT2 composition is in Hurricane?

A    Of the 12-second sample that we're talking about, it

Bennett - Cross / By Mr. Martorell                    173

appears throughout Hurricane's runtime as I previously stated.

Are you referring to that or are you asking me about MSD PT2

itself?

Q    Yes.  Apologies.  How much of the runtime of Hurricane,

the album version that we just heard, contains MSD PT2, the

composition?

A    The composition, it's the same composition.  It contains,

again I can't do a full analysis on the fly in compositional

terms, I understand that's not what we're here to talk about

today.  There are a couple of moments in the mix that we just

heard when the MSD parts kind of drop out of the mix, and other

things like, I can walk on the water, don't let me down.  Those

coral bits that we heard where there was short moments where

MSD PT2 composition elements are not playing.

But it's the same song.  It's the same structure.  It's

the same chords.  The parts of the melody that are derived from

MSD PT2 are all -- you can hear them all.  So I couldn't put an

exact number of it.  It's slightly less than 100% because there

are those moments when it drops out.  But the com -- it's

clearly the same song.

Q    Thank you.

        THE COURT:  Okay, any recross?

        MR. MARTORELL:  Nothing.

        THE COURT:  Okay.  Thank you, doctor.  You can step

down.  You're excused.

174

THE WITNESS:  Thank you.

THE COURT:  All right.  It is 2:40 p.m., so we'll take our afternoon break about five minutes early today, and we'll reconvene at 2:55 p.m.

To our Jurors, please don't talk about the case amongst yourselves, or is anyone else.  And don't do any research about any aspect of the case.  We'll see you in a few minutes.

Okay.  Everyone can be seated.  Anything we need to talk about before I let you go stretch your legs, from Plaintiff?

MR. MEYER:  Just whether the Court expects we should be planning on closing tomorrow or Monday, or if the Court is planning on going to Friday.

THE COURT:  That depends on how many witnesses you have.  Is what I -- if -- so let's -- let me just say.  Well let me ask you this.  How many more witnesses does the Plaintiff plan to put on today or put on period?

MR. MEYER:  We think three.

THE COURT:  Three more.  How much time generally do you think that's going to be?

MR. MEYER:  Combined, a little over an hour, maybe a little bit more than that.

THE COURT:  Okay.  And for the Defense?

MR. MARTORELL:  We have two additional witnesses.

EXCEPTIONAL REPORTING SERVICES, INC

175

THE COURT:  Okay?  And what is -- how much time do you think that's going to take?

MR. MARTORELL:  Probably about two, two and a half hours.

THE COURT:  So --

MR. MARTORELL:  We're going to keep it under 10.

THE COURT:  Yeah.  Right.  I'm just trying to figure out whether or not we're going to get to the end of the day tomorrow or half past the midpoint.  It sounds like we're at least definitely going to go past noon.

MR. MARTORELL:  Well sorry, Your Honor.  Mr. Rosario just pointed out that I guess I was assuming they were going to call the people we would call if they don't call.  So I guess who are your three witnesses?

MR. MEYER:  Sure.  Its Professor Greene.  I'm not sure the order of these two witnesses depending on the timing, Doug Bania and Debra Wise.

MR. MARTORELL:  Debra Wise.  Oh interesting.  Okay. We would then call more -- we would call Josh Mease, Michael Eames.  Anybody else on there?  And Sam Barsh.

THE COURT:  All right.

MR. MARTORELL:  So I guess we have a lot more.

THE COURT:  So I think we have enough to get us at least to the end of tomorrow.  What I -- so as you all know probably, Friday the reason we're not in session on Fridays is

EXCEPTIONAL REPORTING SERVICES, INC

176

because that's when I have my civil and criminal calendars.

What I would like to do, since it doesn't look like we're going to get through all of the witnesses tomorrow anyway, is to -- and we can talk about this at the end because I want to make sure that you have a chance to get up and do whatever you need to do before the jury comes back.  But have you come back sometime on Friday so we can talk jury instructions, verdict form.

So Monday, it sounds like even if we still have testimony on Monday, that it's not going to take up the entire day and you'll be able to do closing arguments, but you can't do that until we finish the jury instructions and the verdict form.  So think about that for a bit, and I hope that kind of answered your question.

MR. MEYER:  It did, Your Honor.

THE COURT:  Okay.

Mr. Martelli, do you have anything else that you would -- Mr. Martorell, would you like to raise anything before I let you take your break?

MR. MARTORELL:  No, Your Honor.  Martorell.

THE COURT:  Martorell.  Believe it or not, I've got a little sticky here with phonetic spelling, because when I have my glasses on, and I look at your name -- last name typed, it looks like Martelli, and I don't know why.

MR. MARTORELL:  I had an old PE coach who used to

EXCEPTIONAL REPORTING SERVICES, INC

call me Martorelli all the time.

THE COURT:  Really?  Well I don't -- I should know better, I've been -- we've been working on this case for a long time together.

MR. MARTORELL:  Yeah, just like its --

THE COURT:  Okay.

MR. MARTORELL:  -- spelled.  Martorell.

THE COURT:  Marto -- that's what I have, its right here.

MR. MARTORELL:  Yeah.

THE COURT:  I'm not -- I -- look, I'm not kidding, I have a little yellow sticky right here that's on my screen. See.

MR. MARTORELL:  No problem, no problem.

THE COURT:  I promise I'll get it right before the end of the trial.  Okay, we'll see you all back here in a few minutes.

MR. MARTORELL:  All right.  Thank you.

**(Recessed at 2:46 p.m.; reconvened at 2:59 p.m.)**

**(Jurors enter courtroom)**

THE CLERK:  All rise.

**(Call to Court)**

THE COURT:  Thank you.  Everyone can be seated.

Okay.  And our next witness?

MS. WANG:  Professor Green.

EXCEPTIONAL REPORTING SERVICES, INC

Greene - Direct / By Ms. Wang                           178

THE COURT:  Okay.

MS. WANG:  And Your Honor --

THE COURT:  Yes.

MS. WANG:  -- I just wanted to note that Professor Bennett who just testified is in the audience, may he be allowed to view the rest of the trial?

THE COURT:  Yes, he's done testifying.

MS. WANG:  Thank you.

THE COURT:  Okay.  Professor, you can come forward. You're going to walk around this way and when you get to Ms. Garcia Marquez, she'll swear you in and then you'll proceed up onto the witness stand and have a seat in that chair.

MR. GREEN:  Thank you, Your Honor.

THE CLERK:  Please raise your right hand.

KEVIN GREENE, PLAINTIFF'S WITNESS, SWORN

THE CLERK:  Thank you, take a seat.  Please state your name and spell your last name for the record.

THE WITNESS:  My name is Kevin Jerome Greene, G-R-E-E-N-E.

THE COURT:  Thank you.  Okay.  Ms. Wang, you may proceed.

DIRECT EXAMINATION

BY MS. WANG:

Q    Good afternoon, Professor Green.

A    Good afternoon.

Greene - Direct / By Ms. Wang                    179

Q    Could you please introduce yourself to the jury?

A    Yes.  My name is Kevin Jerome Greene and I'm tenured law professor at Southwestern Law School right here down the block in Los Angeles where I teach copyright law, entertainment law, and classes essentially related to that.  And my scholarship is also in that area.

Q    Have you been retained as an expert in this case?

A    I have.

Q    By which party?

A    I was retained by the plaintiff ARA.

Q    And what were you asked to do?

A    So broadly I was asked to formulate an opinion independently of two things.  One, whether the music composition inclusive of the sound recording Hurricane was the lead single on the Donda album and also to analyze whether damages resulting from coordinated marketing strategies at listening events could also be part of the ambit of copyright damages.

Q    How are you being compensated for your work?

A    I'm compensated on an hourly basis and my rate doesn't change regardless of the matter or whether I represent a plaintiff or a defendant.  And for general research and the like, brief writing or report writing, $750 an hour and for trial testimony and deposition it goes to $850 an hour.

Q    And does your compensation depend on the opinions or

Greene - Direct / By Ms. Wang                    180

outcomes of this case?

A    No, my opinion is independent.  I formulate my own opinions and it's -- I'm not an advocate here.  I'm an advocate for my opinion.

Q    Approximately how many hours have you worked on this case?

A    Approximately a hundred or so hours on this case and that's going back to last year, so it's been almost I think a full year on the case.

Q    And how much of it relates to the sound recording portion?

A    So I didn't disaggregate that when I initially wrote my report and tried to, you know, separate those things.  As an estimate I would say 20 to 30 percent.

Q    Have you testified as an expert before?

A    I have testified as an expert before.  So in 2024 I was retained by the plaintiffs, the Hansen family of the Hansen Juice Trust in a right (indisc.) listed case and I testified twice in that matter.  Once at the liability phase and I also testified in the damages phase of that case.

That case was -- went up on appeal, it was reversed, and so there was a retrial in essence of it, and in the second matter I also testified twice.

Q    Can you describe your educational background for the jury?

A    Yes.  So after high school I enrolled at Moorehouse College in Atlanta, Georgia and I left Moorehouse College after about a year to serve my country in the United States Marine

Greene - Direct / By Ms. Wang                    181

Corps.  While I was in the Marine Corps I did college classes, all the college classes I could take at Shaman Ed (phonetic) University and also at University of Maryland which had extension courses in Japan where I was stationed.

Following that I came back state side and I completed my degree with highest departmental honors at State University of New York and immediately after that, I was accepted to and attended and graduated from Yale Law School in Connecticut.

Q    What type of work did you do after law school?

A    Immediately after law school I did a judicial clerkship with the Michigan Supreme Court and received a reward for outstanding service to the Court.  I then summer associated at a New York firm, a Wall Street firm called Cravath Swaine & Moore and I was offered a position following the summer and I accepted that position after my judicial clerkship.

Q    When did you transition to being a professor?

A    So I became a professor in 1997 when I accepted the faculty, tenure tracked faculty position in San Diego and I left that position in 2020 to take a chair, a named chair position at Southwestern Law School here in Los Angeles.

Q    How long have you been a professor?

A    Almost 30 years, creeping up on that.

Q    And what classes do you teach as a professor?

A    So I taught the basic contract class for many years.  I also teach copyright law.  I teach entertainment law and

Greene - Direct / By Ms. Wang                    182

variations of those classes, international entertainment law,

advanced entertainment law.  I've taught music law as well as a

course.

Q    Have you published any scholarship related to music

copyright?

A    Yes.  I have a fairly extensive portfolio scholarship in

the intellectual property area including copyright.  My

scholarship was the first to look at how so-called marginalized

communities such as African Americans were essentially got

shortchanged on the copyright law.  I'm probably best known for

that of all my work and I write about copyright terminations,

copyright registrations, copyright infringement, copyright

remedies, a whole series of article, copyright clearance.  I've

written in all those areas.

Q    And can you give an example of scholarship as it relates

to commercialization of music copyright?

A    I can.  So in 2024 Chapman University Law School asked me

to write an article for them and I produced an article called

Goodbye Copyright, the Rise of Trademark and Publicity Rights

in the Hip Hop Music Space.  That was my second explicitly hip

hop related article, hip hop music article.

      And in that article I basically looked at how revenues

from traditional sources in the music industry have diminished,

mainly due to streaming and now artists seek to kind of merge

their musical efforts with merchandising and marketing, which

Greene - Direct / By Ms. Wang                          183

is Kanye West is at the top of the food chain when it comes to doing that.

Q    Have you presented your scholarship?

A    Yes.  I'm a prolific presenter.  I have two or three, four page long presentations I present at major universities, such as Columbia Law School, UCLA, USC, I also presented before the ABA, American Bar Association, the American Association of Law Schools.  I've presented before law firms, including my former law firm Frankfurt and now Kernig Klines & Sell (phonetic) which asked me to present my work to the entire firm.  And more recently at another law firm in New York, as well as non-profit organizations.

Q    And have you been recognized from your work?

A    I've been recognized for my work.  I've twice been recognized by Thompson Reuters, who analyzes legal scholarship and found two of my articles among the best of intellectual property scholarship of that year.  I also am the recipient from the California State Bar, its highest award, the California State Bar IP Institute Vanguard award in 2016 for innovation and intellectual property.

And my own institution is recognized my scholarship twice with something they call the Montgomery Award for outstanding scholarship.  That's just a few things.

Q    Thank you, Professor Greene.  And just to make the court reporter's life a little easier, can you please speak a little

slower.  I know you do a lot of speaking engagements where --

but those are not transcribed.

A    Yes, and I am a native New Yorker, so pardon.

        MS. WANG:  I now tender Professor Kevin Greene as an expert with respect to the commercialization of music copyright.

        THE COURT:  Any objection?

        MR. MARTORELL:  Yes, Your Honor, motion in limine No. 1 listed --

        THE COURT:  You don't need to say it.  I've got it here.  Just one minute.

        MR. MARTORELL:  I was just going to say, listed our objections.

        THE COURT:  Okay.

        Okay.  We -- so Professor Greene is accepted by the Court as an expert in the areas that have been stated.  The Court does note the defendants' objection based on defendants' motion in limine No. 2 and I'm going to be keeping that in mind as we go through.  Okay.

BY MS. WANG:

Q    Professor Greene, what are the opinions you are --

        THE COURT:  Oh, hold on for one second.  Mr. Martorell.

        MR. MARTORELL:  Yeah, motion in limine No. 1.

        THE COURT:  I'm sorry, motion in limine No. 1, yes.

MR. MARTORELL:  Thank you, Your Honor.

THE COURT:  I misspoke, my apologies.

MR. MARTORELL:  I was just trying to make sure, thank you.

THE COURT:  Okay.  Thank you.  Okay.  Sorry, Ms. Wang, you may proceed.

MS. WANG:  Thank you.

Q   Professor Greene, what are the opinions you are prepared to give in this case as it relates to the first listening party?

A   As it relates to the first listening party I have two opinions.  My first opinion examined whether the music composition Hurricane was the lead single from the Donda album.  Would you like me to state the second or?

Q   Yes, please.

A   And the second opinion is whether an artist merger of music with deliberate strategies to market merchandise based on music and musical performance is within the ambit of copyright damages.

Q   Professor Greene, starting with your first opinion, what's the significance of Hurricane being an anticipated song on the Donda album?

A   It's very significant in a lot of ways in this matter.  Hurricane was the only song that people knew about prior to the release of the Donda album.  And the reason for that is that it

EXCEPTIONAL REPORTING SERVICES, INC

was part of a prior project which never got off the ground, but which was also highly anticipated in 2018 called the Yandhi, it would have been the Yandhi album that was never released.  But Hurricane was leaked and released.

And so there was an enormous longing in the fan base for the Hurricane song particularly since it was the only one that was known.

Q    And so was this happening before or after the first listening party?

A    The anticipation was long before the first listening party, years before.

Q    And how is a listening party different from a traditional concert?

A    So listening parties are a fairly recent innovation.  I mean, they've been around in some form or other, probably even back to the '60s, but in those days it meant gathering people at your home in Malibu and, you know, sipping wine and a few people would come and you would try out your material, it was an opportunity to try out new material and maybe make some alterations to it.

Today listening parties, particularly in the case of Ye are very, very different.  They are mass events, designed to generate tremendous excitement and also designed to monetize, monetize through streaming, monetize through merchandise sales.

Q    Are there any other markers of Hurricane's success that

Greene - Direct / By Ms. Wang                    187

you can point to?

A    Yes.  There are numerous other markers that we can point to.  Hurricane was the lead track before the album was released.  There were -- the tracks were listed, Hurricane was the only track that was listed.

Hurricane topped the charts.  He was at the top of the Billboard R&B charts.  It also tracked well in the all genre billboard ratings.  It had a massive number of streams, record breaking at the time and all of those are indicia markers of a lead single and it was basically marketed that way.

Q    Turning to your second opinion, why would merchandise be part of the ambit of damages in this case?

A    So this is --

MR. MARTORELL:  Objection, Your Honor, lacks foundation, calls for speculation.

THE COURT:  Overruled, you can answer.

THE WITNESS:  This isn't, and no offense -- no ageism intended, this isn't your grandfather's music business.  The music business today has changed a lot as I discuss in my article and because traditional streams such as traditional revenues of just streaming have diminished in the streaming error, artists are looking to monetize using their compositions and marrying or merging those with merchandise.  And Kanye West as I said I think -- there's no better exemplar of somebody who does that, who makes a deliberate strategy.

Greene - Direct / By Ms. Wang                    188

This isn't, you know, t-shirts at the back of a merch table, which was, you know, the traditional music and throw some t-shirts back, there may be people who buy some.  This is deliberate and there was no better example of that than at the first listening party when Ye wore the round jacket.  He could have worn any jacket as a -- close to -- well, a very wealthy person, let me just say that way, he chose that jacket.  And it also wasn't a coincidence that a day later, that jacket shows up for sale on the Yeezy Gap collaboration and also on Instagram.

So this is very different than throwing some t-shirts and hoping fans buy, this is actually a total and complete merger of music and artistry and from his own website he talks about this.

**BY MS. WANG:**

Q    And is there any type, any precedent for this type of model that you're describing?

A    I think the kind of basics or origins of the model really was in hip hop.  Hip hop was always unapologetically commercial, like for example rock genre is where rock artists didn't want to commercialize, they viewed that as selling out, hip hop right out of the gate was All About the Benjamins, it was about Paid in Full, and there are songs about that.  And Run-D.M.C. I think is the -- not I think I know, is the kind of foundational artist there.

Greene - Direct / By Ms. Wang                    189

Back in the '80s, mid-'80s they collaborated with Adidas, Adidas Corporation and basically put that corporation on the map to the multi-billion dollar corporation it is today.  They did that by singing about the songs, but not only singing about the songs, but having fans hold up the songs and always appearing and performing in Adidas' garb.  This is a brilliant marketing strategy which netted the group and Adidas millions of dollars.

Ye has taken that very basic Run-D.M.C. type approach and really perfected it with a merchandising machine that marries music to merchandise in a very deliberate and calculated way.

Q    And how specifically and again if you can please just slow down for the court reporter --

A    Yes, I was trying to be slow.

Q    Yes, the New York thing is hard to break.  So can you say or explain how specifically Ye's models played out with the first listening party.

A    Oh, it plays out beautifully.  Genius marketing strategy, PEN up'd demand for the Hurricane song, thousands of fans filling up a stadium, they're coming to hear only one song, that's the only song possible, because that's the only song that had been leaked and released which is Hurricane, they're coming with dollars in their pockets or credit cards in their pockets to buy merchandise and there is Ye standing on the stage wearing the comfort jacket, the round jacket and it sold

EXCEPTIONAL REPORTING SERVICES, INC

Greene - Cross / By Mr. Martorell                    190

in the millions.  So everything worked beautifully.

Q    Can you please summarize your opinions for the jury, Professor Greene?

A    Yes.  So as to my first opinion there's no doubt in my mind that Hurricane is the lead single, is the dog, not the tail in the Donda album.  And it was highly anticipated by the fans and was used in connection with turning that fan demand, pent up demand into money in the form of merchandising dollars and streaming.

     Secondly, this is not the old school music business where merchandise was really separate and apart from the music.  This is a complete merger of the two using them in targeted, deliberate, calculated, smart ways to generate lots and lots of revenue.

          MS. WANG:  Thank you, Professor Greene.  I will now pass the witness to defendants' counsel.

          THE COURT:  Okay.  Thank you.

          Okay.  Mr. Martorell.

          MR. MARTORELL:  Thank you, Your Honor.

                        CROSS EXAMINATION

BY MR. MARTORELL:

Q    Good afternoon, Professor Greene, how are you?

A    Good afternoon, great, how are you?

Q    Good.  What is the most streamed song off Donda, did you analyze that?

EXCEPTIONAL REPORTING SERVICES, INC

Greene - Cross / By Mr. Martorell                    191

A    I looked at it at the time of the listening party, so I know those numbers changed.  Initially Hurricane was the most streamed, but that changed over time and some other songs eclipsed it, I'm aware of that.

Q    You're saying Hurricane was streamed at the time of the listening party?

A    Initially when it was released I'm talking about.

Q    You said at the time of the listening party.  It hadn't been released yet.

A    Well, at the listening party it was streamed.

Q    I'm not following what you're saying.  What do you mean it was streamed?

A    So the song was streamed, it was on Apple, was it not?

Q    You mean the concert was streamed.

A    Yes, the concert.

Q    The listening party itself.

A    Includes the relevant song, yes.

Q    Okay.  Well, all 20 songs off Donda played at the listening party, right?

A    Yeah, but Donda was the only one that got that massive amount of streams and it was the only one that won a Grammy and all the other things that I talked about, so I think it's very distinct.

Q    What about Jail?

A    I didn't analyze Jail.  It's not at issue in this case.

Greene - Cross / By Mr. Martorell                    192

Q    Do you know whether it received a Grammy?

A    I don't know, it might have.

Q    Okay.  But you just said that the only one to receive a Grammy was the Hurricane.

THE COURT:  Do you have a question for him, or are you -- I'm not going to let you argue with him, just ask him questions.

MR. MARTORELL:  Okay.

BY MR. MARTORELL:

Q    Do you know as of today what the most streamed song off Donda is?

A    No.

Q    Did you do any focus groups to determine why people went to the listening party?

A    I did not.

Q    Did you do any surveys, any polls?

A    I did not.

Q    Did you perform any sort of experiment to quantify why people went to the listening party?

A    No.

Q    Did you talk to anyone who went to the listening party?

A    I did not.

Q    Did you do anything to analyze why anybody attended the listening party?

A    I did.  I did voluminous research on this case, looking at

EXCEPTIONAL REPORTING SERVICES, INC

Greene - Cross / By Mr. Martorell                    193

industry sources, credible industry sources and there's no

doubt that they viewed Hurricane in the ways that I've talked

about.

Q    Okay.

          MR. MARTORELL:  Let's play the video from the

listening party please.

          THE COURT:  This is Exhibit 577?

          MR. MARTORELL:  Yes.

          THE COURT:  Okay.

          MR. MARTORELL:  Oh, it's the demonstrative, if that's

577?

          THE COURT:  That's 577.

          MR. MARTORELL:  Thank you very much.

BY MR. MARTORELL:

Q    Did you watch the video from the listening party?

A    I did.

Q    Okay.  Did you take note of the audience reaction?

A    I mean generally I saw the audience reacted, you know, he

was not actually performing, he was playing tracks at the

listening party, so I think it would have been -- every now and

then he would jump around, but there -- you didn't do much, he

basically stood around in the jacket.

Q    What did you take in from the audience response to

Hurricane playing?

A    Excitement.

Greene - Cross / By Mr. Martorell                194

Q    Excitement at what point?

A    Again, you know, I'd have to look at the video, it's been a while since I've looked at it.

Q    Okay.

A    But I think the fans generally were very excited, it was a very successful event I think in every way.

Q    Have you ever been to a concert and all of a sudden a recognizable song plays and people cheer at the first few bars being played?

A    I have.

**(Audio played at 3:22 p.m.)**

Q    So that's the beginning.  Let's play the end and see if we can hear the crowd.

**(Audio played at 3:22 p.m.)**

Q    Do you agree with me that the crowd cheers louder at the end?

A    I mean it's hard to say, perhaps.  You know, I'm not --

Q    You don't see a difference?

A    I'm not an audience expert so it's a little bit outside my lane, but in terms of audience reaction in terms of how much they're cheering.  And also sometimes a song could be a song that gives a lot of emotion, they may not cheer as much.  This seems like -- I'm not exactly sure what you're trying to ask.

Q    Well, I'm seeing if you agree that there was more cheering at the end after the song was played than before.

Greene - Cross / By Mr. Martorell                    195

A    Yeah, perhaps.

Q    Okay.

A    Could be.

Q    That would be the opposite of the expectation if there was all this pent up anticipation, wouldn't it?

A    Again, I can't say, it was a long event, who knows what the audience was doing.  Maybe some of them weren't in -- it's hard to really quantify that.  I want to answer you, but I don't know.

Q    It's impossible to quantify why somebody went to a listening party outside of taking surveys, right?

A    Well, I'm saying it's impossible to quantify how the audience reacted, right, and what that means in a darkened stadium, we couldn't see their faces, there are a lot of things that are left out of that.  I don't want to argue with you, I'm just saying it just seems a poor kind of analogy for demand.

Q    Right.  But you're saying people went to this listening party to hear one song that was your exact testimony, right?

A    No, I didn't say that.  I never said that.  I said that Hurricane was the only song they could have possibly known because it was the only one that was leaked from the Donda album.

Q    Okay.  So you admit that you don't know why people went to the listening party?

A    Well, I didn't do a survey or anything as you said, but I

think it's a reasonable kind of rationale to think that they would go because they wanted to hear a song which was beloved, and which was shown to be beloved by all the metrics that I gave you before, and not every song in the album certainly achieved those metrics.

Q    Okay.  But now you're talking about the album version of Hurricane.

A    Well, I'm talking about right out of the gate, the amount, the song was streamed, how it was used at the listening party, et cetera.

Q    Okay.

A    And later on, yes, it did very well on the album as well, although as you mentioned other songs may have eclipsed it, but that was not in the time frame that we're talking about.

Q    You testified previously that you're not a survey person, right?

A    I am not.

Q    You testified that's not your role in this case.

A    Correct.

Q    You say that -- you testified earlier that Kanye West is the top of the food chain in terms of integrating, branding with music, right?

A    Yes, I mean, there might be some quibble, Travis, the rapper also I think does a lot of those kind of collaborations and we might think of others, but I think even in the industry

Kanye is seen as kind of a one off in what he's able to do with marketing and kind of marrying the music to his brand.  There are others who do it, but I think -- there's -- I don't want to say universal but very wide agreement on that point.

Q    Travis the rapper, who's that?

A    Travis Scott.

Q    Okay.  You are not saying that people purchased -- strike that.

You don't know exactly why people purchased apparel at the show, correct?

A    Well, I know they purchase it because they like it.

Q    Right.

A    Yes.

Q    But you didn't analyze whether it's because they like Ye or like any of his nine prior albums and whether that drove them to purchase, right?

MS. WANG:  Objection, argumentative.

THE COURT:  Overruled, you can answer.

THE WITNESS:  I didn't do a survey on those things as you indicated before.  However, I don't think it's irrational to think that a song that was the most anticipated for a number of years would have been something that drove demand.

BY MR. MARTORELL:

Q    Did you analyze how many Grammys Ye had received at the time of the listening party?

A    I did not.

Q    Do you have any idea as you sit here?

A    I don't know, I want to say something like 16.  I don't know the exact number.

Q    16?

A    Yeah.

Q    How many nominations do you think he had at the time of the listening party?

A    I don't know.

Q    Ballpark estimate?

A    No estimate to give you.

Q    So don't you think that would be a necessary analysis to conduct if you're going to determine why Ye was, as you put it, at the top of the food chain in terms of branding?

A    Can you repeat the question?

Q    Don't you think you should have looked at how many Grammys he's won and been nominated for in terms of making a determination as to why you consider him at the top of the food chain branding-wise?

A    Well, I stand by my assertion that he's at the top of the food chain.

Q    And that's certainly not attributable to an unreleased song, right?

A    Everything has to be looked at in combination under the facts.

EXCEPTIONAL REPORTING SERVICES, INC

Greene - Cross / By Mr. Martorell                    199

Q    I'm sorry?

A    Everything has to be looked at in combination under the facts.

Q    My question is --

A    You're isolating one thing, Grammys and this is a listening party, not a concert.

Q    Okay.  I'm asking your determination that he's at the top of the food chain branding-wise, that certainly is not attributable to an unreleased song, right?

A    Well, he built -- he certainly had a brand before this started.  I don't dispute that.

Q    One of the biggest in the world.

A    Correct.

Q    Which is --

A    A very large brand.

Q    Which is what drove people to the listening party, right?

A    Well, I believe Hurricane in part at least drove people to the listening party because of the pent up demand for it, the desire to hear the song, the fact that it was teased and it was put on social media and it was leaked and it was used in a video, there are a lot of things, so I don't think you have to show that all of the value comes from that or all the value comes from the Grammys, I don't think that's my role to assert, I think that's more of a damages expert's position, which I am not.

EXCEPTIONAL REPORTING SERVICES, INC

Greene - Cross / By Mr. Martorell                    200

Q    Do you hold an opinion as to whether the same amount of tickets would have been sold had Hurricane not played at all?

A    I mean again I don't know if that's an answerable question.

Q    Right, it would call for speculation, right?

A    Well, I don't want to say that, but the way you asked the question I don't think it's really answerable --

Q    I agree.

A    -- yes or no.

Q    Okay.  Do you -- did you perform any analysis to determine if any apparel would have -- if any less apparel would have sold had Hurricane not played at the listening party?

A    I did not.

Q    Did you do any analysis as to whether Apple Music would have paid a dollar less to Ye to stream his listening party had Hurricane not played?

A    No, but I don't think that really has anything to do with my opinion.

Q    Okay.  So your opinion is that you didn't analyze whether a dollar of revenue would have been different, right?

A    That's not part of my opinion.

Q    Okay.

A    My opinion is, is that could those --

        MR. MARTORELL:  Your Honor, move to strike, he's already answered the question.

EXCEPTIONAL REPORTING SERVICES, INC

**THE COURT:**  There's no question pending, if you could just wait.

**THE WITNESS:**  Yes, Your Honor.

BY MR. MARTORELL:

Q    Professor Greene, you are being paid $850 an hour to be here today, right?

A    Yes, that's my trial testimony rate.

Q    And how much have you been paid to date?

A    So there are some invoices that are outstanding, but I calculated at the last count, it was about $73,000.

Q    That's including what's owed?

A    No, not including the invoices that haven't been submitted.

Q    Okay.  And how much are those?

A    Well, first of all, I've not submitted any invoice for this trial part of it, you know, it's too early, I'm here today so there's no invoice for that.  I have an invoice outstanding, I want to say it's about $6,000 and then I had an invoice that you paid for I think about the same, but I don't know if that counts.

Q    You're saying when I deposed you, I had to pay for your time, right?

A    Well, I didn't make you do it, but I understand that that's the rule.

Q    That's the rule, okay.  But we have -- we're on opposite

Greene - Cross / By Mr. Martorell                    202

sides, we don't have any sort of affiliation.  Like I'm paying for your time to depose you, not because you're performing a service for me, right?

A    Okay.  So that shouldn't be counted in the revenues is that what you're saying?

Q    No, we can count it, that's fine.

A    Okay.  Great, yes.

Q    Okay.

A    So if you would count those two things, there's an additional $12,000.

Q    Plus today.

A    And again, that's not the penny but yeah.

Q    So 73,000 did you say?

A    Yes.

Q    Plus 12,000 so we're up to 85,000 --

A    Yes.

Q    -- plus today.

A    Which hasn't been billed yet, but yes.

Q    Quite the incentive to please your client.

        MS. WANG:  Objection, argumentative.

        THE COURT:  Sustained.

BY MR. MARTORELL:

Q    Do you believe that biases your opinion?

A    Not at all.  My client is my opinion.  My client is protecting my integrity and by telling the truth about what I

Greene - Cross / By Mr. Martorell                203

believe and I will not move one nickel for that, one nickel, a million nickels can't change that.

Q    Sir, at your deposition you testified that the complaint was the main source of your opinion, correct?

A    I think that's not quite accurate.  I said that I did look at the complaint, but I also looked at many other sources and I believe I talked about that in the deposition.

Q    We have two volumes of your deposition because you had to go the first day, right?

A    Yes, it was a teaching day.

Q    Okay.  So on February 17th, 2026 we took the first volume of your deposition; is that right?

A    Okay.  I'll take your word for it.

Q    Well, do you remember me taking your deposition?

A    Absolutely.

        **MR. MARTORELL:**  Your Honor, I'd like to read from page 51, lines 3 through 7.

        **THE COURT:**  Any objection?

        **MS. WANG:**  No objection.

        **THE COURT:**  You may proceed.

    **(Excerpts of Deposition Read by Mr. Martorell)**

        "QUESTION:  Are there any facts you assume to be true in formulating your opinions?

        "ANSWER:  So my opinion, the main source of my opinion is the complaint --"

Greene - Cross / By Mr. Martorell                    204

THE WITNESS:  As to the facts, yes.

MR. MARTORELL:  I'm not done reading, sir.

THE WITNESS:  Okay.

MR. MARTORELL:  Your Honor, may I start over?

THE COURT:  Go ahead.

THE WITNESS:  Sorry to interrupt you.

"QUESTION:  Are there any facts you assume to be true in formulating your opinions?

"ANSWER:  So my opinion, the main source of my opinion is the complaint.  So I assume the facts of the complaint to be true, yes."

BY MR. MARTORELL:

Q    So a complaint is just the allegations, right?

A    Yes.

Q    Okay.  Yet you assumed your client's allegations to be true.

A    Yes, and I still make that assumption.

Q    How is that not an inherent bias, sir?

A    It's not a bias, because first of all the complaint is I believe filed under penalty of perjury, and also it's very common for experts to use the complaint as the jumping off point.  There's nothing unusual about that at all.

Q    A complaint is not filed under the penalty of perjury, sir, is it?

THE COURT:  Do you have a question for him?

Greene - Cross / By Mr. Martorell                    205

**BY MR. MARTORELL:**

Q    What is your basis for saying a complaint is under the
penalty of perjury?

A    Well, it's a document before the Court and you can't make
misrepresentations before the Court, that's my basis.

Q    Okay.  It constitutes allegations that do not --

          **THE COURT:**  Do you have a question?  I don't want you
to argue with him.

          **MR. MARTORELL:**  A complaint is not under the penalty
of perjury, Your Honor.

          **THE COURT:**  Counsel, are you done with this witness?

          **MR. MARTORELL:**  No.

          **THE COURT:**  If you're not, then I need you to ask a
question.

          **MR. MARTORELL:**  Okay.

Q    You did not review the agreements between the four artists
and their administrators, right?

A    No.

Q    You do not know the role of HH Music, PEN Music, UMPG,
right?

A    No.

Q    You have never spoken to Ye, right?

A    I have not.

Q    You've never spoken to anyone that's on his team to
analyze how he built his brand?

**EXCEPTIONAL REPORTING SERVICES, INC**

A    No.

MR. MARTORELL:  I'm just going through my outline, Your Honor, I'm almost done.  One moment, please.

(Pause)

Q    When you testified earlier that Ye's own website says that he merged music with apparel, you referenced that -- you were referencing his own website, right?

A    Yes.

Q    Did you confirm that that was Ye's official site?

A    It seemed to be.

Q    Kanye West MerchS.com.

A    I'd have to go back and look at my report.

Q    His official site is Yeezy.com?

A    Well, he may have more than one site, so Yeezy is one of them I'm sure.

Q    So you relied on something without verifying that it was his actual website; is that true?

A    Well, it purported to be and it had a quotation from him, so.

Q    Kanye West MerchS.com is a third party fan site; is it not?

A    Again I don't know.  I don't know the providence of it.

Q    All right.  You analyzed various data to determine what you call not your grandfather's melding of branding and music; is that right?

Greene - Cross / By Mr. Martorell                    207

A    Did I analyze data?  I analyzed information, I guess inclusive of data, I didn't look at -- I'm not a data cruncher, so I didn't crunch numbers.  I'm just trying to answer your question honestly what you mean by data.

Q    Well, can you point to a single circumstance where artists of the level of the four that are the plaintiffs in this case worked with an artist of the level of Ye and received a portion of anything but royalties?

A    I want to answer your question, but I'm not sure.  Are you saying artists such as the plaintiffs who have I think among them some Grammys and the like and some real success, or is it that they're not -- I'm not sure where you're going with the question, I want to answer it, but it was unclear to me.

Q    It would be unprecedented for artists such as the plaintiffs to request a piece of an artist like Ye's profits in another area outside of music for providing music, do you agree with that?

A    Again I'm just trying to -- is this a question about the stature of the artists underlying this?  I want to answer it correctly.

Q    Partly?

A    Okay.  And again I'm not sure if your reference is that these artists aren't very successful or they're highly successful.  Could you clarify that?

Q    They have obviously had some success, but can you point to

Greene - Cross / By Mr. Martorell                      208

a single case where a mega star gave artists that objectively
have had, let's say, lesser levels of success --

A    Got it, got it, yeah.

Q    -- okay, can you -- I'm defining it as unprecedented and
I'm wondering if you agree with that.

A    Well, again I want to be fair here, but I can think of a
recent example and I don't know if it's on point to what you
were saying, the artist is Lizzo and the woman who came up with
the name and I won't say it in court because it has a bad word
in it but you guys know it, I just took a DNA test and I found
out I'm a hundred percent.  Lizzo gave that person credit, a
composer's credit in publishing on her big hit Truth Hurts.

Q    No, I'm asking outside of -- royalties is common, right.

A    Gotcha.

Q    I'm asking about apparel or ticket sales or the like.

A    I mean to answer your question frankly I don't know, on
the other hand, a lot of times deals are not public, so
everything in the music industry is behind what I call the
great wall of secrecy, so it could have happened and we're not
aware of it.

        **MR. MARTORELL:**  All right.  No further questions,
thank you.

        **THE COURT:**  Okay.  Thank you.  Any redirect?

        **MS. WANG:**  Yes, Your Honor.

        **THE COURT:**  You may proceed when you're ready.

**REDIRECT EXAMINATION**

**BY MS. WANG:**

Q    Professor Greene, defense counsel asked you about the format of the first listening party.  What was played at the first listening party, old Ye songs or new Ye songs?

A    So the first listening party did not have any performances of his big hits or his well known songs, and as I asserted earlier, the only song that was known was Hurricane.

Q    And what song on the Donda album got the highest rating on the Billboard charts?

A    Hurricane.

Q    And what position was it?

A    It was at No. 1 I believe.

Q    Would a survey have been necessary to perform in this case?

          MR. MARTORELL:  Objection, vague and ambiguous.

          THE COURT:  Overruled, you can answer.

          THE WITNESS:  A survey as to what, can you clarify, counsel?

**BY MS. WANG:**

Q    Sure, sorry.  Defense counsel was asking you about whether you performed a survey in this case.  Would a survey have been necessary to perform in this case to form your opinions?

A    No.

          MR. MARTORELL:  Objection, vague and ambiguous.

Greene - Recross / By Mr. Martorell                    210

THE COURT:  Overruled, you can answer.

THE WITNESS:  No.

Q    And why not?

A    Why, because of all of the reasons that I asserted before, the fact that Hurricane was highly anticipated from the Yandhi album for a number of years, the fact that it did indeed chart the best initially from the Donda album and the fact that it was clearly a driver of sorts of fans to get eyeballs on merchandise, which he wore unapologetically and rightfully so at the listening party.

MS. WANG:  Thank you, no further questions.

THE COURT:  Okay.  Any recross?

MR. MARTORELL:  Yes, Your Honor.

THE COURT:  You may proceed when you're ready.

MR. MARTORELL:  Thank you.

                    RECROSS EXAMINATION

BY MR. MARTORELL:

Q    Hurricane never reached No. 1, right?

A    It did on the Hot Rap charts, I believe it did, yes.

Q    Okay.  What basis do you have for saying that?

A    You can see my report, I cite it.

Q    But not the Billboard Top 100?

A    In the Billboard, again it was on the R&B charts in the Billboard if had charted at the top, if not at the top on those as well.  It was a major chart topper the song by any measure.

MR. MARTORELL:  No further questions.

THE COURT:  Thank you.  All right.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Okay.  Next witness.

MR. MEYER:  Plaintiff call Doug Bania.

THE COURT:  Okay.  Sir, you can come forward.  You'll come around this way.  When you get to Ms. Garcia Marquez you'll stop, she'll administer the oath and then you'll come up to the witness stand and have a seat next to me.

THE CLERK:  Please raise your right hand.

**DOUG BANIA, PLAINTIFF'S WITNESS, SWORN**

THE CLERK:  Please state your name and spell your last name for the record.

THE WITNESS:  Yes, my name is Doug Bania, B as in boy, A, N as in Nancy, I-A.

THE COURT:  Thank you.  Okay.  Mr. Meyer, you may proceed.

**DIRECT EXAMINATION**

**BY MR. MEYER:**

Q    Good afternoon.  Could you please introduce yourself to the jury?

A    Yes.  Hello, my name is Doug Bania.

Q    What do you do for a living, Mr. Bania?

A    Yes, I am an intellectual property consultant, so I specialize in valuing intellectual property, copyrights,

Bania - Direct / By Mr. Meyer                          212

trademarks, patents, publicity rights for various reasons,

mergers, acquisitions, tax reasons.  And then I'm also a

damages expert when somebody infringes on an asset like that I

testify in court like I am today.

Q    Have you been retained as an expert in connection with

this case?

A    Yes, I have.

Q    Who retained you?

A    I was retained by the plaintiff Artists Revenue Advocates.

Q    What were you asked to do in connection with this case?

A    Yeah.  So I am asked to calculate a reasonable amount of

damages as it relates to the defendants' infringement of the

MSD P2 sound recording in the song Hurricane at the listening

party.

Q    The listening party on July 22nd, 2021 in Atlanta?

A    That's correct.

Q    In connection with performing the analysis and the work

that you do, are you compensated for your work?

A    Yes, I am.

Q    How are you compensated?

A    I'm paid an hourly rate for my work at $700 an hour.

Q    Does your compensation depend on the outcome of this case

and what the jury finds?

A    No, a completely independent analysis.  So I get paid no

matter what the outcome is.

**EXCEPTIONAL REPORTING SERVICES, INC**

Bania - Direct / By Mr. Meyer                          213

Q    Do you have any connection to the plaintiff or to the four artists outside of your work in this case?

A    No connection.

Q    Does that matter for purposes of your report?

A    Yeah, I -- as an expert, I need to be unbiased.  I need not to have a connection with any of the parties.  So I'm here to just, you know, give my honest opinion.

         MR. MEYER:  Your Honor, Mr. Bania has prepared a set of slides that were exchanged a few hours ago.  We'd like to publish?

         THE COURT:  Any objection?

         MR. MARTORELL:  I haven't seen these slides, Your Honor.  When did you send them?

         MR. MEYER:  We sent them before the break.

         MR. MARTORELL:  I haven't been checking my e-mail, Your Honor, I was not advised.  I have hundreds of e-mails.

         THE COURT:  Okay.  So what are we going to do about this?  Do you want to look at them now?

         MR. MARTORELL:  Can we have a sidebar, Your Honor?

         THE COURT:  Yes.

    (Begin sidebar at 3:48 p.m.:)

         MR. MARTORELL:  We were not advised that he was going to be called today at all, so we weren't expecting that.  And then additionally, I mean we can -- let me get my e-mails here, I haven't opened a single e-mail so I didn't know.

EXCEPTIONAL REPORTING SERVICES, INC

THE COURT:  Okay.

MR. MARTORELL:  What time did you send it?

MR. MEYER:  We sent it when it became clear that we were going to run out of witnesses otherwise.  What I told Mr. Martorell in court yesterday was we expected to be calling Ye after Mr. Johnson finished and we'd get into our experts, the order of experts would be Bennett, Greene, Bania and that we'd send him -- writing what we thought would happen today and we sent up to Professor Greene.

When Professor Bennett seemed to go faster than expected, we realized it was possible, Mr. Bania would have to come, we advised him to come down to the courthouse and we did and we transmitted the deck as soon as we realized it was possible he would come up today.

THE COURT:  Okay.

MR. MARTORELL:  Your Honor, I've asked multiple times what time this was sent.  I just found it, 2:34 p.m.

THE COURT:  Okay.  The answer is, when we talked about the witnesses you mentioned all three of these experts did he --

MR. MARTORELL:  No, he did not.  I was going to say -- sorry, Your Honor.

MR. MEYER:  My witness --

MR. MARTORELL:  I was going to -- no, no, no, not only did the written disclosure not -- we talked right back

Bania - Direct / By Mr. Meyer                    215

there and he said, and I quote, I can't say quote, he said I may call experts, I may call these people, I will e-mail you and he listed all his remaining witnesses.

Anyways, I think we have two writings here that I've shown that I received this at 2:34 while we were in this courtroom.  I have not seen it, it's unopened and I can open it, maybe take a quick look at it.

MR. MEYER:  What I would say is if it's 3:50, the first seven pages I suspect will be completely uncontroversial. I don't know if he'll get past that, perhaps we publish those seven pages and then see where we are timewise.

THE COURT:  Okay.  Can you take a quick look at them?

MR. MARTORELL:  I'm fine with the first seven pages.

THE COURT:  Okay.  Let's do that.  I think that'll take us at least close enough to 4:30 and then you'll have some time to look at them the rest of them over the break.

MR. MARTORELL:  Great.

THE COURT:  To the extent you ever have a break in trial, the break in trial --

MR. MEYER:  And I think we should designate the seven pages as a single exhibit the next in order, if that makes sense.

THE COURT:  Okay.  That makes sense.

MR. MARTORELL:  Thank you, Your Honor.

THE COURT:  Thank you.

(End sidebar at 3:50 p.m.)

THE COURT:  Okay.  So, Mr. Meyer.

MR. MEYER:  Yes, Your Honor, I would like to publish the first seven pages of Mr. Bania's presentation.

THE COURT:  Okay.  Any objection?

MR. MARTORELL:  No objection.

THE COURT:  Okay.  Thank you.

MR. MEYER:  All right.  Let's pull up the first page of your presentation and, Mr. Cummings, do not go past page 7 today.

All right.  Let's go actually to slide 3 right there.

BY MR. MEYER:

Q    Let's start, Mr. Bania, by your telling us a little bit about your employment background.

A    Yes, so I've been an intellectual property consultant since 2002.  I started my own firm Nevium in 2012.  I'm based in San Diego.  And at Nevium we do several different types of consulting services.  The first is IP valuation that I explained when I introduced myself, of valuing trademarks, copyrights, publicity rights, various internet and social media assets for various reasons, mergers, acquisitions, tax estate reasons.

I'm also an IP expert witness like I am today, I'll be asked to opine on damages, a lot of licensing issues when it comes to intellectual property licensee/licensor disputes,

Bania - Direct / By Mr. Meyer                          217

causation opinions, and apportionment, what percent of revenue

or profits are due to the infringement.

We also build IP monetization strategies, so simply I

consult with my clients to help them make more money off their

IP.  We do IP infringement investigations.  Oftentimes

attorneys needs to understand if an infringement is willful, so

I have an area of expertise when it comes to HDML internet and

social media analytics, I help along those lines.

And then we do a lot of defamation work, somebody's

defamed, I calculate economic damages and reputational damages

and then help build reputation repair programs to get those

folks back on their feet.

Q    Let's go to the next slide.  Can you please describe for

the jury your educational background?

A    Yes.  So I have a creative background.  I have a bachelors

in cinema from San Francisco State University and then I have a

master's degree from San Diego State University in television,

film and new media production.

Q    All right.  Do you hold any professional designations?

A    Yes.  I am a certified licensing professional.  As I

mentioned, I do a lot of work with licensing, that's a

designation that you can earn from the Licensing Executive

Society.  I earned that in 2011.

Q    Let's move to the next slide, please.  Are you a member of

any professional organizations?

Bania - Direct / By Mr. Meyer                          218

A    Yes, again Licensing Executive Society, that's a not for profit organization that supports licensing experts such as myself.  INTA is the International Trademark Association, I've been a member since day one in 2002 when I started an IP.  I'm on the committee.  It's the Trademark Reporter Committee, that's a journal, hundred plus year old journal peer reviewed journal and I peer review articles for publication.

I'm also a member of the Copyright Society of the United States.  I'm a member and I'm on the website and Social Media Committee and then I'm a non-attorney member of the American Bar Association, I'm part of the IP section of the ABA.

Q    Okay.  Let's move to the next slide.  With regard to issues related to intellectual property disputes specifically, can you provide the jury with an overview of your experience please?

A    Yeah.  As it relates to expert witness work, I've been named in about 150 cases.  I've been deposed 41 times.  This is my twelfth trial.  Of the 150 or so cases, 33 of those are copyright related.  As I mentioned I do trademark work, right of publicity work as well, but 33 are specifically related to copyright disputes like this in which I calculated damages that are attributable to the infringement as we're doing here.

Q    In this case, you're providing an analysis for the plaintiff.  Do you only work for plaintiffs for this type of work?

A    No, no.  I'm -- it changes year after year, but plaintiff, defendant, it's really a mixed bag, some more plaintiff work one year, more defendant work the next year.

Q    Does your methodology change depending on whether you're on plaintiff side or defense side?

A    No.

Q    Did you get paid differently if you're working for the plaintiff or the defendant?

A    No, you know, whether I'm on the plaintiff side, defendant side I get paid the same.

        **MR. MEYER:**  Your Honor, at this time I would tender Mr. Bania as an expert in copyright valuation and damages.

        **THE COURT:**  Any objection?

        **MR. MARTORELL:**  No objection, Your Honor.

        **THE COURT:**  Okay.  The Court accepts him as an expert as stated.

        **MR. MEYER:**  Let's turn to the next slide.  And, Mr. Cummings, don't go past this slide until.

**BY MR. MEYER:**

Q    Mr. Bania, turning to this case, what information did you review to prepare your analysis?

A    Yeah, with this case like every case I do start out with the court filings and, you know, expert testimony, testimony from plaintiff's side, defendants' side, really you know, getting started on a case and just settling in to see what the

dispute is about.

Then I move to, you know, reviewing any financial documents provided by the defendants.  There was a bit of lack of documents in this case, so I did rely on some public sources in order to form my opinion.

Also, as you know, there are other experts on this case, Dr. Bennett and Professor Greene, but I had conversations with them as well and then I did my own independent research, which I typically do in most cases.

Q    Why did you rely upon public sources, Mr. Bania?

A    I relief on public sources because I did not get information that I needed from the defendant.  You know, I let counsel know the information that I need as it relates to this case and I don't know the reason why I didn't get that information, so I had to rely on the publicly available data to form my opinions.

Q    Okay.

MR. MEYER:  And, Your Honor, I'm now at the next slide.

THE COURT:  Okay.  So just so for clarity of the record, we're going to mark pages 1 through 7 of this PowerPoint which was just presented to the jury as Exhibit No. 578, it's demonstrative only.  And, ladies and gentlemen of the jury, I'm going to let you -- we're going to excuse you a little bit early.  The lawyers and I have some work that we

need to do.  We'll continue the presentation of evidence tomorrow morning at 9 o'clock.  So you'll try to do what you've been doing in terms of getting here on time and being ready to go at 8:30.

As I indicated before this trial started, you as jurors will decide this case based solely on the evidence presented in the courtroom.  This means that after you leave for the night, you must not conduct any independent research about this case, the matters in this case, the legal issues in the case, or the individuals or entities involved in the case.

This is important for the same reasons that jurors have long been instructed to limit their exposure to traditional forms of media information, such as television and newspapers.

You also must not communicate with anyone in any way about this case, and you must ignore any information about the case that you might see while browsing the internet or your social media feeds.

And with that, I'm going to excuse you until 9 o'clock tomorrow morning.  Have a wonderful evening and we'll see you tomorrow.

**THE CLERK:**  All rise.

**(Jurors exit courtroom at 3:59 p.m.)**

**THE COURT:**  And, Mr. Bania, you can step down.  We'll see you tomorrow morning at 9 o'clock as well.

THE WITNESS:  Okay.  Thank you.

THE COURT:  Thank you.  Okay.  Everyone can be seated.  Okay.  So first, thanks to counsel on both sides for being so cooperative concerning that last witness and the demonstrative, I think that was a compromise on the part of both sides and I truly appreciate it, so thank you.

Is there anything that we need to talk about today or tonight or tomorrow morning before the jury gets here?

MR. MEYER:  Not from plaintiff.

THE COURT:  Okay.  From defendants' perspective?

MR. MARTORELL:  Your Honor, yes, the declarations from the parties who are submitting declarations in lieu of testifying, we will of course meet and confer with counsel, but if there are any procedures we should be following within that meet and confer, any guidance.  I would imagine they would be read aloud to the jury.

THE COURT:  Right.

MR. MARTORELL:  Okay.

THE COURT:  So the party that is proffering it would read it out loud to the jury or have somebody else read it out loud if you don't want to mix the rule of trial counsel and actor, for lack of a better way to say it.

MR. MARTORELL:  Sure.

THE COURT:  Anything else?

MR. MARTORELL:  Not from defense, Your Honor.

223

THE COURT:  Okay.  Just so we're all clear on our witness situation, we're going to have Mr. Bania back on the stand tomorrow at 9:30 and then who's next?

MR. MEYER:  At 9:30 or at 9, Your Honor?

THE COURT:  I'm sorry, at 9 o'clock.

MR. MEYER:  I think in light of defense's indication of calling -- they would want everyone called, we would call Ms. Wise, then Mr. Mease and then Mr. Barsh and Mr. Eames.

THE COURT:  Okay.  And then do you -- does -- Mr. Martorell, do you know what order you're going to be calling your witnesses then or at least who the first witness is going to be?

MR. MARTORELL:  It would be -- I'm just trying to exclude, so we have Bania, Wise, then Eames, then Barsh then Mease?

MR. MEYER:  No, we need to confirm precise times with the witnesses.  I believe it'll be Barsh last.  We will confer with the witnesses as to their availability tomorrow and we'll let you know the sequence of the witnesses tonight.

MR. MARTORELL:  Okay.  So that only leaves -- okay, we'll probably go Milo Yiannopoulos, Joseph Karre, and I'd have to think about more, Your Honor.

THE COURT:  Okay.  I think that's going to get us to the end of the day tomorrow anyway.

MR. MARTORELL:  Definitely.  Thank you.

224

THE COURT: Okay. And I'll keep working on the jury instructions. I'm hoping to have something that we can actually start talking about tomorrow, but we'll see. And then have all of you had a chance to look at your calendars to see what would work for you to come in to talk with me on Friday?

MR. MARTORELL: Can we do that right now, Your Honor?

THE COURT: Sure.

MR. MEYER: Your Honor, at least from my end, I'm available any time after about 9:30.

THE COURT: Okay.

MR. MARTORELL: We left the day open.

THE COURT: Okay. So we have our criminal calendar which is pretty full, so I don't think I'll be able to do it in the morning. Our civil calendar is fairly light, so what I'll do is have you come on Friday at 1:30. There may be one -- let me see -- Ms. Garcia Marquez, do you have a copy of Friday's calendar? Can you --

THE CLERK: One second, Your Honor.

THE COURT: I can access it, but I didn't know if Ms. Jackson left it for you.

THE CLERK: Not yet.

THE COURT: Okay. Let's see.

THE CLERK: I know in the morning we have -- you have two change of please.

THE COURT: Right, the criminal calendar is going to

EXCEPTIONAL REPORTING SERVICES, INC

225

take us about an hour and 45 minutes.  This is -- they're both in custody.

Okay.  So we have a couple of very light matters on calendar on our 1:30 calendar, if you want to come at 2, that's fine, so that way you're not sitting and waiting for me, but they shouldn't take very long.  Okay?

MR. MARTORELL:  Will do, thank you, Your Honor.

THE COURT:  All right.  Thank you all very much. Have a great evening.

MR. MEYER:  What time are we back tomorrow?

THE COURT:  Does it work for you to come in at 8:45 or would you prefer to come earlier to talk about things or do you think that you're going to have things that we need to discuss after you have your meet and confer about the declarations?

MR. MARTORELL:  It depends on what there is to talk about I guess.  I don't think the declarations should take longer than us being here at 8:45.

THE COURT:  Okay.

MR. MARTORELL:  But if there's something else --

THE COURT:  We can plan on 8:30 and then if that only takes us ten minutes, you'll have 20 minutes in the courtroom or go downstairs and grab a cup of coffee until the jurors get here.  That's fine with me.  I'll be here either way.

MR. MARTORELL:  Okay.

226

THE COURT:  8:30 to be safe?

MR. MARTORELL:  It's just the declarations, I think 8:45 is what I was --

THE COURT:  Oh, okay.

MR. MEYER:  I think I agree.

THE COURT:  Okay.

MR. MARTORELL:  If there's anything else -- okay, I think we got it.

THE COURT:  That's fine and you're going to be here on Friday anyway so if unexpected things come up that we need to talk about outside of the presence of the jury we can add that to our Friday afternoon list.

MR. MARTORELL:  Great.

THE COURT:  Okay.  We'll see everyone at 8:45.  Have a nice evening.

THE CLERK:  All rise.

   (Proceedings adjourned at 4:06 p.m.)

                    * * * * *

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____

Signed

May 7, 2026

Dated

*TONI HUDSON, TRANSCRIBER*