# EXHIBIT 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| ARTIST REVENUE ADVOCATES, LLC, | ) | CASE NO: 2:24-cv-06018-MWC-BFM |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| KANYE OMARI WEST, ET AL, | ) | Wednesday, May 6, 2026 |
| | ) | (9:04 a.m. to 11:59 a.m.) |
| Defendants. | ) | (1:05 p.m. to  4:06 p.m.) |

JURY TRIAL - DAY 3

BEFORE THE HONORABLE MICHELLE WILLIAMS COURT,
UNITED STATES DISTRICT JUDGE, PRESIDING

**APPEARANCES**:                    SEE PAGE 2

Court Reporter:           Recorded; CourtSmart

Courtroom Deputy:         Claudia Garcia-Marquez

Transcribed by:           Exceptional Reporting Services, Inc.
                          20079 Stone Oak Pkwy
                          Suite 1105-237
                          San Antonio, TX 78258
                          361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

Johnson – Direct / By Mr. Meyer                    14

MR. MEYER:  Let's go to top of page 2.

BY MR. MEYER:

Q    And can you read your February 7th, 2022 email to Free out loud, please, for the jury.

A    Free, I told you from day one we would never agree to your proposed 10 or so percent regarding writer share for Khalil and his 3 cowriters, and in fact I told you I would need to discuss with them as well as I am not their publisher.

Q    Oh, and then the last sentence?

A    Now, we did discuss with Khalil and Boogz the producer fees and points, which are fine.

Q    What did you mean by the producer fees and points, which are fine?

A    Well what he had stated was that there were five -- I can't remember -- four or five other producers on the song, and if that's the case then what he proposed we would be comfortable with, but we hadn't heard the song at that point and we were never -- there was no collaboration, we weren't in the room, et cetera, so until we hear it, Khalil gets to hear it and make a determination, we needed to see what would happen, and then in negotiation Debra would -- Debra Wise, the attorney, would tie it off.

Q    And could you have done a producer deal for Mr. Abdul-Rahman without also settling the splits?

A    No, because he's got to convey his master ownership rights

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Direct / By Mr. Meyer                    15

in essence, so it needs to be a clear title.  So clear title means the underlying copyrights the songwriters need to agree on splits.

Q    So could you do a deal just on the fees and points?

MR. MARTORELL:  Objection, lacks foundation.

THE COURT:  Overruled, he can answer.

THE WITNESS:  It would have to be in the entire producer agreement.  It would be inclusive of the agreement, if that answers your question.

BY MR. MEYER:

Q    It does.  Can I --

MR. MEYER:  I'd move to admit 116.

THE COURT:  Any objection?

MR. MARTORELL:  No objection, Your Honor.

THE COURT:  Okay, Exhibit 116 is admitted.

(Exhibit Number 116 received in evidence)

BY MR. MEYER:

Q    So your email to Free is dated February 7th, 2022.  Do you recall a response from Free to this email?

A    No, I do not.

Q    To your recollection did anyone ever reach out to your team from Ye's team after February 20 -- February of 2022?

A    Not to my recollection, no.

Q    Were you or your team able to reach anyone on Ye's side after February of 2022 who can engage substantively?

Johnson - Direct / By Mr. Meyer                    16

MR. MARTORELL:  Objection, lacks foundation, assumes facts not in evidence.

THE COURT:  Overruled, he can answer.

THE WITNESS:  No, not to my knowledge.  I know that Debra tried to reach out to who we thought were legal representatives of his at the time or moving forward, but I think she may have contacted one, but they were no longer representing Kanye at the time.

MR. MEYER:  All right.  I'd like to publish Exhibit 140.

THE COURT:  Any objection?

MR. MARTORELL:  No objection, Your Honor.

THE COURT:  Okay, you may publish.

MR. MEYER:  All right.  This is another threaded email, so let's start at the bottom.  And the first email starts on page 5.  Scroll up a little bit.  There you go, stop.

BY MR. MEYER:

Q    All right.  Is this your email dated November 28th, 2023 to Jeff Harleston?

A    Yes.

Q    Who is Jeff Harleston?

A    He's head of business affairs for all of the Universal Music Recordings worldwide I believe.

Q    So you were emailing Universal, not Ye, in this email?

A    Correct.

**EXCEPTIONAL REPORTING SERVICES, INC**

Johnson - Direct / By Mr. Meyer                    17

Q    Why UMG and not -- sorry -- why Universal and not Ye's people?

A    Because we hadn't gotten any response, I was trying to find out who was a representative for him at that time so we could try and follow up.

Q    And had you been successful in getting through to anyone?

A    No, Jeffrey directed us to the head of business affairs at Def Jam Recordings, which in essence was a distributor and marketing arm for Kanye's releases.

Q    And is Def Jam a Ye affiliated company or a Universal affiliated company?

A    Well it's a Universal affiliated company or owned company. I guess you could say there's an affiliation because Kanye's label G.O.O.D Music distributed and was marketed through Def Jam.

Q    But Def Jam is a Universal company?

A    Yes.

Q    Okay.  Let's move up to page 4, there's an email from you dated December 14th, 2023 to Odell Nails, do you see that?

A    That Odell sent to me?

Q    No, that you sent to Mr. Nails.

A    Let's see where it is.

Q    It's at the bottom of --

A    Okay.

Q    -- page 4.

Johnson - Direct / By Mr. Meyer                    18

A      Yes.

Q      Can you please read your email to Mr. Nails for the jury.

A      "Hi, Odell, checking in here as we would prefer to settle the matter with you as opposed to filing an action.  Any thoughts on where we are I can relay to Debra?  Thanks."

Q      And who is Odell Nails?

A      He's head of business affair at Def Jam.

Q      And I see his email address is at U Music, is that Universal Music?

A      Yeah, Def Jam is owned by Universal Music.

Q      All right.  Let's scroll up to Mr. Nails' response to you. Can you please read that for the jury.

A      "Hello Greg, we are in the process of communicating with artist counsel regarding this matter, and either he or I will get back to you on this as quickly as possible with the understanding that UMG's offices will be closing for the holiday season commencing tomorrow."

Q      All right.

A      "The foregoing is without prejudice to and all of Def Jam, UMG's rights, remedies, powers, privileges, defenses, and claims, whether in equity or at law, and hereby expressly reserved."

Q      All right.  When they say communicating with artist counsel do you understand that to be Ye's counsel?

A      Yes.

Q     All right.  This is December 14th.

MR. MEYER:  Let scroll up to the next email in the chain, please.

BY MR. MEYER:

Q     All right, we're now at January 26th, 2024, over a month later.  Had you heard from Ye's counsel in this interval?

A     No.

MR. MEYER:  All right.  Let's then look at the most recent email in the chain, the top email.  Right there.

BY MR. MEYER:

Q     This is February 7th, 2024.  What did you understand Mr. Nails was telling you here?

A     That he talked to Debra and that they are formally tendering this claim to artist's current legal representative who should be reaching out to you in order to attempt to address this matter, if he does not hear from me first.  Of course the foregoing is without prejudice to Def Jam.

Q     Okay.  So you understood that Def Jam was sending this onto Ye?

A     Yes, they're his representatives.

Q     And did you -- this was February of 2024, did you hear from anyone on Ye's side after this?

A     I did not personally hear from any of his representatives, and I don't believe, but I'm not for sure, that anybody called Debra, Khalil's attorney, after that.

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Direct / By Mr. Meyer                24

BY MR. MEYER:

Q    So I've got them side by side.  Exhibit 520 was shown to Mr. Monts yesterday.  Do you see a time zone indicated anywhere on Exhibit 5200?  And it's one page, we can just scroll down slowly.

A    That's the one you just --

Q    Yes, on the left.

A    Do I see times, yeah.

Q    Do you see a time zone described like you do on 157?

A    No.

        MR. MEYER:  We can take those exhibits down.

BY MR. MEYER:

Q    To your knowledge were any of the artists paid for the use of the MSD PT2 master at the July 22nd, 2021 listening party?

A    For the master, the SR, no.

Q    And do you think you would know if they had been?

A    Yes, and it would have just been Khalil.

Q    Did you ever agree to a license of MSD PT2 to Ye?

A    For -- no.

        MR. MARTORELL:  Objection, vague and ambiguous, overly broad.

        THE COURT:  Overruled, he can answer.

        THE WITNESS:  No, there was no license either on the SR, which we're here for today, or the underlying copyright.

        MR. MEYER:  I tender the witness.

EXCEPTIONAL REPORTING SERVICES, INC

**BY MR. MARTORELL:**

Q    You -- we've talked a lot about the music industry here today, a lot about your experience --

A    Uh-huh.

Q    -- decades of experience in the music industry, you've answered several questions relating to your expertise in the music industry.  Do you believe you're qualified to note whether a music label like Universal would release on album like Donda if it had not cleared?

A    They're not supposed to, but what happens is the onus is on the label, not the distributor to have -- to hand in a cleared master.

Q    Def Jam handed in the clear master here, right?

A    No, they did not hand in a clear master.

Q    Free Maiden is who you were negotiating with, correct?

A    That's who I spoke with and he told me what he suggested they do.  I passed the ball on with that information to Khalil's attorney, and she negotiates that, and then memorializes it in a written agreement.

Q    Free Maiden thought you had a deal, correct?

A    I have no idea what he was thinking.  We had zero deal.

Q    Okay.  But he told you multiple times, come on, Greg, we had a deal on both the composition and the sound recording, right?

A    He said that in the email.  We did two calls and one --

Johnson - Cross / By Mr. Martorell                    39

the first call was regarding the songwriting where I told him I did not see the 10 percent or whatever he was suggesting would be acceptable, but I also had to speak to the guys.  I don't have the authorization to make a decision on behalf of the writers, whether it's yea or in nay, I always have to go through them.

     So it's a discussion, and then I pass the ball to the attorneys, they negotiate, and then that way we have a written agreement.  That's when we have a deal.

Q    So I'm not asking for your side of that story, right, I'm not asking for your version of that event, I'm asking if you understand that Free Maiden had a different version of the event?

A    That's what he stated in the email.

Q    Right.  You knew he was stating in the email, Greg, we had a deal on both the composition and the sound recording, true?

          MR. MEYER:  Objection, argumentative.

          THE COURT:  Sustained.

BY MR. MARTORELL:

Q    Did you know at the time whether Free Maiden believed he a deal with you?

A    He might have thought he had a deal on the production side, on the songwriting side I have no idea how he could possibly think that, because I told him flat out that I don't see the guys accepting 10 or so percent on the songwriting

you I would need to discuss with them as well, I am not their publisher.  Now, we did discuss with Khalil and Boogz the producer fees and points, which are fine."

A    Correct.

Q    So you're agreeing on February 27th (sic), 2022 that the production side are fine?

A    When we had the discussion I told him that was okay.

Q    On February 7th, 2022 you say they are fine, you don't say they were fine.

A    Okay, that's correct, that's what I stated.

Q    Okay.  So on February 7th, 2022 you had a deal for an exclusive license on the sound recording that is the subject of this lawsuit; isn't that true?

        MR. MEYER:  Objection, argumentative.

        THE COURT:  Overruled, you can answer.

        THE WITNESS:  We didn't have a deal because we didn't have it in writing, and the underlying copyright has to be included in the producer agreement, so the writer splits had to be agreed upon as well otherwise we can't submit a license.

BY MR. MARTORELL:

Q    This email is in writing, sir.

A    This is --

        THE COURT:  Do you have a question for -- wait.  Do you have a question for him?

//

Johnson - Cross / By Mr. Martorell                                    64

**BY MR. MARTORELL:**

Q    So isn't it true that in this email you have agreed to a license that is in writing that relates to the sound recording that is at issue in this lawsuit?

A    I can't -- no one can agree to a sound license recording license until unless the master is cleared, it has to include the publishing splits as well.

Q    That is a legal conclusion is it not?

        **MR. MEYER:**  Objection, argumentative.

        **THE COURT:**  Sustained.

        **THE WITNESS:**  I don't --

**BY MR. MARTORELL:**

Q    Okay.  What is your basis for saying that?

A    Well because when we do producer agreements the underlying copyright is the first point of I guess a license.  If you don't have a song mechanical license in place you can't -- technically you can't release a record, and you don't have a cleared master because the production or SR recording is a part of the entire release.

        **MR. MARTORELL:**  Let's go up, please.

**BY MR. MARTORELL:**

Q    All right.  So Mr. Johnson, there is -- there was a written full producer's agreement for this sound recording that was presented to you, correct?

A    No, I never received a producer agreement, a full producer

EXCEPTIONAL REPORTING SERVICES, INC

Johnson - Cross / By Mr. Martorell                    69

Q    Did anyone from your side reach out to anyone from Ye's side?

A    Yes.

Q    Who?

A    Well, Debra reached out after she talked to Def Jam.  I think they gave her a number for an attorney maybe in San Diego that she attempted to reach out to -- I believe at that point he had moved on, or he and Kanye had parted ways, and then she continued to try and find other attorneys that represented him.

Q    Right.  But there was no reach out to someone that you knew represented him at that point; is that correct?

A    I believe the gentleman in San Diego did represent him at one point when she talked to them or reached out.  My understanding is he had moved on, and there were a few other attorneys that they attempted to reach out that had worked with Kanye.

Q    Can you name any of them?

A    No.  There was a gentleman in Florida.  I believe his name is Eric.  I can't recall his last name.

Q    Okay.  So your side contends that Ye's side ghosted you all, but, in fact, we have negotiations from 2018 consistently until 2022, correct?

            MR. MEYER:  Objection.  Argumentative.

            THE COURT:  Sustained.  Just ask him a question.

//

**EXCEPTIONAL REPORTING SERVICES, INC**

Johnson - Redirect / By Mr. Meyer                    85

signed?

A    It appears so.

        MR. MARTORELL:  No further questions, Your Honor.

        THE COURT:  Any redirect.

        MR. MEYER:  Yes, Your Honor.

    (Pause)

        MR. MEYER:  May I proceed, Your Honor?

        THE COURT:  Yes, you may.

                    **REDIRECT EXAMINATION**

**BY MR. MEYER:**

Q    Good morning again, Mr. Johnson.

A    Good morning.

Q    Let's take another look at Exhibit 116, which I think you've looked at with me and with Mr. Martorell.

        MR. MEYER:  And may I publish, Your Honor?

        THE COURT:  You may.

Q    I'm looking at this top email, the one from February 7th, 2022, from you.  Would it be possible to do a long-form agreement just on the fees and points without agreement on writer splits?

        MR. MARTORELL:  Objection.  Leading?

        THE COURT:  Overruled.  You can answer.

A    No, we need all.  That's one of the material terms.

Q    Why is your answer no?  Can you explain that more, please?

A    Because you need to know the writer share of the song for

Johnson - Redirect / By Mr. Meyer                    86

each participant to add up to 100 percent, and that way you can execute.  Then you have a cleared master to release, or SR in this case.  It's SR, master recording.

Q    So can you do a deal on producer fees and points without a cleared master?

A    You can't complete a deal.  You can't have a signed agreement -- excuse me -- out of all those different points agreed to.

Q    So can you have agreement on terms without agreement on points for the writers?

A    Can you have what?  One more time.

Q    Can you have an agreement on all terms without having agreement on splits for the writers?

          MR. MARTORELL:  Objection.  Leading.

          THE COURT:  Overruled.  You can answer.

          THE WITNESS:  It says to have a signed producer agreement to have a fully executed agreement, you need to have the writer splits.

BY MR. MEYER:

Q    And can you have --

A    Master rights ownership or conveyance, in this case of Khalil's production, which would include whoever he had on his song version, I guess, MSD PT2.

Q    And could you --

A    That was included on Hurricane.

Q    My apologies.  And could you do that long form without agreement on splits?

A    No.  You can't complete it.  That's one of the material terms.

MR. MEYER:  Thank you, Mr. Johnson.

THE COURT:  Okay.  Any recross?

MR. MARTORELL:  Nothing further, Your Honor.

THE COURT:  Okay.  Thank you, Mr. Johnson.  You're excused.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  Okay.  Your next witness?

MS. LEE:  The plaintiff calls Ye.

THE COURT:  Okay.  Is someone getting him?

(Pause)

THE COURT:  Good morning, sir.  You can go ahead and come forward.  You're going to come all the way around this way, and you'll stop in front of Ms. Garcia Marquez.  She'll administer the oath, then you'll come around and have a seat in the chair in the witness stand right here.

YE, A/K/A KANYE OMARI WEST, PLAINTIFF'S WITNESS, SWORN

THE CLERK:  Thank you.  Please take a seat.  Please state your name and spell your last name for the record.

THE WITNESS:  It's just Ye, Y-E.

THE COURT:  Thank you.  Okay, Ms. Lee, you may

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee          88

proceed.

MS. LEE:  Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MS. LEE:**

Q    Good morning.  Please state your name for the record one more time.

A    Ye, Y-E.

Q    Do you go by any other name, sir?

A    No.

Q    Is it okay if I just refer to you as Ye instead of Mr. Ye?

A    Yes.

Q    Thank you.  Do you recall taking a deposition in 2025 sometime in August?

A    Yes.

Q    Thank you.  Why don't we go to Exhibit 370, which has been admitted.  Ye, I invite your attention to this music.  It's titled MSD PT2.  Have you heard of MSD PT2 music?

A    Yes.

Q    Thank you.  It was played during your deposition, but we're going to play it just one more time.  Is that okay?

A    Yes.

Q    Okay, let's play it.

     **(Audio played at 11:22 a.m.)**

Q    Do you know that this work was created by four artists?

A    Yes.

Q    Do you know their names?

A    No.

Q    I'm going to tell you their names.  DJ Khalil, Sam Barsh, Josh Meese, Dan Seeff.  Can you remember their names, sir?

            MR. MARTORELL:  Objection.  Relevance.

            THE COURT:  Overruled.  You can answer.

            THE WITNESS:  Yes.

BY MS. LEE:

Q    Before this lawsuit, before this case, you did not know any of the four artists, correct?

A    Correct.

Q    As far as you can remember, you had never met them, correct?

A    Correct.

Q    You've never communicated with them, correct?

A    Correct.

Q    As far as you can remember, you've never worked with them before?

A    Right.

Q    And you've never recorded with them, correct?

A    Correct.

Q    And you've never asked any of the four artists to create any musical work for you, correct?

A    Correct.

Q    So as far as you can tell, MSD PT2, the music we just

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee          90

listened to, wasn't created because you asked them to create, correct?

A    Correct.

Q    In fact, you've never even heard of the artists before this lawsuit, correct?

A    Correct.

Q    Do you recall your deposition that you took in August of 2025?  And do you remember testifying truthfully at the deposition?

A    Yes.

Q    Thank you.  Until your deposition, no one had ever told you about the artists, correct?

A    Not that I can remember.

Q    And you never followed any of the four artists on their Instagram, correct?

A    Correct.

Q    You don't actually even know whether they even have an Instagram account, correct?

A    Well, now I do because of this case.

Q    Okay.  Before the lawsuit, you didn't know whether they even had an Instagram account, correct?

A    Correct.

Q    And you never signed a license agreement where they permitted you to use MSD PT2, correct?

A    Correct.

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee        94

Q    You work with a producer who goes by the name Boogz Da Beast?

A    Yes.

Q    I may be mispronouncing, I apologize.  Is it Boogz or am I pronouncing correctly?

A    Yes.

Q    Thank you.  Before singing over the MSD PT2 sound recording for 80 Degrees, you didn't ask anyone if that MSD PT2 music was cleared, correct?

A    Correct.

Q    And in fact, no one told you that the music was clear, correct?

A    Correct.

Q    And you later changed the name of the song from 80 Degrees to Hurricane, correct?

A    Correct.

Q    And you initially named the song 80 Degrees because it has to do with something about you have to have 80 degrees to have a Hurricane.  Is that something you remember?

A    Yes.

Q    All right, let's turn to Exhibit Number 12, which has been admitted.  Before we play, just hold for a second.  I just want to make sure the witness and jury, everybody can see.  Before we play the video, I just want to let you know that we are in 2021.  And this is the public listening party, which took place

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee          96

Q    Was anybody else other than you performing present on the
stage at the listening party?

A    No.

Q    No dancers?

A    No.

Q    No musicians?

A    No.

Q    In this version of Hurricane played at the listening party
on July 22nd, 2021, were you singing over the MSD PT2 sound
recording?

A    Yes.

Q    The first listening party lasted about one hour, is that
correct?

A    As far as I can recall.

Q    And do you recall how many songs you played as you sit
here?

A    20.

Q    20, okay.  At that time, when you're on the stage at the
listening party, is it fair to say you knew how many songs you
played?

A    Yes.

Q    And it's been a while.  And just want to make sure, is
there anything else?  If I show you, let's say, like set list,
would that refresh your recollection as to how many songs were
played at the listening party on July 22nd, 2021?

EXCEPTIONAL REPORTING SERVICES, INC

A     15.

Q     And in a listening party like -- thank you.  We can actually take this down now that the recollection has been refreshed.  How is a listening party different from your traditional concerts?

A     A listening party you play the music -- at a traditional concert -- a listening party you play new music that people may have not heard before and a traditional concert you usually play songs that people have heard.

Q     Do you remember what you were wearing at the listening party?

A     Yes.

Q     What were you wearing?

A     I was wearing a red outfit.

Q     Do you remember the brand of the red outfit?

A     The jacket was by Yeezy Gap and the pants were custom and then the boots were Yeezy.

Q     Do you recall making the jacket you're wearing available for U.S. sale pre-order the very next day after the listening party?

A     No, I don't recall that.

Q     Did you sell merch at the listening party?

A     Yes.

Q     Did you have any involvement in designing any of your merch at the listening party?

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee          101

product that was offered right there.  Thank you.

**BY MS. LEE:**

Q    Ye, do you see what's on the screen?

A    Yes.

Q    And do you see -- I would not describe what's on the screen, but did that refresh your recollection as to what was offered at the listening party as merchandise offered for sale?

A    Yes.

Q    What were the products that you offered for sale at the listening party as merchandise?

A    Well, I see this one item right here.

Q    Okay.  And how do you describe that item?

A    I would call it a long-sleeved T-shirt.

Q    Did you sell -- did that refresh your recollection as to any other products that you offer at the listening party?

A    No.

Q    Okay.  Did you offer this particular product online as well?

A    I don't recall.

Q    And do you see what's appearing on the product itself?  Is that visible to you?

A    Yes.

Q    Okay.  We can take it down.  Did you have any products that you offer at the listening party that had the word 7/22/2021 representing the date of the listening party?

EXCEPTIONAL REPORTING SERVICES, INC

A     Yes.

Q     When you perform at the listening party, you didn't have the artist who goes by the name The Weeknd singing, correct?

A     No.

Q     In fact, it was after the first listening party, The Weeknd approached you and asked to be on your Donda album, correct?

A     Correct.

Q     So after the listening party, The Weeknd reached out to you and said, I want to be on the Donda album.  And how many songs do you have on Donda album?

A     Around 20.

Q     And did The Weeknd end up being on Donda album?

A     Yes.

Q     Which song did he play?

A     On Hurricane.

Q     Of 20 or so songs on Donda album, is there any other song The Weeknd sang?

A     No.

Q     Other than Hurricane.  Thank you.

        MS. LEE:  Let's turn -- oh, permission to publish Exhibit No. 423.

        THE COURT:  Any objection?

        MR. MARTORELL:  No objection, Your Honor.

        THE COURT:  Okay.  You may publish.

EXCEPTIONAL REPORTING SERVICES, INC

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee          105

follow along, sir?

A    Okay, yes.

Q    Okay.  Let's go to paragraph one.  It says, company hereby grants to Apple and its worldwide affiliates a worldwide exclusive license.  Do you see that, sir?

A    Yes.

Q    Do you know what you're granting, what license you're granting to Apple at the time?

A    I think it was for them to stream the listening party.

Q    Let's go to paragraph four.  Do you have the paragraph four in front of you?

A    Yes.

Q    In full consideration of the rights granted and the services promised herein, Apple agrees to, and in parenthesis small a, pay to company a total sum of $750,000.  Do you see that, sir?

A    Yes.

Q    Which is subject to Apple's purchase order and invoice requirements and company's timely execution and delivery of this agreement shall be payable in accordance with Apple's standard business practices and follows.  And then now we are moving on to a small, I think it's one.  It says an installment of $250,000 shall be payable upon the event date.  And do you remember the event date referenced in this document?

A    Yeah, it's the date we discussed earlier.

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee          116

A    -- first one was public also, just smaller.

Q    I see.  How many people attended your first Las Vegas listening party?

A    I'm not positive, maybe 500.

Q    Okay.  And how many people showed up at your listening party that took place on July 22nd, 2021 at Mercedes Benz Stadium in Atlanta, Georgia?

A    I'm not sure, but 30 to 50,000 people.

          MS. LEE:  Thank you.  All right.

Q    Just focusing on that listening party where Weeknd said -- so when we talk about Weeknd listening to your performance and the listening party, are we talking about the Las Vegas show or the first public listening party in Atlanta, Georgia?

A    The listening party in Atlanta, Georgia.

          MS. LEE:  Thank you.

Q    That took place on July 22nd, 2021, correct?

A    I believe so.

          MS. LEE:  Thank you.

Q    After that performance, or after you played that music at the listening party, you removed the MSD Part Two sample from "Hurricane," correct, --

A    Correct.

Q    -- because you did not have clearance?

A    Correct.

          (Pause)

Ye, a/k/a Kanye Omari West - Direct / By Ms. Lee          117

Q    And then the reason you removed the sample after the first listening party on July 22nd, 2021 is because the sample was not cleared, correct?

A    Correct.

     (Pause)

         MS. LEE:  When you enter into this settlement -- let me refocus our attention one more time.  Apologize, I was going back and forward.  We're still on Exhibit 73.  This is the settlement agreement you enter into with UMG and Bravado and Def Jam on June 30th, 2021.

     I just want to refocus.  There's no question pending, sir.

Q    By the time you enter into this agreement, you already had many versions of "Hurricane," correct?

A    Correct.

Q    How many versions do you think you had by the time we arrived in the middle of so June 30th of 2021?

A    I'm not sure.

Q    Can you give us the best estimate?

A    It would be completely a longshot guess.  I don't -- I'm not sure at all.

Q    Would 20 be approximate?

A    I don't know.

         MS. LEE:  Let's go to -- may we publish deposition transcript page 63, line one through page 64, line seven?

         THE COURT:  Any objection?

Bennett - Direct / By Ms. Wang                          145

copyrights in music.  There is the composition, sometimes called the song or the musical work, sometimes called the publishing.

And that's the thing that the songwriter makes, so normally thought of as the melody, the musical accompaniment, and the lyrics.  And a sound recording is a recording of that song.

So when I'm explaining this to my students at Berklee, the example I like to give is The Beetles "Yesterday," which was recorded by The Beatles in 1965, appeared on the *Help!* Album. The Beatles made the first recording of that, and that was their sound recording.

And since that day in 1965, many people, actually more than a thousand people, have recorded a cover version of "Yesterday."

There's a Frank Sinatra version and a Boyz II Men version and so on.  And those are separate sound recordings.  But in each case, the songwriter is Lennon and McCartney.

So the composition or the song, the music work, is the thing made by the songwriter.  And the sound recording is a recording of that song.

Q    And does the sound recording also encompass a composition?

A    Yes.  Necessarily when you -- certainly in the context of copying, when you copy part of a sound recording, you are necessarily copying part of the musical work, you're copying a

Bennett - Direct / By Ms. Wang                           146

section of the composition.

Q    You also mentioned copyright.  When does copyright exist in a piece of music?

A    My understanding of the law is that copyright subsists from the moment of creation, the moment you create it.

Q    Have you testified at trial before?

A    This is my first time giving verbal testimony.  I've given written testimony to courts in the U.S. and in the UK in the past.

Q    Have you served as an expert in other music copyright cases?

A    Yes, I have.

Q    And what is the opinion that you are prepared to give today?

A    My opinion is in two parts.  The first part is that the sound recording, MSD Part Two, was played back or sampled as part of the performance of "Hurricane," the sound recording of "Hurricane" that was played back at the listening party on 22nd of July, 2021.

     And the second part of my analysis demonstrates that the excerpt of MSD Part Two plays throughout "Hurricane," so it plays back to back throughout the duration of "Hurricane."

          **MS. WANG:**  I proffer Dr. Bennett as an expert in musicology.

          **THE COURT:**  Any objection?

Bennett - Direct / By Ms. Wang                    156

fifteen.  Da-da-da-da-da-da-da-da.  And the walkup again. Here's play number sixteen.

And here's play number seventeen, the walk up again. Da-da-da.

And here is cycle number eighteen.  This is the last complete cycle of MSD PT2 that we hear in *Hurricane*.

And halfway through bar two in playback number nineteen the track fades out and then we hear the crowd cheering and that's the end of the video.

Q    Dr. Bennett, how much of *Hurricane* at that first listening party had MSD PT2 in it?

A    In terms of run time, 100 percent.

Q    Given your opinion that 100 percent of *Hurricane* at the first listening party has the sound recording of MSD PT2, what would you determine a music apportion to be for the song?

MR. MARTORELL:  Objection, lacks foundation.

THE COURT:  Overruled.

(To the Witness):  You can answer.

THE WITNESS:  So in my initial report when I analyzed the MSD PT2 I suggested that it would be 50/50 in the musical work, and I understand that's not a part of what we're here to talk about today.  So in order get to an appropriate apportionment for the sound recording I used my initial measurement but tried to contextualize common practice in the music industry, so I researched a number of case studies.

EXCEPTIONAL REPORTING SERVICES, INC

MR. MARTORELL:  Thank you, Your Honor.

THE COURT:  I misspoke, my apologies.

MR. MARTORELL:  I was just trying to make sure, thank you.

THE COURT:  Okay.  Thank you.  Okay.  Sorry, Ms. Wang, you may proceed.

MS. WANG:  Thank you.

Q    Professor Greene, what are the opinions you are prepared to give in this case as it relates to the first listening party?

A    As it relates to the first listening party I have two opinions.  My first opinion examined whether the music composition Hurricane was the lead single from the Donda album. Would you like me to state the second or?

Q    Yes, please.

A    And the second opinion is whether an artist merger of music with deliberate strategies to market merchandise based on music and musical performance is within the ambit of copyright damages.

Q    Professor Greene, starting with your first opinion, what's the significance of Hurricane being an anticipated song on the Donda album?

A    It's very significant in a lot of ways in this matter. Hurricane was the only song that people knew about prior to the release of the Donda album.  And the reason for that is that it

Greene - Direct / By Ms. Wang                          186

was part of a prior project which never got off the ground, but which was also highly anticipated in 2018 called the Yandhi, it would have been the Yandhi album that was never released. But Hurricane was leaked and released.

And so there was an enormous longing in the fan base for the Hurricane song particularly since it was the only one that was known.

Q    And so was this happening before or after the first listening party?

A    The anticipation was long before the first listening party, years before.

Q    And how is a listening party different from a traditional concert?

A    So listening parties are a fairly recent innovation. I mean, they've been around in some form or other, probably even back to the '60s, but in those days it meant gathering people at your home in Malibu and, you know, sipping wine and a few people would come and you would try out your material, it was an opportunity to try out new material and maybe make some alterations to it.

Today listening parties, particularly in the case of Ye are very, very different. They are mass events, designed to generate tremendous excitement and also designed to monetize, monetize through streaming, monetize through merchandise sales.

Q    Are there any other markers of Hurricane's success that

Greene - Direct / By Ms. Wang                    187

you can point to?

A    Yes.  There are numerous other markers that we can point to.  Hurricane was the lead track before the album was released.  There were -- the tracks were listed, Hurricane was the only track that was listed.

Hurricane topped the charts.  He was at the top of the Billboard R&B charts.  It also tracked well in the all genre billboard ratings.  It had a massive number of streams, record breaking at the time and all of those are indicia markers of a lead single and it was basically marketed that way.

Q    Turning to your second opinion, why would merchandise be part of the ambit of damages in this case?

A    So this is --

          MR. MARTORELL:  Objection, Your Honor, lacks foundation, calls for speculation.

          THE COURT:  Overruled, you can answer.

          THE WITNESS:  This isn't, and no offense -- no ageism intended, this isn't your grandfather's music business.  The music business today has changed a lot as I discuss in my article and because traditional streams such as traditional revenues of just streaming have diminished in the streaming error, artists are looking to monetize using their compositions and marrying or merging those with merchandise.  And Kanye West as I said I think -- there's no better exemplar of somebody who does that, who makes a deliberate strategy.

Greene - Direct / By Ms. Wang                    188

This isn't, you know, t-shirts at the back of a merch table, which was, you know, the traditional music and throw some t-shirts back, there may be people who buy some.  This is deliberate and there was no better example of that than at the first listening party when Ye wore the round jacket.  He could have worn any jacket as a -- close to -- well, a very wealthy person, let me just say that way, he chose that jacket.  And it also wasn't a coincidence that a day later, that jacket shows up for sale on the Yeezy Gap collaboration and also on Instagram.

So this is very different than throwing some t-shirts and hoping fans buy, this is actually a total and complete merger of music and artistry and from his own website he talks about this.

BY MS. WANG:

Q    And is there any type, any precedent for this type of model that you're describing?

A    I think the kind of basics or origins of the model really was in hip hop.  Hip hop was always unapologetically commercial, like for example rock genre is where rock artists didn't want to commercialize, they viewed that as selling out, hip hop right out of the gate was All About the Benjamins, it was about Paid in Full, and there are songs about that.  And Run-D.M.C. I think is the -- not I think I know, is the kind of foundational artist there.

Greene - Cross / By Mr. Martorell                    197

Kanye is seen as kind of a one off in what he's able to do with marketing and kind of marrying the music to his brand.  There are others who do it, but I think -- there's -- I don't want to say universal but very wide agreement on that point.

Q     Travis the rapper, who's that?

A     Travis Scott.

Q     Okay.  You are not saying that people purchased -- strike that.

      You don't know exactly why people purchased apparel at the show, correct?

A     Well, I know they purchase it because they like it.

Q     Right.

A     Yes.

Q     But you didn't analyze whether it's because they like Ye or like any of his nine prior albums and whether that drove them to purchase, right?

          **MS. WANG:**  Objection, argumentative.

          **THE COURT:**  Overruled, you can answer.

          **THE WITNESS:**  I didn't do a survey on those things as you indicated before.  However, I don't think it's irrational to think that a song that was the most anticipated for a number of years would have been something that drove demand.

**BY MR. MARTORELL:**

Q     Did you analyze how many Grammys Ye had received at the time of the listening party?

227

**CERTIFICATION**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    **May 7, 2026**

         **Signed**                                              **Dated**


*TONI HUDSON, TRANSCRIBER*